# EXHIBIT A

101801



*2940252038*



*000*



*FBOP   CORPORATIO*

# DOCUMENT TYPE SEPARATOR SHEET

CRITICAL

# LOAN AGREEMENT



# AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, AS AGENT AND AS A LENDER,

AND

# THE INSTITUTIONS THAT ARE FROM TIME TO TIME PARTIES AS LENDERS

----

$210,000,000 Loan
to
FBOP CORPORATION

April 30, 2001

Closing Documents

79001_1.doc

ORIGINAL

# AMENDED AND RESTATED CREDIT AGREEMENT

BY AND AMONG

## FBOP CORPORATION,

## AMERICAN NATIONAL BANK AND TRUST
## COMPANY OF CHICAGO, AS AGENT AND AS A LENDER,

AND

## THE INSTITUTIONS THAT ARE FROM TIME TO TIME
## PARTIES HERETO AS LENDERS

Dated as of April 30, 2001

# AMERICAN NATIONAL BANK AND
# TRUST COMPANY OF CHICAGO

# LASALLE NATIONAL BANK

# HARRIS TRUST AND SAVING BANK

## April 30, 2001

## Description of the Transaction

Loans to FBOP Corporation in the aggregate principal amount of $210,000,000. The Loans are comprised of term facility in the principal amount of Sixty Million Dollars ($60,000,000) and a revolving facility in the principal amount of up to One Hundred Fifty Millions Dollars ($150,000,000). The proceeds are intended to be used for general corporate purposes, including, without limitation, to provide working capital to the Borrower and any Subsidiary of the Borrower.

## Parties to the Transaction

| | |
|---|---|
| American National Bank and Trust Company of Chicago, a Lender | ("ANB") |
| Associated Bank, a Lender | ("ASSB") |
| Firstar Bank, National Association, a Lender | ("FSB") |
| M&I Marshall & Ilsley Bank, a Lender | ("M&I") |
| Fifth Third Bank, a Lender | ("FTB") |
| Union Bank of California, a Lender | ("UBC") |
| LaSalle Bank National Association, a Lender | ("LBN") |
| Harris Trust and Savings Bank, a Lender | ("HTSB") |
| FBOP Corporation, an Illinois corporation, the Borrower | ("Borrower") |
| Lord, Bissell & Brook, Counsel to the Borrower | ("LBB") |
| Barack Ferrazzano Kirschbaum Perlman & Nagelberg, Counsel to the Lenders | ("BFKPN") |

# TABLE OF CONTENTS

**Note: Unless otherwise indicated, all documents are dated April 30, 2001**

.

| CLOSING DOCUMENTS | Tab |
|---|---|
| Amended and Restated Credit Agreement, by and between ANB and Borrower, including Exhibits and Schedules | 1 |
| Restated Revolving Note payable to ANB in the principal amount of $3,571,429 | 2 |
| Restated Term Note payable to ANB in the principal amount of $1,428,571 | 3 |
| Restated Revolving Note payable to ASSB in the principal amount of $14,285,714 | 4 |
| Restated Term Note payable to ASSB in the principal amount of $5,714,286 | 5 |
| Restated Revolving Note payable to FSB in the principal amount of $28,571,429 | 6 |
| Restated Revolving Note payable to FSB in the principal amount of $11,428,571 | 7 |
| Restated Revolving Note payable to HTSB in the principal amount of $25,000,000 | 8 |
| Restated Term Note payable to HTSB in the principal amount of $10,000,000 | 9 |
| Restated Revolving Note payable to LBN in the principal amount of $35,714,286 | 10 |
| Restated Term Note payable to LBN in the principal amount of $14,285,714 | 11 |
| Restated Revolving Note payable to M&I in the principal amount of $25,000,000 | 12 |
| Restated Term Note payable to M&I in the principal amount of $10,000,000 | 13 |
| Restated Revolving Note payable to FTB in the principal amount of $10,714,286 | 14 |

| CLOSING DOCUMENTS | Tab |
|---|---|
| Restated Term Note payable to FTB in the principal amount of $4,285,714 | 15 |
| Restated Revolving Note payable to UBC in the principal amount of $7,142,857 | 16 |
| Restated Term Note payable to UBC in the principal amount of $2,857,143 | 17 |
| Legal Opinion Letter from LBB to ANB, LBN, HTSB, UBC, M&I, ASSB, FTB, (U.S. BANK) FSB | 18 |
| Disbursement Instructions | 19 |
| Certificate of Compliance for Borrower | 20 |
| Certificate of Good Standing for Borrower | 21 |
| Certified copies of Articles of Incorporation and Resolutions of Board of Directors of Borrower | 22 |
| Certificate of Incumbency of Borrower | 23 |

79001_1.doc

# TABLE OF CONTENTS

<u>Page</u>

## ARTICLE I
## DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Definitions | 2 |
| 1.2 | Financial Standards | 12 |

## ARTICLE II
## THE CREDITS

| | | |
|---|---|---|
| 2.1 | Commitments | 12 |
| 2.2 | Required Payments, Termination | 12 |
| 2.3 | Ratable Loans | 13 |
| 2.4 | Types of Advances | 13 |
| 2.5 | Commitment Fee; Reductions in Aggregate Commitment | 13 |
| 2.6 | Minimum Amount of Each Advance | 13 |
| 2.7 | Optional Principal Payments | 13 |
| 2.8 | Method of Selecting Types and Interest Periods for New Advances | 14 |
| 2.9 | Conversion and Continuation of Outstanding Advances | 14 |
| 2.10 | Changes in Interest Rate, etc | 15 |
| 2.11 | Rates Applicable After Default | 15 |
| 2.12 | Method of Payment | 15 |
| 2.13 | Notes; Telephonic Notices | 16 |
| 2.14 | Interest Payment Dates; Interest and Fee Basis | 16 |
| 2.15 | Notification of Advances, Interest Rates, Prepayments and Commitment Reductions | 16 |
| 2.16 | Lending Installations | 16 |
| 2.17 | Non-Receipt of Funds by the Agent | 17 |
| 2.18 | Notice in the Event of a Change in Control | 17 |

## ARTICLE III
## CHANGE IN CIRCUMSTANCES

| | | |
|---|---|---|
| 3.1 | Availability of Eurodollar Advances | 17 |
| 3.2 | Funding Indemnification | 17 |

## ARTICLE IV
## CONDITIONS PRECEDENT; WITHHOLDING TAX EXEMPTION

| | | |
|---|---|---|
| 4.1 | Initial Advance | 18 |
| 4.2 | Each Advance | 19 |
| 4.3 | Withholding Tax Exemption | 19 |

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 5.1 | Corporate Existence, Standing, and Capital Stock | 20 |
| 5.2 | Authorization and Validity | 21 |
| 5.3 | No Conflict; Government Consent | 21 |
| 5.4 | Financial Statements | 21 |
| 5.5 | Material Adverse Change | 22 |
| 5.6 | Taxes | 22 |
| 5.7 | Litigation and Contingent Obligations | 22 |
| 5.8 | Subsidiaries | 22 |
| 5.9 | ERISA | 23 |
| 5.10 | Accuracy of Information | 23 |
| 5.11 | Margin Stock | 23 |
| 5.12 | Material Agreements | 23 |
| 5.13 | Compliance With Laws | 24 |
| 5.14 | Ownership of Properties | 24 |
| 5.15 | Environmental Matters | 24 |
| 5.16 | Allowance for Possible Loan and Lease Losses | 24 |
| 5.17 | Regulatory Enforcement Actions | 25 |
| 5.18 | Subordinated Indebtedness | 25 |
| 5.19 | Insurance | 25 |
| 5.20 | Solvency | 25 |

## ARTICLE VI
## COVENANTS

| | | |
|---|---|---|
| 6.1 | Financial Reporting | 26 |
| 6.2 | Use of Proceeds | 27 |
| 6.3 | Notice of Default | 27 |
| 6.4 | Conduct of Business | 27 |
| 6.5 | Taxes | 27 |
| 6.6 | Compliance with Laws | 27 |
| 6.7 | Inspection | 27 |
| 6.8 | Indebtedness | 27 |
| 6.9 | Sale of Assets | 28 |
| 6.10 | Investments and Acquisitions | 28 |
| 6.11 | Liens | 28 |
| 6.12 | Affiliates | 28 |
| 6.13 | Contingent Obligations | 29 |
| 6.14 | Financial Covenants | 29 |

## ARTICLE VII
## DEFAULTS

7.1   Events of Default ............................................................................................31

## ARTICLE VIII
## ACCELERATION, WAIVERS, AMENDMENTS AND REMEDIES

8.1   Acceleration .................................................................................................33
8.2   Amendments..................................................................................................33
8.3   Preservation of Rights...................................................................................34
8.4   Change to Commitments; Payments after Default .........................................34

## ARTICLE IX
## GENERAL PROVISIONS

9.1   Survival of Representations...........................................................................35
9.2   Governmental Regulation...............................................................................35
9.3   Taxes ...........................................................................................................35
9.4   Headings ......................................................................................................35
9.5   Entire Agreement ..........................................................................................35
9.6   Several Obligations; Benefits of this Agreement ...........................................36
9.7   Expenses; Indemnification.............................................................................36
9.8   Numbers of Documents .................................................................................36
9.9   Accounting....................................................................................................36
9.10  Severability of Provisions...............................................................................36
9.11  Nonliability of Lenders .................................................................................37
9.12  Confidentiality...............................................................................................37
9.13  Nonreliance ...................................................................................................37
9.14  Disclosure.....................................................................................................37

## ARTICLE X
## THE AGENT

10.1   Appointment; Nature of Relationship ...........................................................37
10.2   Powers..........................................................................................................38
10.3   General Immunity..........................................................................................38
10.4   No Responsibility for Loans, Recitals, etc ....................................................38
10.5   Action on Instructions of Lenders .................................................................39
10.6   Employment of Agents and Counsel .............................................................39
10.7   Reliance on Documents; Counsel...................................................................39
10.8   Agent's Reimbursement and Indemnification .................................................39
10.9   Notice of Default............................................................................................40
10.10  Rights as a Lender .......................................................................................40
10.11  Lender Credit Decision .................................................................................40
10.12  Successor Agent............................................................................................40

10.13 Agent's Fee ...................................................................................41

## ARTICLE XI
### SETOFF; RATABLE PAYMENTS

11.1 Setoff ...........................................................................................41
11.2 Ratable Payments ............................................................................41

## ARTICLE XII
### BENEFIT OF AGREEMENT; ASSIGNMENTS; PARTICIPATIONS

12.1 Successors and Assigns .....................................................................41
12.2 Participations .................................................................................42
12.3 Assignments ...................................................................................43
12.4 Dissemination of Information ...............................................................43
12.5 Tax Treatment.................................................................................44

## ARTICLE XIII
### NOTICES

13.1 Notices .........................................................................................44
13.2 Change of Address............................................................................44

## ARTICLE XIV
### COUNTERPARTS

## ARTICLE XV
### CHOICE OF LAW, CONSENT TO JURISDICTION, WAIVER OF JURY TRIAL

15.1 CHOICE OF LAW .............................................................................45
15.2 CONSENT TO JURISDICTION ...............................................................45
15.3 WAIVER OF JURY TRIAL .....................................................................45

SCHEDULES:

| | | |
|---|---|---|
| SCHEDULE 1.1 | - | Excluded Obligations |
| SCHEDULE 5.6 | - | Taxes |
| SCHEDULE 5.7 | - | Litigation |
| SCHEDULE 5.8 | - | Depository Institution Subsidiaries/Subsidiaries |
| SCHEDULE 5.9 | - | ERISA Matters |
| SCHEDULE 5.14 | - | Liens on Property |
| SCHEDULE 5.15 | - | Environmental Matters |
| SCHEDULE 5.16 | - | Certain Loans |
| SCHEDULE 6.8 | - | Certain Indebtedness |

**EXHIBITS:**

EXHIBIT A - Form of Revolving Note
EXHIBIT B - Form of Term Note
EXHIBIT C - Form of Opinion of Borrower's Counsel
EXHIBIT D - Loan/Credit Related Money Transfer Instruction
EXHIBIT E - Compliance Certificate
EXHIBIT F - Assignment Agreement

# AMENDED AND RESTATED CREDIT AGREEMENT

This AMENDED AND RESTATED CREDIT AGREEMENT (this "Agreement"), dated as of April 30, 2001, is entered into by and among FBOP CORPORATION, a bank holding company incorporated under the laws of the State of Illinois and having its principal place of business at 11 West Madison Street, Oak Park, Illinois 60302, and the institutions that are from time to time parties hereto as Lenders (whether by execution of this Agreement or an Assignment and Acceptance), and AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a national banking association having its principal place of business at 120 South LaSalle Street, Chicago, Illinois 60603, in its capacity as the Agent and as a Lender. Capitalized terms shall have the meanings given to such terms in Article I of this Agreement.

## R E C I T A L S:

A.     The Borrower and the Lenders executed and delivered that certain Credit Agreement, dated as of June 2, 1997, as amended by that certain Amendment No. 1 to Credit Agreement, dated as of May 29, 1998, that certain Second Amendment to Credit Agreement, dated as of November 4, 1998, that certain Third Amendment to Credit Agreement, dated as of January 7, 1999, that certain Fourth Amendment to Credit Agreement, dated as of January 1, 2000, that certain Fifth Amendment to Credit Agreement, dated as of July 5, 2000, that certain Sixth Amendment to Credit Agreement, dated as of December 29, 2000, that certain Seventh Amendment to Credit Agreement, dated as of February 1, 2001, and that certain Eight Amendment to Credit Agreement, dated as of March 30, 2001 (collectively, "Original Credit Agreement").

B.     Pursuant to the Original Credit Agreement, the Lenders made available to the Borrower a term loan and a revolving credit facility to be used for general working capital purposes of the Borrower.

C.     In addition to, and together with, the Original Credit Agreement, the Borrower executed and delivered, or caused to be executed and delivered, to the Lenders certain other documents and instruments (collectively, "Original Loan Documents").

D.     As of the date hereof, Borrower is indebted to the Lenders under the Original Loan Documents, without defense, setoff, or counterclaim, in the aggregate principal amount of One Hundred Thirty Million Eight Hundred Twenty-Eight Thousand Five Hundred Sixty-Five Dollars ($130,828,565.00).

E.     ANB and Borrower are, concurrently herewith, executing and delivering a Subordinated Debenture Purchase Agreement ("Subordinated Debt Agreement").

F.     In connection with an acquisition with respect to which the Lenders hereby provide their consent, the Borrower and the Lenders desire to amend and restate the Original

Loan Documents as set forth herein to, among other things, provide to the Borrower the principal amount of Sixty Million Dollars ($60,000,000) under the Term Loans and up to the principal amount of One Hundred Fifty Million Dollars ($150,000,000) under the Revolving Loans in accordance with the terms, subject to the conditions, and in reliance upon the recitals, representations, warranties, and covenants set forth herein and in the other Loan Documents.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## A G R E E M E N T:

### ARTICLE I
### DEFINITIONS

**1.1    Definitions**. As used in this Agreement, the following terms have the meanings set forth below. The following definitions shall be equally applicable to both the singular and plural forms of the defined terms.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the date of this Agreement, by which the Borrower or any of its Subsidiaries: (a) acquires any going business or all or substantially all of the assets of any financial institution, corporation, or limited liability company, or division thereof, whether through purchase of assets, merger, or otherwise; or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the securities of a corporation that have ordinary voting power for the election of directors (other than securities having such power only by reason of the happening of a contingency) or a majority (by percentage or voting power) of the outstanding ownership interests of a partnership or limited liability company.

"Advance" means a borrowing hereunder (or conversion or continuation thereof) consisting of the aggregate amount of the several Loans made on the same Borrowing Date (or date of conversion or continuation) by the Lenders to the Borrower of the same Type and, in the case of Eurodollar Advances, for the same Eurodollar Interest Period.

"Affiliate" of any Person means any other Person directly or indirectly controlling, controlled by, or under common control with, such Person. A Person shall be deemed to control another Person (other than any depository institution for which such Person shall not have been successful in rebutting control thereof with the appropriate Governmental Agency) if the controlling Person owns 25% or more of any class of voting securities (or other ownership interests) of the controlled Person or possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of stock, by contract or otherwise. A Person shall be deemed to control a depository institution for which such Person shall not have been successful in rebutting control thereof with the appropriate Governmental Agency if the controlling Person owns 10% or

more of any class of voting securities (or other ownership interests) of the controlled depository institution or possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled depository institution, whether through ownership of stock, by contract or otherwise. Notwithstanding anything in this Agreement to the contrary, P.N.B. Financial Corp. ("PFC"), Park National Bank of Chicago ("PNB" and together with PFC, the "PFC Entities") and Tremont Capital Corporation ("Tremont") shall not be deemed to be Affiliates of Borrower for purposes of this Agreement.

"Agent" means American National Bank and Trust Company of Chicago in its capacity as agent for the Lenders pursuant to Article X, and not in its individual capacity as a Lender, and any successor Agent appointed pursuant to Article X.

"Aggregate Commitment" means the aggregate of the Commitments of all the Lenders, as reduced from time to time pursuant to the terms hereof.

"Aggregate Term Loans Commitment" means the aggregate of the Term Loans Commitments of all the Lenders, as reduced from time to time pursuant to the terms hereof.

"Aggregate Revolving Loans Commitment" means the aggregate of the Revolving Loans Commitments of all the Lenders, as reduced from time to time pursuant to the terms hereof.

"Agreement" means this Credit Agreement, as it may be amended, modified, restated, renewed, or extended and as in effect from time to time.

"Alternate Base Rate" means, for any day, a rate of interest per annum equal to the higher of: (a) the Corporate Base Rate for such day; and (b) the sum of Federal Funds Effective Rate for such day plus one-half of one percent (1/2%) per annum.

"Alternate Base Rate Advance" means an Advance that bears interest at the Alternate Base Rate.

"Alternate Base Rate Loan" means a Loan that bears interest at the Alternate Base Rate.

"ANB" means American National Bank and Trust Company of Chicago in its individual capacity, and its successors or assigns.

"Article" means an article of this Agreement unless another document is specifically referenced.

"Authorized Officer" means the Chairman of the Board, President, or Chief Financial Officer of the Borrower.

"Borrower" means FBOP Corporation, an Illinois corporation as set forth in more detail in the preamble to this Agreement, and its permitted successors and assigns.

"Borrower Related Party" shall mean as to any Person: (a) any corporation more than twenty-five percent (25%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person; (b) any partnership, association, joint venture, or other entity in which such Person and/or one or more Borrower Related Parties of such Person has more than a twenty-five percent (25%) equity interest at the time; or (c) provided the following is consistent with controlling judicial, administrative, or other similar decisions, any Person that is at the time controlled, directly or indirectly, through either: (i) that Person being a borrower of any Depository Institution Subsidiary, and any Depository Institution Subsidiary, as that Person's lender, actually influencing or altering such Person's procedures, methods or actions relating to the use, handling, generation, transportation, storage, treatment, or disposal of hazardous materials; or (ii) common directors, officers, or employees, by that Person or one or more of the other Borrower Related Parties of that Person or a combination thereof. Notwithstanding anything in this Agreement to the contrary, P.N.B. Financial Corp., Park National Bank of Chicago and Tremont shall not be deemed to be Borrower Related Parties for purposes of this Agreement.

"Borrowing Date" means a date on which an Advance is made hereunder.

"Borrowing Notice" is defined in Section 2.8.

"Business Day" means: (a) with respect to any borrowing, payment or rate selection of Eurodollar Advances, a day (other than a Saturday or Sunday) on which banks generally are open in Chicago and New York for the conduct of substantially all of their commercial lending activities and on which dealings in United States dollars are carried on in the London interbank market; and (b) for all other purposes, a day (other than a Saturday or Sunday) on which banks generally are open in Chicago for the conduct of substantially all of their commercial lending activities.

"Capitalized Lease" of a Person means any lease of Property by such Person as lessee that would be capitalized on a balance sheet of such Person prepared in accordance with GAAP.

"Capitalized Lease Obligations" of a Person means the amount of the obligations of such Person under Capitalized Leases that would be shown as a liability on a balance sheet of such Person prepared in accordance with GAAP.

"Change in Control" means the failure of Michael E. Kelly to continue to own directly, free and clear of all Liens or other encumbrances other than Liens or other encumbrances for the benefit of ANB, at least one hundred percent (100%) of the outstanding capital stock of the Borrower on a fully diluted basis; provided, however, Mr. Kelly, subject to the receipt of the prior written approval of ANB, which approval may be withheld in ANB's sole discretion, may transfer the capital stock of the Borrower, subject to the rights of ANB, if any, to

members of his immediate family or any entity that is wholly-owned (directly or indirectly) by Mr. Kelly or members of his immediate family.

"Change in Control Notice" is defined in Section 2.18.

"Code" means the Internal Revenue Code of 1986, as amended, reformed, or otherwise modified from time to time.

"Commitment" means, for each Lender, the obligation of such Lender to make Loans not exceeding the amounts set forth opposite its signature below or as set forth in any Notice of Assignment relating to any assignment that has become effective pursuant to Section 12.3(b), as such amount may be modified from time to time pursuant to the terms hereof.

"Contingent Obligation" of a Person means any contract, agreement, instrument, undertaking, or arrangement by which such Person assumes, guarantees, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes or is contingently liable upon, the obligation or liability of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person, or otherwise assures any creditor of such other Person against loss, including, without limitation, any comfort letter, operating agreement or take-or-pay contract. The term Contingent Obligation with respect to the Borrower shall not include any guaranty by the Borrower of any obligations of any Depository Institution Subsidiary or any other obligation described in Schedule 1.1. The term Contingent Obligations with respect to any Depository Institution Subsidiary shall not include any of the following provided they have been purchased or entered into in the ordinary course of the banking business of the Deposit Institution Subsidiary: (a) obligations incurred in the ordinary course of conducting a banking business including obligations under any letter-of-credit, loan commitment, or in connection with the endorsement of instruments for deposit or collection; (b) any exchange-traded or over-the-counter futures, forward, swap, or option contract, or other financial instrument with similar characteristics; or (c) any agreements, devices, or arrangements providing for payments related to fluctuations of interest rates, exchange rates, or forward rates, including, but not limited to, interest rate exchange agreements, forward currency exchange agreements, interest rate cap or collar protection agreements, forward rate currency or interest rate options, puts, or warrants.

"Conversion/Continuation Notice" is defined in Section 2.9.

"Controlled Group" means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Borrower or any of its Subsidiaries, are treated as a single employer under Section 414 of the Code.

"Corporate Base Rate" means a rate per annum equal to the corporate base rate of interest announced by ANB from time to time, changing when and as said corporate base rate changes.

"Default" means an event described in Article VII.

"Depository Institution Subsidiary" shall mean any of the institutions listed on Schedule 5.8 and any other institution that holds deposits insured by the FDIC and becomes a Subsidiary of the Borrower after the date hereof by any means, including an Acquisition, but shall not include Park National Bank of Chicago.

"Employee Benefit Plans" has the meaning provided in Section 3(3) of ERISA.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, plans, injunctions, permits, concessions, grants, franchises, licenses, agreements, and other governmental restrictions relating to: (a) the protection of the environment; (b) the effect of the environment on human health; (c) emissions, discharges or releases of pollutants, contaminants, hazardous substances or wastes into surface water, ground water or land; or (d) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, hazardous substances or wastes, or the clean-up or other remediation thereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any rule or regulation issued thereunder.

"ERISA Affiliate" shall mean any person (as defined in Section 3(9) of ERISA) which together with the Borrower would be a member of the same "controlled group" within the meaning of Sections 414(b), (m), (c), and (o) of the Code.

"Eurodollar Advance" means an Advance that bears interest at a Eurodollar Rate.

"Eurodollar Base Rate" means, with respect to a Eurodollar Advance for the relevant Eurodollar Interest Period, the rate of interest per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) at which deposits in U.S. Dollars are being offered to prime banks in the London interbank market at 11:00 a.m., London time, two (2) Business Days prior to the first day of such Eurodollar Interest Period for delivery on the first day of such Eurodollar Interest Period for the number of months comprised therein and in an amount approximately equal to the principal amount of the Eurodollar Loans requested for such Eurodollar Interest Period, as determined by the Agent by reference to Bloomberg Financial Market's terminal screen entitled "Official BBA LIBOR Fixings" or such other information vendor selected by the Agent for determining British Bankers' Association Interest Settlement Rates for Dollar deposits. Each determination of Eurodollar Base Rate made by the Agent shall be conclusive and binding on the Borrower and the Lenders absent manifest error.

"Eurodollar Interest Period" means, with respect to a Eurodollar Advance, a period of one (1), two (2), three (3), or six (6) months commencing on a Business Day selected by the Borrower pursuant to this Agreement. Such Eurodollar Interest Period shall end on the day which corresponds numerically to such date one (1), two (2), three (3), or six (6) months thereafter, provided, however, that if there is no such numerically corresponding day in such next, second, third, or sixth succeeding month, such Eurodollar Interest Period shall end on the last Business Day of such next, second, third, or sixth succeeding month. If a Eurodollar

Interest Period would otherwise end on a day which is not a Business Day, such Eurodollar Interest Period shall end on the next succeeding Business Day, provided, however, that if said next succeeding Business Day falls in a new calendar month, such Eurodollar Interest Period shall end on the immediately preceding Business Day.

"Eurodollar Loan" means a Loan that bears interest at a Eurodollar Rate.

"Eurodollar Rate" means, with respect to a Eurodollar Advance for the relevant Eurodollar Interest Period, the sum of: (a) the quotient of: (i) the Eurodollar Base Rate applicable to such Eurodollar Interest Period; divided by (ii) one minus the Reserve Requirement (expressed as a decimal) applicable to such Eurodollar Interest Period; plus (b) one and one-half percent (1.50%) per annum. The Eurodollar Rate shall be rounded to the next higher multiple of 1/16 of 1% if the rate is not such a multiple.

"FDI Act" means the Federal Deposit Insurance Act, as amended.

"FDIC" means the Federal Deposit Insurance Corporation.

"Federal Funds Effective Rate" means, for any day, an interest rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published for such day (or, if such day is not a Business Day, for the immediately preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations at approximately 10:00 a.m. (Chicago time) on such day on such transactions received by the Agent from three federal funds brokers of recognized standing selected by the Agent in its sole discretion.

"GAAP" means generally accepted accounting principles as in effect in the United States from time to time, applied in a manner consistent with that used in preparing the financial statements referred to in Section 5.4.

"Governmental Agency" means any federal or state governmental department, commission, board, regulatory authority or agency that has examination, supervision or oversight authority with respect to the Borrower or any Depository Institution Subsidiary including, but not limited to, Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, the FDIC, the Office of the Illinois Commissioner of Banks and Real Estate, the Office of Thrift Supervision and the Texas Department of Banking.

"IBA" means the Illinois Banking Act, as amended.

"Indebtedness" of a Person means such Person's: (a) obligations for borrowed money; (b) obligations representing the deferred purchase price of Property or services (other than accounts payable arising in the ordinary course of such Person's business payable on terms customary in the trade); (c) obligations, whether or not assumed, secured by Liens or payable out of the proceeds or production from property now or hereafter owned or acquired by such

Person; (d) obligations which are evidenced by notes, acceptances, or other instruments; and (e) Capitalized Lease Obligations.

"Investment" of a Person means any: (a) loan, advance (other than commission, travel and similar advances to officers and employees made in the ordinary course of business), extension of credit (other than accounts receivable arising in the ordinary course of business on terms customary in the trade), or contribution of capital by such Person; (b) stocks, bonds, mutual funds, partnership interests, notes, debentures, or other securities owned by such Person; (c) any deposit accounts and certificate of deposit owned by such Person; and (d) structured notes, derivative financial instruments, and other similar instruments or contracts owned by such Person.

"Lenders" means the lending institutions listed on the signature pages of this Agreement and their respective successors and assigns.

"Lending Installation" means, with respect to a Lender or the Agent, any office, branch, Subsidiary, or affiliate of such Lender or the Agent.

"Letter of Credit" of a Person means a letter of credit or similar instrument that is issued upon the application of such Person or upon which such Person is an account party or for which such Person is in any way liable.

"Lien" means any lien (statutory or other), mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, or preference, priority, or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, Capitalized Lease, or other title retention agreement).

"Loan" means, with respect to a Lender, such Lender's loan made pursuant to Article II (or any conversion, extension or continuation thereof).

"Loan Documents" means this Agreement, the Notes, and the other contracts, agreements, instruments, documents, and certificates contemplated hereby and executed by the Borrower in favor, or for the benefit of, the Agent or any Lender.

"Material Adverse Effect" means a material adverse effect on: (a) the business, Property, condition (financial or otherwise), results of operations, or prospects of the Borrower and its Subsidiaries taken as a whole in an aggregate amount (when considered together with all material adverse effects) equal to five percent (5%) of the shareholder's equity of the Borrower (on a stand alone basis); or (b) the ability of the Borrower to perform its material obligations under the Transaction Documents.

"Minimum Dividend Amount" means an amount equal to forty percent (40%) of the consolidated net income of the Borrower determined as of the date on which the Minimum Dividend Amount is required to be determined and calculated on a rolling four quarter basis for the four most recent quarters.

"Note" means a Term Note or a Revolving Note.

"Notice of Assignment" is defined in Section 12.3(b).

"Obligations" means all unpaid principal of, and accrued and unpaid interest on, the Notes, all accrued and unpaid fees and all expenses, reimbursements, indemnities, and other obligations of the Borrower to the Lenders or to any Lender, the Agent, or any indemnified party hereunder arising under the Transaction Documents.

"Original Credit Agreement" has the meaning set forth in the Recitals of this Agreement.

"Original Loan Documents" has the meaning set forth in the Recitals of this Agreement.

"Participants" is defined in Section 12.2(a).

"Payment Date" means the second Business Day of each calendar quarter.

"Percentage Commitment" means, for each Lender, the ratio that each Lender's Commitment bears to the Aggregate Commitment.

"Person" means any natural person, corporation, firm, joint venture, partnership, association, enterprise, trust, or other entity or organization, or any government or political subdivision or any agency, department, or instrumentality thereof.

"Prohibited Transaction" means a prohibited transaction as defined in ERISA.

"Property" of a Person means any and all property, whether real, personal, tangible, intangible, or mixed, of such Person, or other assets owned, leased, or operated by such Person.

"Purchasers" is defined in Section 12.3(a).

"Regulation D" means Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor thereto or other regulation or official interpretation of said Board of Governors relating to reserve requirements.

"Regulation U" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor or other regulation or official interpretation of said Board of Governors relating to the extension of credit by banks for the purpose of purchasing or carrying margin stocks.

"Rentals" of a Person means the aggregate fixed amounts payable by such Person under any lease of Property having an original term (including any required renewals or any renewals at the option of the lessor or lessee) of one year or more.

"Reportable Event" means a reportable event as defined in ERISA.

"Required Lenders" means Lenders in the aggregate having at least sixty-six and 2/3rds percent (66 2/3%) of the Aggregate Commitment or, if the Aggregate Commitment has been terminated, Lenders in the aggregate holding at least sixty-six and 2/3rds percent (66 2/3%) of the aggregate unpaid principal amount of the outstanding Advances.

"Reserve Requirement" means, with respect to a Eurodollar Interest Period, the maximum aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) that is imposed under Regulation D on Eurocurrency liabilities (in the case of Eurodollar Advances).

"Revolving Facility Termination Date" means March 31, 2002 or any later date as may be specified by the Agent as the Revolving Facility Termination Date in accordance with Section 2.1(b) or any earlier date on which the Aggregate Revolving Facility Commitment is reduced to zero or otherwise terminated pursuant to the terms hereof.

"Revolving Loan" means, with respect to a Lender, such Lender's loan made pursuant to the Revolving Loan Commitments described in Section 2.1(b).

"Revolving Loans Commitment" means, for each Lender, the obligation of such Lender to make Revolving Loans not exceeding the amount set forth opposite its signature below or as set forth in any Notice of Assignment relating to any assignment that has become effective pursuant to Section 12.3(b), as such amount may be modified from time to time pursuant to the terms hereof.

"Revolving Note" means a restated revolving promissory note, in substantially the form of Exhibit A hereto, duly executed by the Borrower and payable to the order of a Lender in the amount of its Commitment, including any amendment, modification, renewal, or replacement of such promissory note.

"Sale and Leaseback Transaction" means any sale or other transfer of Property by any Person with the intent to lease such Property as lessee.

"Section" means a numbered section of this Agreement, unless another document is specifically referenced.

"Subordinated Debt Agreement" has the meaning set forth in the Recitals of this Agreement.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person the payment of which is subordinated to payment of the Obligations to the written satisfaction of the Required Lenders.

"Subsidiary" of a Person means:  (a) any corporation, more than 50% of the outstanding securities having ordinary voting power of which shall at the time be owned or

controlled, directly or indirectly, by such Person or by one or more of its Subsidiaries or by such Person and one or more of its Subsidiaries; and (b) any partnership, limited liability company, association, joint venture, or similar business organization, more than 50% of the ownership interests having ordinary voting power of which shall at the time be so owned or controlled. Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower. The parties acknowledge that Tremont is not a Subsidiary of FBOP as a result of the ownership of 100% of the outstanding capital stock of Tremont by Mr. Kelly. Additionally, the parties agree and acknowledge that neither PFC Entity shall be a Subsidiary of FBOP unless more than 67% (rather than 50% as set forth above) of PFC is owned by FBOP in accordance with this definition.

"TBA" means Texas Banking Act of 1995, as amended.

"Term Loan" means, with respect to a Lender, such Lender's loan made pursuant to Term Loan Commitments described in Section 2.1(a).

"Term Loans Termination Date" means March 31, 2006 or such other date as may be specified by the Agent as the Term Loans Termination Date in accordance with the terms of this Agreement.

"Term Loans Commitment" means, for each Lender, the obligation of such Lender to make Term Loans not exceeding the amount set forth opposite its signature below or as set forth in any Notice of Assignment relating to any assignment that has become effective pursuant to Section 12.3(b), as such amount may be modified from time to time pursuant to the terms hereof.

"Term Note" means a restated term promissory note, in substantially the form of Exhibit B hereto, duly executed by the Borrower and payable to the order of a Lender in the amount of its Term Loans Commitment, including any amendment, modification, renewal, or replacement of such promissory note.

"Transaction Documents" means, collectively, the Loan Documents and the fee letter described in Section 10.13.

"Transferee" is defined in Section 12.4.

"Type" means, with respect to any Advance, its nature as an Alternate Base Rate Advance or Eurodollar Advance.

"Unmatured Default" means an event which but for the lapse of time or the giving of notice, or both, would constitute a Default.

"Wholly-Owned Subsidiary" of a Person means: (a) any Subsidiary, 100% of the outstanding voting securities of which shall at the time be owned or controlled, directly or indirectly, by such Person or one or more Wholly-Owned Subsidiaries of such Person, or by such Person and one or more Wholly-Owned Subsidiaries of such Person; and (b) any

partnership, limited liability company, association, joint venture, or similar business organization, 100% of the ownership interests having ordinary voting power of which shall at the time be so owned or controlled. The parties acknowledge that Tremont is not a Wholly-Owned Subsidiary of FBOP as a result of the ownership of 100% of the outstanding capital stock of Tremont by Mr. Kelly.

**1.2    Financial Standards.** All financial computations required of a Person under this Agreement shall be made, and all financial information required under this Agreement shall be prepared, in accordance with GAAP, except that if any Person's financial statements are not audited, such Person's financial statements shall be prepared in accordance with the same sound accounting principles utilized in connection with the financial information submitted Lenders with respect to the Borrower in connection with this Agreement and shall be certified by an authorized representative of such Person.

**ARTICLE II**
**THE CREDITS**

**2.1    Commitments.**

(a)    <u>Term Loans Commitments</u>.    From and including the date of this Agreement, each Lender severally (and not jointly) agrees, on the terms and conditions set forth in this Agreement, to make the Term Loans in amounts not to exceed the amount of its Term Loan Commitment.

(b)    <u>Revolving Loans Commitments</u>.    From and including the date of this Agreement and prior to the Revolving Facility Termination Date, each Lender severally agrees, on the terms and conditions set forth in this Agreement, to make Revolving Loans to the Borrower from time to time in amounts not to exceed in the aggregate at any one time outstanding the amount of its Revolving Loan Commitment. Subject to the terms of this Agreement, the Borrower may borrow, repay, and reborrow at any time prior to the Revolving Facility Termination Date. The Revolving Loan Commitments to lend hereunder shall expire on the Revolving Facility Termination Date.

**2.2    Required Payments, Termination.**

(a)    <u>Term Loans</u>.    The Term Loans shall be payable in installments of Two Million One Hundred Forty-Two Thousand Eight Hundred Fifty-Seven Dollars ($2,142,857) on the second Business Day of each January, April, July and October during the time period that the Term Loan is outstanding beginning July 3, 2001 and ending March 31, 2006. Any outstanding Term Loans Advances and any other unpaid Obligation shall be paid in full by the Borrower on the Term Loans Termination Date.

(b)    <u>Revolving Loans</u>.    Any outstanding Revolving Loans Advances and any other unpaid Obligation arising from, in connection with, or relating to, the Revolving

Loans shall be paid in full by the Borrower on the Revolving Facility Termination Date.

**2.3    Ratable Loans**.

(a)    <u>Term Loans</u>.  Each Term Loan Advance hereunder shall consist of Term Loans made from the several Lenders ratably in proportion to the ratio that their respective Term Loans Commitments bear to the Aggregate Term Loans Commitment.

(b)    <u>Revolving Loans</u>.    Each Revolving Loan Advance hereunder shall consist of Revolving Loans made from the several Lenders ratably in proportion to the ratio that their respective Revolving Loans Commitments bear to the Aggregate Revolving Loans Commitment.

**2.4    Types of Advances**.  The Advances may be Alternate Base Rate Advances or Eurodollar Advances, or a combination thereof, selected by the Borrower in accordance with <u>Sections 2.8</u> and <u>2.9</u>.

**2.5    Commitment Fee; Reductions in Aggregate Commitment**.  The Borrower agrees to pay to the Agent for the account of each Lender a commitment fee of .125% (12.5 basis points) per annum on the daily unborrowed portion of such Lender's Revolving Loans Commitment from the date hereof to and including the Revolving Facility Termination Date, payable on each Payment Date hereafter and on the Revolving Facility Termination Date.  The Borrower may permanently reduce the Aggregate Revolving Loans Commitment, in whole or in part, ratably among the Lenders in integral multiples of One Million Dollars ($1,000,000) upon at least three Business Days' written notice to the Agent, which notice shall specify the amount of any such reduction, provided, however, that the amount of the Aggregate Revolving Loans Commitment may not be reduced below the aggregate principal amount of the outstanding Revolving Loans Advances.  All accrued commitment fees shall be payable on the effective date of any termination of the obligations of the Lenders to make Revolving Loans hereunder.

**2.6    Minimum Amount of Each Advance**.  Each Revolving Loan Advance shall be in the minimum amount of One Million Dollars ($1,000,000) and, if in excess thereof, in additional increments of One Hundred Thousand Dollars ($100,000), provided, however, that any Revolving Loan Advance may be in the amount of the total unused Aggregate Revolving Loans Commitment.

**2.7    Optional Principal Payments**.  The Borrower may from time to time pay, without penalty or premium, all or any portion of the outstanding Alternate Base Rate Advances upon two Business Days' prior notice to the Agent.  A Eurodollar Advance may not be paid prior to the last day of the applicable Eurodollar Interest Period, unless the Borrower shall fully compensate the Lenders in accordance with <u>Section 3.2</u> hereto.  Principal payments made with respect to the Term Loans shall be applied to the principal installments payable under <u>Section 3.2</u> in the inverse order of maturity.

**2.8 Method of Selecting Types and Interest Periods for New Advances**. The Borrower shall select the Type of Advance and, in the case of each Eurodollar Advance, the Eurodollar Interest Period applicable to each Advance from time to time. The Borrower shall give the Agent irrevocable notice (a "Borrowing Notice") not later than 10:00 a.m. (Chicago time) at least one Business Day before the Borrowing Date of each Alternate Base Rate Advance and three Business Days before the Borrowing Date for each Eurodollar Advance, specifying:

      (a)    the Borrowing Date (which shall be a Business Day) of such Advance;

      (b)    the aggregate amount of such Advance;

      (c)    the Type of Advance selected; and

      (d)    in the case of each Eurodollar Advance, the Eurodollar Interest Period applicable thereto.

Not later than noon (Chicago time) on each Borrowing Date, each Lender shall make available its Loan or Loans, in funds immediately available in Chicago to the Agent at its address specified pursuant to Article XIII. The Agent will make the funds so received from the Lenders available to the Borrower at the Agent's aforesaid address.

**2.9 Conversion and Continuation of Outstanding Advances**. Alternate Base Rate Advances shall continue as Alternate Base Rate Advances unless and until such Alternate Base Rate Advances are converted into Eurodollar Advances. Each Eurodollar Advance of any Type shall continue as a Eurodollar Advance of such Type until the end of the then applicable Eurodollar Interest Period therefor, at which time such Eurodollar Advance shall be automatically converted into an Alternate Base Rate Advance unless the Borrower shall have given the Agent a Conversion/Continuation Notice requesting that, at the end of such Eurodollar Interest Period, such Eurodollar Advance either continue as a Eurodollar Advance of such Type for the same or another Eurodollar Interest Period. Subject to the terms of Section 2.6, the Borrower may elect from time to time to convert all or any part of an Advance of any Type into any other Type or Types of Advances; provided that any conversion of any Eurodollar Advance shall be made on, and only on, the last day of the Eurodollar Interest Period applicable thereto. The Borrower shall give the Agent irrevocable notice (a "Conversion/Continuation Notice") of each conversion of an Advance or continuation of a Eurodollar Advance not later than 10:00 a.m. (Chicago time) at least one Business Day, in the case of a conversion into an Alternate Base Rate Advance or three Business Days, in the case of a conversion into or continuation of a Eurodollar Advance, prior to the date of the requested conversion or continuation, specifying:

      (a)    the requested date (which shall be a Business Day) of such conversion or continuation;

      (b)    the aggregate amount and Type of the Advance which is to be converted or continued; and

(c) the amount and Type(s) of Advance(s) into which such Advance is to be converted or continued and, in the case of a conversion into or continuation of a Eurodollar Advance, the duration of the Eurodollar Interest Period applicable thereto.

**2.10 Changes in Interest Rate, etc.** Each Alternate Base Rate Advance shall bear interest on the outstanding principal amount thereof, for each day from and including the date such Advance is made or is converted from a Eurodollar Advance into an Alternate Base Rate Advance pursuant to Section 2.9 to but excluding the date it becomes due or is converted into a Eurodollar Advance pursuant to Section 2.9 hereof, at a rate per annum equal to the Alternate Base Rate for such day. Changes in the rate of interest on that portion of any Advance maintained as an Alternate Base Rate Advance will take effect simultaneously with each change in the Alternate Base Rate. Each Eurodollar Advance shall bear interest on the outstanding principal amount thereof from and including the first day of the Eurodollar Interest Period applicable thereto to (but not including) the last day of such Eurodollar Interest Period at the interest rate determined as applicable to such Eurodollar Advance. No Eurodollar Interest Period may end after the Revolving Facility Termination Date or the Term Loans Termination Date, as applicable. The Borrower shall select Eurodollar Interest Periods so that it is not necessary to repay any portion of a Eurodollar Advance prior to the last day of the applicable Eurodollar Interest Period in order to make a mandatory repayment required pursuant to Section 2.2.

**2.11 Rates Applicable After Default.** Notwithstanding anything to the contrary contained in Section 2.8 or 2.9, during the continuance of a Default or Unmatured Default the Required Lenders may, at their option, by notice to the Borrower (which notice may be revoked at the option of the Required Lenders notwithstanding any provision of Section 8.2 requiring unanimous consent of the Lenders to changes in interest rates), declare that no Advance may be made as, converted into, or continued as, a Eurodollar Advance. If any Advance is not paid at maturity, whether by acceleration or otherwise, the Required Lenders may, at their option, by notice to the Borrower (which notice may be revoked at the option of the Required Lenders notwithstanding any provision of Section 8.2 requiring unanimous consent of the Lenders to changes in interest rates), declare that: (i) each Eurodollar Advance shall bear interest for the remainder of the applicable Eurodollar Interest Period at the rate otherwise applicable to such Eurodollar Interest Period plus 2% per annum; and (ii) each Alternate Base Rate Advance shall bear interest at a rate per annum equal to the Alternate Base Rate otherwise applicable to the Alternate Base Rate Advance plus 2% per annum.

**2.12 Method of Payment.** All payments of the Obligations hereunder shall be made, without setoff, deduction, or counterclaim, in immediately available funds to the Agent at the Agent's address specified pursuant to Article XIII, or at any other Lending Installation of the Agent specified in writing by the Agent to the Borrower, by noon (local time) on the date when due and shall be applied ratably by the Agent among the Lenders. Each payment delivered to the Agent for the account of any Lender shall be delivered promptly by the Agent to such Lender in the same type of funds that the Agent received at its address specified pursuant to Article XIII or at any Lending Installation specified in a notice received by the Agent from such Lender.

**2.13  Notes; Telephonic Notices**. Each Lender is hereby authorized to record the principal amount of each of its Loans and each repayment on the schedule attached to its Note, provided, however, that neither the failure to so record nor any error in such recordation shall affect the Borrower's obligations under such Note.  The Borrower hereby authorizes the Lenders and the Agent to extend, convert or continue Advances, effect selections of Types of Advances and to transfer funds based on telephonic notices made by any Person who the Lenders or the Agent believe in good faith is an Authorized Officer.  The Borrower agrees to deliver promptly to the Agent a written confirmation, if such confirmation is requested by the Agent or any Lender, of each telephonic notice signed by two Authorized Officers.  If the written confirmation differs in any material respect from the action taken by the Agent and the Lenders, the records of the Agent and the Lenders shall govern absent manifest error.

**2.14  Interest Payment Dates; Interest and Fee Basis**.  Interest accrued on each Alternate Base Rate Advance shall be payable on each Payment Date, commencing with the first such date to occur after the date hereof, on any date on which the Alternate Base Rate Advance is prepaid, whether due to acceleration or otherwise, and at maturity.  Interest accrued on that portion of the outstanding principal amount of any Alternate Base Rate Advance converted into a Eurodollar Advance on a day other than a Payment Date shall be payable on the date of conversion.  Interest accrued on each Eurodollar Advance shall be payable on the last day of its applicable Eurodollar Interest Period, on any date on which the Eurodollar Advance is prepaid, whether by acceleration or otherwise, and at maturity.  Interest accrued on each Eurodollar Advance having a Eurodollar Interest Period longer than three months shall also be payable on the last day of each three-month interval during such Eurodollar Interest Period.  Interest and commitment fees shall be calculated for actual days elapsed on the basis of a 360-day year.  Interest shall be payable for the day an Advance is made but not for the day of any payment on the amount paid if payment is received prior to noon (local time) at the place of payment.  If any payment of principal of or interest on an Advance shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and, in the case of a principal payment, such extension of time shall be included in computing interest in connection with such payment.

**2.15  Notification of Advances, Interest Rates, Prepayments and Commitment Reductions**.  Promptly after receipt thereof, the Agent will notify each Lender of the contents of each Aggregate Commitment reduction notice, Borrowing Notice, Conversion/Continuation Notice, and repayment notice received by it hereunder.  The Agent will notify each Lender of the interest rate applicable to each Eurodollar Advance promptly upon determination of such interest rate and will give each Lender prompt notice of each change in the Alternate Base Rate.

**2.16  Lending Installations**.  Each Lender may book its Loans at any Lending Installation selected by such Lender and may change its Lending Installation from time to time.  All terms of this Agreement shall apply to any such Lending Installation and the Notes shall be deemed held by each Lender for the benefit of such Lending Installation.  Each Lender may, by written or telex notice to the Agent and the Borrower, designate a Lending Installation through which Loans will be made by it and for whose account Loan payments are to be made.

**2.17    Non-Receipt of Funds by the Agent**.  Unless the Borrower or a Lender, as the case may be, notifies the Agent prior to the date on which it is scheduled to make payment to the Agent of the proceeds of a Loan (in the case of the Lender) or a payment of principal, interest, or fees to the Agent for the account of the Lenders (in the case of the Borrower) that it does not intend to make such payment, the Agent may assume that such payment has been made.  The Agent may, but shall not be obligated to, make the amount of such payment available to the intended recipient in reliance upon such assumption.  If such Lender or the Borrower, as the case may be, has not in fact made such payment to the Agent, the recipient of such payment shall, on demand by the Agent, repay to the Agent the amount so made available together with interest thereon in respect of each day during the period commencing on the date such amount was so made available by the Agent until the date the Agent recovers such amount at a rate per annum equal to:  (a) in the case of payment by a Lender, the Federal Funds Effective Rate for such day; or (b) in the case of payment by the Borrower, the interest rate applicable to the relevant Loan.

**2.18    Notice in the Event of a Change in Control**.  Within 60 Business Days prior to the consummation of any transaction that could cause or constitute a Change in Control, the Borrower shall notify (a "Change in Control Notice") the Agent and each Lender of such expected transaction, including within such Change in Control Notice the expected closing date of such transaction.  Within 30 Business Days of receipt of such Change in Control Notice by any Lender, such Lender may, at its option, give notice to the Agent and the Borrower that such Lender elects to terminate its Commitment hereunder effective as of the date of the closing of such transaction.

**ARTICLE III**
**CHANGE IN CIRCUMSTANCES**

**3.1    Availability of Eurodollar Advances**.   If any Lender determines that maintenance of any of its Eurodollar Loans would violate any applicable law, rule, regulation, or directive, whether or not having the force of law, the Agent shall suspend the availability of Eurodollar Advances as of the date of any such determination, until the Agent notifies the Borrower that the circumstances giving rise to such suspension no longer exist and any affected outstanding Eurodollar Loans shall not become due and payable; rather, such affected Eurodollar Loans shall automatically convert to Alternate Base Rate Loans.  If the Required Lenders determine that:   (a) deposits of a type or maturity appropriate to match fund Eurodollar Advances are not available; or (b) an interest rate applicable to a Eurodollar Advance does not accurately reflect the cost of making a Eurodollar Advance, then, the Agent shall suspend the availability of Eurodollar Advances as of the date of any such determination until the Agent notifies the Borrower that the circumstances giving rise to such suspension no longer exist and any affected outstanding Eurodollar Loans shall not become due and payable; rather, such affected Eurodollar Loans shall automatically convert to Alternate Base Rate Loans.

**3.2    Funding Indemnification**.  If any payment of a Eurodollar Advance occurs on a date which is not the last day of the applicable Eurodollar Interest Period, whether because of

prepayment, or a Eurodollar Advance is not made on the date specified by the Borrower because of a Default or an Unmatured Default, the Borrower will indemnify and hold harmless each Lender for any loss, expense, or cost associated with liquidating or employing deposits acquired to fund or maintain the Eurodollar Advance. Each Lender shall deliver a written statement of such Lender to the Borrower (with a copy to the Agent) as to the amount due under this section to such Lender. Such written statement shall set forth in reasonable detail the calculations upon which such Lender determined such amount, and shall be final, conclusive, and binding on the Borrower in the absence of manifest error. Determination of amounts payable under such Section shall be calculated as though each Lender funded its Eurodollar Loan through the purchase of a deposit of the type and maturity corresponding to the deposit used as a reference in determining the Eurodollar Rate applicable to such Loan, irrespective of whether in fact that is the case. Unless otherwise provided herein, the amount specified in the written statement of any Lender shall be payable on demand after receipt by the Borrower of such written statement. The obligations of the Borrower under this Section shall survive payment of the Obligations and termination of this Agreement.

## ARTICLE IV
## CONDITIONS PRECEDENT; WITHHOLDING TAX EXEMPTION

**4.1    Initial Advance**.  The Lenders shall not be required to make the initial Advance hereunder unless the Borrower has furnished to the Agent with sufficient copies for the Lenders of each of the following:

(a)    a certificate of good standing, certified by the appropriate governmental officer in Borrower's jurisdiction of incorporation;

(b)    copies of Borrower's articles of incorporation and by-laws (together with all amendments thereto), and the resolutions of its Board of Directors (and resolutions of other bodies, if any are deemed necessary by counsel for any Lender) authorizing the execution and delivery of the Transaction Documents, the borrowing of funds thereunder, and performance of its obligations thereunder, certified by the Secretary or Assistant Secretary of the Borrower;

(c)    an incumbency certificate, executed by the Secretary or Assistant Secretary of the Borrower, which shall identify by name and title and bear the signature of the officers of the Borrower authorized to sign the Transaction Documents and to make borrowings under the Transaction Documents, upon which certificate the Agent and the Lenders shall be entitled to rely until informed of any change in writing by the Borrower;

(d)    a written opinion of the Borrower's counsel addressed to the Lenders, dated as of the date hereof, in substantially the form of Exhibit C hereto;

(e)    Notes payable to the order of each of the Lenders; and

(f)     written money transfer instructions, in substantially the form of Exhibit D hereto, addressed to the Agent and signed by two Authorized Officers, together with such other related money transfer authorizations as the Agent may have reasonably requested.

**4.2    Each Advance.**  The Lenders shall not be required to make any Advance, including the initial Advance hereunder (other than an Advance that, after giving effect thereto and to the application of the proceeds thereof, does not increase the aggregate amount of outstanding Advances), unless on the applicable Borrowing Date:

(a)     there exists no Default or Unmatured Default;

(b)     there exists no litigation or proceeding (governmental or otherwise) that has been instituted or threatened against (i) the Borrower, (ii) any Subsidiary, or, (iii) only where the officers and directors of the Borrower of any Subsidiary may be entitled to indemnification from the Borrower or any Subsidiary, any of their officers or directors, which litigation or proceeding will have a Material Adverse Effect;

(c)     since December 31, 2000, there has been no change in the business, Property, prospects, condition (financial or otherwise), or results of operations of the Borrower and its Subsidiaries reasonably that could reasonably be expected to have a Material Adverse Effect; and

(d)     the representations and warranties contained in Article V are true, accurate, and complete as of such Borrowing Date.

Each Borrowing Notice with respect to each such Advance shall constitute a representation and warranty by the Borrower that the conditions contained in Sections 4.2(a) through (d) have been satisfied.  Any Lender may require a duly completed compliance certificate in substantially the form of Exhibit E hereto as a condition to making an Advance; provided, however, such certificate shall not be required to contain calculations confirming the Borrower's compliance with the financial covenants set forth in Section 6.14 hereto.

**4.3    Withholding Tax Exemption.**  At least five Business Days prior to the first date on which interest or fees are payable hereunder for the account of any Lender, each Lender that is not incorporated under the laws of the United States of America, or a state thereof, agrees that it will deliver to each of the Borrower and the Agent two duly completed copies of United States Internal Revenue Service Form 1001 or 4224, certifying in either case that such Lender is entitled to receive payments under this Agreement and the Notes without deduction or withholding of any United States federal income taxes.  Each Lender that so delivers a Form 1001 or 4224 further undertakes to deliver to each of the Borrower and the Agent two additional copies of such form (or a successor form) on or before the date that such form expires (currently, three successive calendar years for Form 1001 and one calendar year for Form 4224) or becomes obsolete or after the occurrence of any event requiring a change in the most recent forms so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by the Borrower or the Agent, in each case

certifying that such Lender is entitled to receive payments under this Agreement and the Notes without deduction or withholding of any United States federal income taxes, unless an event (including without limitation any change in treaty, law, or regulation) has occurred prior to the date on which any such delivery would otherwise be required that renders all such forms inapplicable or that could prevent such Lender from duly completing and delivering any such form with respect to it and such Lender advises the Borrower and the Agent that it is not capable of receiving payments without any deduction or withholding of United States federal income tax.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Lenders to make the Loans provided for herein, the Borrower hereby represents and warrants to the Lenders as follows:

**5.1    Corporate Existence and Standing**.

(a)    The Borrower (a) is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois, (b) is duly qualified as a foreign corporation and in good standing in all states where its business requires it to so qualify and (c) has all requisite power and authority to own, operate and lease its properties and to conduct its business in each jurisdiction in which its business is conducted. First Bank of Oak Park, Pullman Bank and Trust and Cosmopolitan Bank and Trust are duly organized and validly existing under the IBA, and have all requisite power and authority, corporate or otherwise, to own, operate and lease their respective properties and to carry on their respective businesses as now being conducted. Madisonville State Bank and North Houston Bank are duly organized and validly existing under the TBA, and have all requisite power and authority, corporate or otherwise, to own, operate and lease their respective properties and to carry on their respective businesses as now being conducted. Regency Savings Bank, FSB, San Diego National Bank, California National Bank and Citizens National Bank of Teague are duly organized and validly existing under the laws of the United States, and have all requisite power and authority, corporate or otherwise, to own, operate and lease their respective properties and to carry on their respective business as now being conducted. The Subsidiaries of the Borrower other than those named above, are duly organized and validly existing under the laws and regulations of their state or place of organization and have all requisite power and authority, corporate or otherwise, to own, operate and lease their respective properties and to carry on their respective businesses as now being conducted. The deposit accounts of each Depository Institution Subsidiary are insured by the FDIC. Borrower has made payment of all franchise and similar taxes as are due and payable as of the date of this Agreement in the State of Illinois and in all of the respective jurisdictions in which they are incorporated or qualified.

(b)    All of the issued and outstanding shares of capital stock of the Borrower have been duly authorized and issued and are fully paid and non-assessable. The

Borrower does not have outstanding any stock or securities convertible into, or exchangeable for, any shares of its capital stock or containing any profit participation features, nor will it have outstanding any rights or options to subscribe for or to purchase its capital stock or any stock or securities convertible into, or exchangeable for, its capital stock. As of the date hereof, the Borrower is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options, or other rights to acquire its capital stock. As of the date hereof, there is no plan, arrangement, or agreement providing for, or contemplating, the issuance of any shares of capital stock of the Borrower.

**5.2    Authorization and Validity**.  The Borrower has the power and authority and legal right to:  (a) borrow the principal amount of the Loans; (b) execute and deliver the Transaction Documents; and (c) perform its obligations under the Transaction Documents. The execution and delivery by the Borrower of the Transaction Documents, the borrowing of the principal amount of the Loans, and the performance of its obligations under the Transaction Documents have been duly authorized by proper corporate proceedings.  The Transaction Documents constitute legal, valid, and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms, subject to limitations arising under applicable bankruptcy, insolvency, reorganization, or other similar laws and doctrines affecting the rights of creditors generally.

**5.3    No Conflict; Government Consent**.  Neither the execution and delivery by the Borrower of the Transaction Documents, nor the consummation of the transactions therein contemplated, nor compliance with the provisions thereof, does (as of the date hereof) or will: (a) violate any law, rule, regulation, order, writ, judgment, injunction, decree, or award binding on the Borrower or any Depository Institution Subsidiary; (b) violate the Borrower's or any Depository Institution Subsidiary's corporate charter or by-laws; or (c) breach, conflict with, constitute a default under, or result in the creation or imposition of any Lien in, of, or on, the Property of the Borrower under, the provisions of any contract, agreement, instrument, document, or certificate to which the Borrower or any Depository Institution Subsidiary is a party or is subject, or by which it, or its Property, is bound.  No order, consent, approval, license, authorization, or validation of, or filing, recording, or registration with, or exemption by, or other action in respect of any Governmental Agency is required to authorize, or is required in connection with the execution and delivery of, or the legality, validity, binding effect, or enforceability of, any of the Transaction Documents, or the performance of any obligations thereunder.

**5.4    Financial Statements**.  The consolidated financial statements as of and for the period ending December 31, 2000 of the Borrower and its Subsidiaries heretofore delivered to the Lenders were prepared in accordance with GAAP in effect on the date such statements were prepared and fairly present the consolidated financial condition and operations of the Borrower and its Subsidiaries at such date and the consolidated results of their operations for the period then ended.

**5.5    Material Adverse Change**.  Since December 31, 2000, there has been no change in the business, Property, prospects, condition (financial or otherwise) or results of operations of the Borrower (on a consolidated basis) that could reasonably be expected to have a Material Adverse Effect.

**5.6    Taxes**.  The Borrower and its Subsidiaries have filed all United States federal tax returns and all other tax returns which are required to be filed and have paid all taxes due pursuant to said returns or pursuant to any assessment received by the Borrower or any of its Subsidiaries, except such taxes, if any, as are being contested in good faith and as to which adequate reserves have been provided in accordance with GAAP and as to which no Lien exists.  Except as set forth in Schedule 5.6, Borrower is unaware of any audit, assessment or other proposed action by the Internal Revenue Service with respect to any United States income tax liability of the Borrower or any Subsidiary.  The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of any taxes or other governmental charges are adequate.

**5.7    Litigation and Contingent Obligations**.  Except as set forth on Schedule 5.7 hereto, there is no claim, action, suit, proceeding, investigation, or inquiry pending or, to the knowledge of any of the officers of the Borrower, threatened against or affecting the Borrower, any of its Subsidiaries, or any of their respective assets (at law or in equity) that could have a Material Adverse Effect or that seeks to prevent, enjoin, or delay the making of the Loans or Advances or the consummation of any other transaction contemplated by the Loan Documents.  Other than any liability incident to such claim, action, suit, proceeding, investigation, or inquiry, Borrower has no material contingent obligations not provided for, or disclosed on, the financial statements referred to in Section 5.4.  Neither the Borrower nor any Subsidiary is in default under, or has failed to comply with, any order, writ, injunction, or decree of, or any written agreement with, any Governmental Agency that could have a Material Adverse Effect or that seeks to prevent, enjoin, or delay the making of the Loans or Advances or the consummation of any other transaction contemplated by the Loan Documents.

**5.8    Subsidiaries**.

(a)    Schedule 5.8 hereto contains an accurate list of all Subsidiaries of the Borrower as of the date of this Agreement, setting forth their respective jurisdictions of incorporation and the percentage of their respective capital stock owned by the Borrower or other Subsidiaries.  All of the issued and outstanding shares of capital stock of such Subsidiaries have been duly authorized and issued and are fully paid and non-assessable.

(b)    All of the issued and outstanding shares of capital stock of each Subsidiary have been duly authorized and issued and are fully paid and non-assessable.  No Subsidiary has outstanding any stock or securities convertible into, or exchangeable for, any shares of its capital stock or containing any profit participation features, nor will it have outstanding any rights or options to subscribe for or to purchase its capital stock or any stock or securities convertible into, or exchangeable for, its capital stock.  As of the

date hereof, no Subsidiary is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options, or other rights to acquire its capital stock. As of the date hereof, there is no plan, arrangement, or agreement providing for, or contemplating, the issuance of any shares of capital stock of any Subsidiary.

**5.9    ERISA**. All Employee Benefit Plans established or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes are in material compliance with applicable requirements of ERISA, and are in material compliance with applicable requirements (including qualification and non-discrimination requirements) of the Code for obtaining the tax benefits the Code thereupon permits with respect to such plans. Each Employee Benefit Plan that is a group health plan (within the meaning of Section 5000(b)(1) of the Code) is in material compliance with, and has been maintained and operated in material compliance with, each of the requirements of Section 4980B of the Code. Neither the Borrower nor any ERISA Affiliate has failed to make any material contributions or to pay any material amounts with respect to any Employee Benefit Plan or ERISA or any other applicable law. No Reportable Event or Prohibited Transaction has occurred and is continuing as to any Employee Benefit Plan and no excise taxes have been incurred or security is required with respect to any Employee Benefit Plan. No Employee Benefit Plan has (as of the date hereof) or will have, any material amount of unfunded benefit liabilities (as defined in Section 4001(a)(18) of ERISA) for which the Borrower or any ERISA Affiliate could be liable to any Person under Title IV of ERISA if any such plan were terminated. All Employee Benefit Plans are funded in accordance with Section 412 of the Code (if applicable). There would be no material obligations under Title IV of ERISA relating to any Employee Benefit Plan that is a multiemployer plan (as defined by ERISA) if any such plan were terminated or if the Borrower or any ERISA Affiliate withdrew from any such plan.

**5.10    Accuracy of Information**. No information, exhibit or report furnished by the Borrower or any of its Subsidiaries to the Agent or to any Lender in connection with the negotiation of, or compliance with, the Transaction Documents contained any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained therein not misleading.

**5.11    Margin Stock**. The Borrower shall use the proceeds of the Advances for general corporate purposes. The Borrower will not use any part of the proceeds of the Advances: (a) to directly or indirectly purchase or carry any margin security or reduce or retire any indebtedness originally incurred to purchase any such margin security within the meaning of Regulation U; or (b) so as to involve the Borrower or the Lender in a violation of Regulation U. Margin stock (as defined in Regulation U) constitutes less than 25% of those assets of the Borrower and its Subsidiaries that are subject to any limitation on sale, pledge, or other restriction hereunder.

**5.12    Material Agreements**. Neither the Borrower nor any Subsidiary is in default or violation in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any agreement or instrument to which it is a party or (ii) any

provision in its charter or by-laws, which default or violation would have a Material Adverse Effect.

**5.13 Compliance With Laws**. To the knowledge of the Authorized Officers, the Borrower and its Subsidiaries are in compliance with all applicable statutes, rules, regulations, orders and restrictions of any domestic or foreign government or any instrumentality or agency thereof, having jurisdiction over the conduct of the Borrower's and the Subsidiaries' respective businesses or the ownership of their respective Property.

**5.14 Ownership of Properties**. Except as set forth on Schedule 5.14 hereto, on the date of this Agreement, the Borrower and its Subsidiaries will have good title, free of all Liens (other than liens created or incurred by any Depository Institution Subsidiary in the ordinary course of its banking business and consistent with safe and sound banking practices) to all of the Property and assets reflected in the financial statements as owned by such entity.

**5.15 Environmental Matters**. To the knowledge of the Authorized Officers, and except for (i) violations disclosed on Schedule 5.15 or (ii) other violations that involve a liability to the Borrower or any Subsidiary of the Borrower, either individually or in any combination of such entities, of an aggregate amount that is less than five percent (5%) of the amount of the shareholder's equity of the Borrower, neither the Borrower nor any Borrower Related Party is in violation of any Environmental Laws and no hazardous material (as defined pursuant to applicable Environmental Laws) is located on any real property owned or leased by the Borrower or any Subsidiary of the Borrower or has been discharged from or to, or penetrated into, any real property (or surface or subsurface rivers or streams crossing or adjoining any real property) owned or leased by the Borrower or any Subsidiary of the Borrower or the aquifer underlying any real property owned or leased by the Borrower or any Subsidiary of the Borrower.

**5.16 Allowance for Possible Loan and Lease Losses**.

(a) The allowance for possible loan and lease losses shown on the financial statements referred to in Section 5.4 is adequate in all respects to provide for probable or specific losses, net of recoveries relating to loans previously charged off, on loans and leases outstanding as of the dates of such statements, and contain an additional amount of unallocated reserves for unanticipated future losses at levels considered adequate based upon generally accepted safe and sound banking practices.

(b) Except as otherwise stated in Schedule 5.16 and except for such loans that, in the aggregate, would not have a Material Adverse Effect, to the knowledge of the Authorized Officers of the Borrower, each loan having an outstanding balance of more than $1,000,000 and reflected as an asset of the Borrower is a legal, valid, and binding obligation of the obligor named therein, enforceable in accordance with its terms, subject to limitations arising under applicable bankruptcy, insolvency, reorganization, or other similar laws and doctrines affecting the rights of creditors generally. Except as otherwise stated in Schedule 5.1 and except for such loans that,

in the aggregate, would not have a Material Adverse Effect, to the knowledge of the Authorized Officers of the Borrower, no obligor named therein is seeking to avoid the enforceability of the terms of any loan under any such laws or equitable principles, and no such loan having an unpaid balance (principal and accrued interest) in excess of $1,000,000 is subject to any defense, offset, or counterclaim.

**5.17 Regulatory Enforcement Actions.** None of the Borrower or any of its Subsidiaries or any of their respective officers or directors is now operating under any restrictions, agreements, memoranda, or commitments (other than restrictions generally applicable to banks, bank holding companies or their subsidiaries and affiliates) imposed by any Governmental Agency relating to, or arising from, the safety and soundness of the Borrower or any Subsidiary of the Borrower or affecting the ability to pay dividends by any one or more Subsidiaries of the Borrower which, in the aggregate, have net income equal to, or greater than, the Minimum Dividend Amount nor are any such restrictions threatened or agreements, memoranda, or commitments being sought by any Governmental Agency.

**5.18 Subordinated Indebtedness.** The Obligations are entitled to the benefits of the subordination provisions of all outstanding Subordinated Indebtedness, if any, and constitute senior indebtedness in all respects.

**5.19 Insurance.** The Borrower and its Subsidiaries maintain adequate property and casualty insurance.

**5.20 Solvency.**

(a) Immediately after the consummation of the transactions to occur on the date hereof and immediately following the making of each Loan, if any, made on the date hereof and after giving effect to the application of the proceeds of such Loans: (a) the fair value of the assets of the Borrower and the Subsidiaries on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, subordinated, contingent or otherwise, of the Borrower and the Subsidiaries on a consolidated basis; (b) the present fair saleable value of the property of the Borrower and the Subsidiaries on a consolidated basis will be greater than the amount that will be required to pay the probable liability of the Borrower and the Subsidiaries on a consolidated basis on their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; and (c) the Borrower and the Subsidiaries on a consolidated basis will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured.

(b) The Borrower does not intend to, or to permit any of its Subsidiaries to, and does not believe that it or any of its Subsidiaries will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it or any such Subsidiary and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary.

## ARTICLE VI
## COVENANTS

During the term of this Agreement, unless the Required Lenders or all of the Lenders, as required, shall otherwise consent in writing:

**6.1    Financial Reporting**.   The Borrower will maintain, for itself and each Subsidiary, a system of accounting established and administered in accordance with GAAP, and furnish to the Lenders:

(a)    Within 90 days after the close of each of its fiscal years, financial statements audited by independent certified public accountants, acceptable to the Lenders, prepared in accordance with GAAP on a consolidated and consolidating basis (consolidating statements need not be certified by such accountants) for itself, including balance sheets as of the end of such period, related profit and loss and reconciliation of surplus statements, and a statement of cash flows, accompanied by an unqualified audited opinion.

(b)    As soon as available and to the extent permitted by the appropriate Governmental Agency with jurisdiction, but in any event not more than 45 days after the close of each quarterly period of each fiscal year of Borrower, or within such further time as the Agent may permit: (i) internally prepared "watch list" or other similar reports of the Depository Institution Subsidiaries with respect to delinquent, classified or assets requiring special attention; (ii) the call reports (whether for the quarterly or annual period, as appropriate) filed by each of the Depository Institution Subsidiaries with federal bank regulatory agencies; and (iii) as soon as available, but in any event not more than 45 days after the close of each quarterly period of each fiscal year of Borrower, or within such further time as the Agent may permit, Form FRY-9C and such other financial information (whether for the quarterly or annual period, as appropriate) filed by Borrower with any Governmental Agency.

(c)    Together with the financial statements required under Sections 6.1(a) and (b), a compliance certificate in substantially the form of Exhibit E hereto signed by its chief financial officer showing the calculations necessary to determine compliance with this Agreement and stating that no Default or Unmatured Default exists, or if any Default or Unmatured Default exists, stating the nature and status thereof.

(d)    As soon as possible and in any event within 30 days after the Borrower knows that any Reportable Event has occurred with respect to any Plan, a statement, signed by the chief financial officer of the Borrower, describing said Reportable Event and the action which the Borrower proposes to take with respect thereto.

(e)    As soon as possible and in any event within 30 days after receipt by the Borrower, a copy of: (i) any notice or claim to the effect that the Borrower or any of its Subsidiaries is or may be liable to any Person as a result of the release by the

Borrower, any of its Subsidiaries, or any other Person of any toxic or hazardous waste or substance into the environment; and (ii) any notice alleging any violation of any federal, state or local environmental, health or safety law or regulation by the Borrower or any of its Subsidiaries that could, in either case, have a Material Adverse Effect.

(f)     Such other information (including non-financial information) as the Agent or any Lender may from time to time reasonably request.

**6.2     Use of Proceeds.** The Borrower will, and will cause each Subsidiary to, use the proceeds of the Advances for general corporate purposes.

**6.3     Notice of Default.** The Borrower will, and will cause each Subsidiary to, give prompt notice in writing to the Lenders of the occurrence of any Default or Unmatured Default and of any other development, financial or otherwise, that could have a Material Adverse Effect.

**6.4     Conduct of Business.** The Borrower will, and will cause each Depository Institution Subsidiary to, carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted and to do all things necessary to remain duly incorporated, validly existing and in good standing as a domestic corporation in its jurisdiction of incorporation and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted.

**6.5     Taxes.** The Borrower will, and will cause each Subsidiary to, timely file complete and correct United States federal and applicable foreign, state, and local tax returns required by law and pay when due all taxes, assessments, and governmental charges and levies upon it or its income, profits or Property, except those that are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside on Borrower's financial statements in accordance with GAAP.

**6.6     Compliance with Laws.** The Borrower will, and will cause each Subsidiary to, comply with all laws, rules, regulations, orders, writs, judgments, injunctions, decrees or awards to which it may be subject.

**6.7     Inspection.** The Borrower will, and will cause each Subsidiary to, permit the Agent and the Lenders, by their respective representatives and agents, to inspect any of the Property, corporate books, and financial records of the Borrower and each Subsidiary, to examine and make copies of the books of accounts and other financial records of the Borrower and each Subsidiary, and to discuss the affairs, finances, and accounts of the Borrower and each Subsidiary with, and to be advised as to the same by, their respective officers at such reasonable times and intervals as the Lenders may reasonably designate.

**6.8     Indebtedness.** Without the prior written consent of the Required Lenders, which consent shall not unreasonably be withheld, the Borrower will not, nor will it permit any Subsidiary to, create, incur or suffer to exist any Indebtedness, except:

(a)  The Loans and the Subordinated Indebtedness under the Subordinated Debt Agreement; and

(b)  Indebtedness existing on the date hereof and described in <u>Schedule 6.8</u> hereto or other indebtedness incurred by any Depository Institution Subsidiary arising in the ordinary course of its banking business (including FHLB advances, purchases of federal funds and repurchase agreements).

**6.9  Sale of Assets**.  Without the prior written consent of the Required Lenders, which consent shall not unreasonably be withheld, the Borrower will not, nor will it permit any Depository Institution Subsidiary to, lease, sell, or otherwise dispose of its Property, to any other Person, except:

(a)  Sales of property acquired in connection with debt previously contracted in the ordinary course of business; or

(b)  Leases, sales or other dispositions of its Property that involve an aggregate amount of assets of less than $250,000,000, together with all other Property of the Borrower and its Subsidiaries previously leased, sold, or disposed of as permitted by this section during the twelve-month period ending with the month in which any such lease, sale, or other disposition occurs.

**6.10  Investments and Acquisitions**.  Without the prior written consent of all of the Lenders, which consent shall not unreasonably be withheld, the Borrower will not, nor will it permit any Subsidiary to, make or suffer to exist any Investments (including without limitation, loans and advances to, and other Investments in, Subsidiaries), or commitments therefor, or to create any Subsidiary or to become or remain a partner in any partnership or joint venture, or to make any Acquisition of any Person, except:

(a)  Investments permissible under the laws and regulations governing the permissible investments of bank holding companies and depository institutions;

(b)  Existing Investments in Subsidiaries and other Investments in existence on the date hereof and described in <u>Schedule 5.8</u> hereto; and

(c)  Acquisitions of unrelated depository institutions (or their holding companies) with consolidated assets of less than $250,000,000.

**6.11  Liens**.  The Borrower will not create, incur, or suffer, or allow to exist any Lien in, of, or on the capital stock of any Depository Institution Subsidiary.

**6.12  Affiliates**. The Borrower will not, and will not permit any Subsidiary to, enter into any transaction (including, without limitation, the purchase or sale of any Property or service) with, or make any payment or transfer to, any Affiliate, except in the ordinary course of business and pursuant to the reasonable requirements of the Borrower's or such Subsidiary's business and upon fair and reasonable terms no less favorable to the Borrower or such

Subsidiary than the Borrower or such Subsidiary would obtain in a comparable arms-length transaction.

**6.13    Contingent Obligations.**    The Borrower will not, nor will it permit any Subsidiary to, make or suffer to exist any Contingent Obligation (including, without limitation, any Contingent Obligation with respect to the obligations of a Subsidiary).

**6.14    Financial Covenants.**

(a)    Borrower (on a consolidated basis) shall maintain at all times such capital as may be necessary to cause Borrower to be classified as an "adequately capitalized" institution in accordance with the laws and regulations (as such laws and regulations may be amended, supplemented or otherwise modified from time to time) of the FDIC (including 12 U.S.C. 1831(o)) and each Governmental Agency that has supervisory authority over the Borrower.

(b)    Borrower (on a consolidated basis) shall cause each Depository Institution Subsidiary to maintain at all times such capital as may be necessary to cause each such Depository Institution Subsidiary to be classified as a "well capitalized" institution in accordance with the laws and regulations (as such laws and regulations may be amended, supplemented or otherwise modified from time to time) of the FDIC (including 12 U.S.C. 1831(o)) and each Governmental Agency that has supervisory authority over such Depository Institution Subsidiary.

(c)    Borrower (on a consolidated basis) shall maintain:  (i) a "Leverage Ratio" (Tier 1 Capital to Average Total Assets) in excess of four percent (4%); (ii) a "Total Risk Based Capital Ratio" (the sum of Tier 1 Capital and Tier 2 Capital to Risk-Weighted Assets) in excess of eight percent (8%); and (iii) a "Tier 1 Capital Ratio" (Tier 1 Capital to Risk-Weighted Assets) in excess of four percent (4%).  All ratios set forth in this Section 6.14(c) shall be measured quarterly beginning as of June 30, 2001 and shall be derived from the applicable quarterly financial statements filed with the appropriate Governmental Agency.  Borrower shall comply with the above capital requirements as of June 30, 2001 and thereafter as calculated on a quarterly basis as of the end of each calendar quarter.  For purposes of this Section 6.14(c) and Section 6.14(d)Tier 1 Capital, Tier 2 Capital, Tangible Capital, Core Capital and Risk-Weighed Assets shall be determined in accordance with the rules and regulations of the appropriate Governmental Agency, as amended from time to time, and Average Total Assets shall refer to the average total assets as set forth in the relevant call report for the applicable quarterly period.

(d)    Borrower (on a consolidated basis) shall cause each Depository Institution Subsidiary to maintain:  (i) a "Leverage Ratio" (Tier 1 Capital to Average Total Assets) in excess of five percent (5%) (provided, however, Borrower shall cause Regency Savings Bank, FSB to maintain a "Core Capital Ratio" (Core Capital to Average Total Assets) in excess of 4% and "Tangible Capital Ratio" (Tangible Capital

to Average Total Assets) in excess of 1.5% in lieu of maintaining the above required Leverage Ratio); (ii) a "Total Risk Based Capital Ratio" (the sum of Tier 1 Capital and Tier 2 Capital to Risk-Weighted Assets) in excess of ten percent (10%); and (iii) a "Tier 1 Capital Ratio" (Tier 1 Capital to Risk-Weighted Assets) in excess of six percent (6%). All ratios set forth in this Section 6.14(d) shall be measured quarterly beginning as of June 30, 2001 and shall be derived from the applicable quarterly financial statements filed with the appropriate Governmental Agency. Borrower shall cause each Depository Institution Subsidiary to comply with the above capital requirements as of June 30, 2001 and thereafter as calculated on a quarterly basis as of the end of each calendar quarter. For purposes of this Section 6.14(d), Tier 1 Capital, Tier 2 Capital, Tangible Capital, Core Capital, and Risk-Weighed Assets shall be determined in accordance with the rules and regulations of the appropriate Governmental Agency, as amended from time to time, and Average Total Assets shall refer to the average total assets as set forth in the relevant call report for the applicable quarterly period.

(e) Borrower (on a consolidated basis) shall maintain a ratio of nonperforming assets to total loans and other real estate owned of Borrower of less than four percent (4.0%) at all times. All ratios set forth in this Section 6.14(e) shall be measured quarterly beginning as of June 30, 2001 and shall be derived from the applicable quarterly financial statements filed with the appropriate Governmental Agency. For purposes of Sections 6.14(e) and 6.14(f) "nonperforming assets" shall mean the sum of all other real estate owned, non-accrual loans, restructured loans and loans on which any payment is ninety (90) or more days past due which is still accruing interest, and for purposes of this Section 6.14(e) "total loans and other real estate owned" shall mean total loans and other real estate owned.

(f) Borrower (on a consolidated basis) shall maintain a ratio of nonperforming assets to an amount equal to Tier 1 capital plus the allowance for loan losses of Borrower of less than thirty-seven and one-half percent (37½%) at all times. All ratios set forth in this Section 6.14 (f) shall be measured quarterly beginning as of June 30, 2001 and shall be derived from the applicable quarterly financial statements filed with the appropriate Governmental Agency.

(g) Borrower (on a consolidated basis) shall maintain a return on assets of not less than 1.10%. The return on assets shall be an amount (expressed as a percentage) equal to the adjusted net income of Borrower divided by the total assets of Borrower. The percentage set forth in this Section 6.14 (g) shall be measured quarterly on a rolling four quarter basis beginning as of four quarters ending on June 30, 2001 and shall be derived from the applicable quarterly financial statements filed with the appropriate Governmental Agency. For purposes of this Section 6.14(g), "adjusted net income" shall mean the consolidated net income of Borrower (calculated in accordance with GAAP), excluding the effects of the amortization of goodwill and "total assets" shall mean total consolidated average assets for such period.

## ARTICLE VII
## DEFAULTS

**7.1    Events of Default.** The happening or occurrence of any of the following events, acts or conditions shall each constitute a Default hereunder, without right to notice or time to cure except as indicated below:

(a)    if the Borrower fails to make any payment when due as provided herein or in the Notes, whether by acceleration or otherwise, and such failure continues for five (5) days;

(b)    if there occurs any breach under this Agreement or any other Transaction Document and such breach remains uncured beyond the applicable time period, if any, specifically provided therefor, and if no time period is stated, then such breach remains uncured for thirty (30) days;

(c)    if any representation or warranty made by the Borrower herein or in any other agreement now or at any time hereafter existing with either the Borrower or any Subsidiary of the Borrower, is breached or is false or misleading in any material respect, or any schedule, certificate, financial statement, report, notice, or other writing furnished by either the Borrower, or any Subsidiary of the Borrower is false or misleading in any material respect on the date as of which the facts therein set forth are stated or certified;

(d)    if any Governmental Agency charged with the regulation of bank holding companies or depository institutions: (i) issues to the Borrower or any Depository Institution Subsidiary of the Borrower, or initiates any action, suit or proceeding to obtain against, impose on or require from the Borrower or any Depository Institution Subsidiary of the Borrower, a cease and desist order or similar regulatory order, the assessment of civil monetary penalties, articles of agreement, a memorandum of understanding, a capital directive, a capital restoration plan, restrictions affecting: (x) one or more Depository Institution Subsidiaries of the Borrower which, in the aggregate, have net income equal to or greater than the Minimum Dividend Amount; or (y) the payment of any debt by the Borrower, a notice or finding under Section 8(a) of the FDI Act, or any similar enforcement action, measure or proceeding; (ii) issues to any Lender or any direct or indirect parent, direct or indirect subsidiary, or affiliate of any Lender, or initiates any action, suit, or proceeding to obtain against, impose on, or require from, any Lender or any direct or indirect parent, direct or indirect subsidiary, or affiliate of any Lender, in each case in connection with a finding that the total investment (including all indebtedness to the Lender and equity held by the Lender) by the Lender with respect to the Borrowers is inconsistent with, or in violation of, applicable laws, regulations and guidelines of any Governmental Agency, a cease and desist order or similar regulatory order, articles of agreement, a memorandum of understanding, or any similar enforcement action, measure, or proceeding; or (iii) issues to any executive officer or director of either Borrower or any Depository

Institution Subsidiary of the Borrower in his or her capacity as such, or initiates any action, suit, or proceeding to obtain against, impose on, or require from, any such officer or director in his or her capacity as such, a cease and desist order or similar regulatory order, a removal order, or suspension order, or the assessment of civil monetary penalties;

(e)     if any Depository Institution Subsidiary is notified that it is considered an institution in "troubled condition" within the meaning of 12 U.S.C. Section 1831i and the regulations promulgated thereunder, or if a conservator or receiver is appointed for any Depository Institution Subsidiary;

(f)     if the Borrower or any Depository Institution Subsidiary of the Borrower becomes insolvent or is unable to pay its debts as they mature; or makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts as they mature; or suspends transaction of its usual business; or if a trustee of any substantial part of the assets of the Borrower or any Depository Institution Subsidiary of the Borrower is applied for or appointed, and if appointed in a proceeding brought against the Borrower, the Borrower by any action or failure to act indicates its approval of, consent to, or acquiescence in such appointment, or within thirty (30) days after such appointment, such appointment is not vacated or stayed on appeal or otherwise, or shall not otherwise have ceased to continue in effect;

(g)     if any proceeding involving the Borrower or any Depository Institution Subsidiary of the Borrower is commenced by the Borrower or any Depository Institution Subsidiary of the Borrower or against the Borrower or any Depository Institution Subsidiary of the Borrower under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution, or liquidation law or statute of any Governmental Agency and, with respect to the Borrower only, if such proceedings are instituted against the Borrower, the Borrower by any action or failure to act indicates its approval of, consent to, or acquiescence therein, or an order shall be entered approving the petition in such proceedings and within thirty (30) days after the entry thereof such order is not vacated or stayed on appeal or otherwise, or shall not otherwise have ceased to continue in effect;

(h)     if any judgment or judgments, writ or writs, or warrant or warrants of attachment, or any similar process or processes, in an aggregate amount in excess of $10,000,000, shall be entered or filed against the Borrower or any Subsidiary of the Borrower or against any of their property and which remains unvacated, unbonded, unstayed, or unsatisfied for a period of thirty (30) days;

(i)     if the Borrower or any of its Subsidiaries shall be found liable or otherwise responsible for the release of any toxic or hazardous waste or substance into the environment, or any violation of any federal, state or local environmental, health or safety law or regulation, which, in either case involve an aggregate amount in excess of $10,000,000;

(j)     if any Change in Control shall occur; or

(k)     if the Borrower shall fail to make any payment when due as provided in the Subordinated Debt Agreement or the subordinated debenture delivered pursuant to the Subordinated Debt Agreement whether by acceleration or otherwise and such failure continues for five (5) days or if the Lender (as defined in the Subordinated Debt Agreement) shall otherwise exercise any of its rights under Section 5.2 of the Subordinated Debt Agreement.

## ARTICLE VIII
## ACCELERATION, WAIVERS, AMENDMENTS AND REMEDIES

**8.1     Acceleration**. If any Default described in Section 7.1(f) or 7.1(g) occurs with respect to the Borrower, the obligations of the Lenders to make Loans hereunder shall automatically terminate and the Obligations shall immediately become due and payable without any election or action on the part of the Agent or any Lender. If any other Default occurs, the Required Lenders (or the Agent with the consent of the Required Lenders) may terminate or suspend the obligations of the Lenders to make Loans hereunder, or declare the Obligations to be due and payable, or both, whereupon the Obligations shall become immediately due and payable, without presentment, demand, protest, or notice of any kind, all of which the Borrower hereby expressly waives. If, within 10 Business Days after acceleration of the maturity of the Obligations or termination of the obligations of the Lenders to make Loans hereunder as a result of any Default (other than any Default as described in Section 7.1(f) or 7.1(g) with respect to the Borrower) and before any judgment or decree for the payment of the Obligations due shall have been obtained or entered, the Required Lenders (in their sole discretion) shall so direct, the Agent shall, by notice to the Borrower, rescind and annul such acceleration and/or termination.

**8.2     Amendments**. Subject to the provisions of this Article VIII, the Required Lenders (or the Agent with the consent in writing of the Required Lenders) and the Borrower may enter into agreements supplemental hereto for the purpose of adding or modifying any provisions to the Loan Documents or changing in any manner the rights of the Lenders or the Borrower hereunder or waiving any Default hereunder; provided, however, that no such supplemental agreement shall, without the consent of each Lender affected thereby:

(a)     Extend the maturity of any Loan or Note or postpone any regularly scheduled payment of principal of any Loan or forgive all or any portion of the principal amount thereof, or reduce the rate or extend the time of payment of interest or fees thereon;

(b)     Reduce the percentage specified in the definition of Required Lenders;

(c)     Extend the Revolving Facility Termination Date or the Term Loans Termination Date, or reduce the amount or extend the payment date for, the mandatory payments required under Section 2.2, or increase or decrease the amount of the Commitment of any Lender hereunder (except for a ratable decrease in the

Commitments of all Lenders), or permit the Borrower to assign its rights under this Agreement;

(d)     Approve any Acquisition not otherwise permitted under Section 6.10(c);

(e)     Approve any waiver or amendment of the requirements of, or any failure to maintain the required ratio set forth in, Section 6.14(f), or approve any amendment to Section 6.14(f); and

(f)     Amend this Section 8.2.

No amendment of any provision of this Agreement relating to the Agent shall be effective without the written consent of the Agent. The Agent may waive payment of the fee required under Section 12.3(b) without obtaining the consent of any other party to this Agreement.

**8.3     Preservation of Rights.** No delay or omission of the Lenders or the Agent to exercise any right under the Loan Documents shall impair such right or be construed to be a waiver of any Default or an acquiescence therein, and the making of a Loan notwithstanding the existence of a Default or the inability of the Borrower to satisfy the conditions precedent to such Loan shall not constitute any waiver or acquiescence. Any single or partial exercise of any such right shall not preclude other or further exercise thereof or the exercise of any other right, and no waiver, amendment or other variation of the terms, conditions or provisions of the Loan Documents whatsoever shall be valid unless in writing signed by the Lenders required pursuant to Section 8.2, and then only to the extent in such writing specifically set forth. All remedies contained in the Loan Documents or by law afforded shall be cumulative and all shall be available to the Agent and the Lenders until the Obligations have been paid in full.

**8.4     Change to Commitments; Payments after Default.**

(a)     Notwithstanding any provision of this Agreement or in any Loan Document to the contrary: (i) in the event that the Subordinated Debt Agreement shall be terminated in accordance with the terms and conditions thereof, or in the event that the Subordinated Indebtedness outstanding under the Subordinated Debt Agreement shall be reduced at any time or from time to time in an aggregate amount more than Ten Million Dollars ($10,000,000), the Agent shall, within a reasonable period thereafter, decrease each Commitment and reallocate each Percentage Commitment to reflect a Commitment and Percentage Commitment as if the aggregate maximum amount (or such lesser amount in the event that the amount of the Subordinated Indebtedness under the Subordinated Debt Agreement is reduced and the Subordinated Debt Agreement continues to be in full force and effect) of the Subordinated Indebtedness outstanding under the Subordinated Agreement had been originally included in the Aggregate Commitment hereunder (provided, however, that no such decrease or reallocation shall be effective until such time as the Lender shall have received a payment in an amount that reflects the reduction to the amount outstanding under such Lender's Commitment); and (ii) in the event that the Subordinated Debt outstanding under the Subordinated Debt Agreement shall fail to be deemed to be Tier 2 Capital, the Agent shall, within a reasonable period thereafter, increase the Aggregate Commitment and reallocate each

Percentage Commitment to reflect an Aggregate Commitment, and each Commitment and Percentage Commitment, as if the aggregate maximum amount of the Subordinated Indebtedness outstanding under the Subordinated Debt Agreement had been originally included in the Aggregate Commitment hereunder. As soon as practicable following any such increase, decrease, adjustment, or reallocation hereunder, the Agent shall provide written notice thereof to each Lender. The Agent agrees and acknowledges that it shall not take any action under this <u>Section 8.4</u> that results in the increase of the Commitment of any Lender other than ANB.

(b) Notwithstanding any provision to the contrary of this Agreement or any Loan Document, the Lenders and the Agent agree and acknowledge that the obligations of Agent in <u>Section 8.4(a)</u> above shall be mandatory at all times including after an Event of Default and that the reallocation made by Agent shall reflect and result in, a ratable participation on the part of ANB in the Aggregate Term Loans Commitment and the Aggregate Revolving Loans Commitment. Additionally, the Lenders agree that after the date on which a Default under this Agreement or the Subordinated Debt Agreement (the "Default Date"), any and all amounts received after the Default Date by any Lender (including ANB in its capacity as Lender under the Subordinated Debt Agreement) in satisfaction of the obligations of the Borrower under this Agreement or the Subordinated Debt Agreement shall be allocated as if the reallocation under <u>Section 8.4(a)(ii)</u> shall have occurred as of the Default Date.

## ARTICLE IX
## GENERAL PROVISIONS

**9.1** **Survival of Representations.** All representations and warranties of the Borrower contained in this Agreement shall survive delivery of the Notes and the making of the Loans herein contemplated.

**9.2** **Governmental Regulation.** Notwithstanding anything contained in this Agreement to the contrary, no Lender shall be obligated to extend credit to the Borrower in violation of any limitation or prohibition provided by any applicable statute or regulation.

**9.3** **Taxes.** Any taxes (excluding federal income taxes on the overall net income of any Lender) or other similar assessments or charges made by any governmental or revenue authority in respect of the Loan Documents shall be paid by the Borrower, together with interest and penalties, if any.

**9.4** **Headings.** Section headings in the Loan Documents are for convenience of reference only, and shall not govern the interpretation of any of the provisions of the Loan Documents.

**9.5** **Entire Agreement.** The Transaction Documents embody the entire agreement and understanding among the Borrower, the Agent, and the Lenders and supersede all prior agreements and understandings among the Borrower, the Agent, and the Lenders relating to the subject matter thereof.

**9.6    Several Obligations; Benefits of this Agreement**.  The respective obligations of the Lenders hereunder are several and not joint, and no Lender shall be (or deemed to be) the partner or agent of any other (except to the extent to which the Agent is authorized to act as such).  The failure of any Lender to perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.  This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and assigns.

**9.7    Expenses; Indemnification**.  The Borrower shall reimburse the Agent for any and all reasonable costs and out-of-pocket expenses (including reasonable attorneys' fees and time charges of attorneys for the Agent, which attorneys may be employees of the Agent) paid or incurred by the Agent in connection with the preparation, negotiation, execution, delivery, review, amendment, modification, and administration of the Transaction Documents.  The Borrower also agrees to reimburse the Agent and the Lenders for any and all reasonable costs, and out-of-pocket expenses (including reasonable attorneys' fees and time charges of attorneys for the Agent and the Lenders) paid or incurred by the Agent or any Lender in connection with the collection and enforcement of the Transaction Documents.  The Borrower further agrees to indemnify and hold harmless the Agent and each Lender, its directors, officers, and employees against all losses, claims, damages, penalties, judgments, liabilities, and expenses (including, without limitation, all expenses of litigation or preparation therefor irrespective of whether the Agent or any Lender is a party thereto) that any of them may pay or incur arising out of, or relating to, this Agreement, the other Transaction Documents, the transactions contemplated hereby or thereby, or the direct or indirect application or proposed application of the proceeds of any Loan hereunder except to the extent that they are determined by a court of competent jurisdiction in a final and non-appealable order to have resulted from the gross negligence or willful misconduct of the party seeking indemnification.  The obligations of the Borrower under this section shall survive the execution and delivery of the Loan Documents, the payment of the Obligations, and termination of the Loan Documents.

**9.8    Numbers of Documents**.  All statements, notices, closing documents, and requests hereunder shall be furnished to the Agent with sufficient counterparts so that the Agent may furnish one to each of the Lenders.

**9.9    Accounting**.  Except as provided to the contrary herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with GAAP, except that any calculation or determination that is to be made on a consolidated basis shall be made for the Borrower and all of its Subsidiaries, including those Subsidiaries, if any, that are unconsolidated on the Borrower's audited financial statements.

**9.10   Severability of Provisions**.  Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end, the provisions of all Loan Documents are declared to be severable.

**9.11 Nonliability of Lenders**. The relationship between the Borrower and the Lenders and the Agent shall be solely that of borrower and lender. Neither the Agent nor any Lender shall have any fiduciary responsibilities to the Borrower. Neither the Agent nor any Lender undertakes any responsibility to the Borrower to review or inform the Borrower of any matter in connection with any phase of the Borrower's business or operations. The Borrower agrees that neither the Agent nor any Lender shall have liability to the Borrower (whether sounding in tort, contract or otherwise) for losses suffered by the Borrower in connection with, arising out of, or in any way related to, the transactions contemplated and the relationship established by the Transaction Documents, or any act, omission or event occurring in connection herewith or therewith, unless it is determined by a court of competent jurisdiction in a final and non-appealable order that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought. Neither the Agent nor any Lender shall have any liability with respect to, and the Borrower hereby waives, releases, and agrees not to sue for, any special, indirect, or consequential damages suffered by the Borrower in connection with, arising out of, or in any way related to the Transaction Documents or the transactions contemplated hereby or thereby.

**9.12 Confidentiality**. Each Lender agrees to hold any confidential information that it may receive from the Borrower pursuant to this Agreement in confidence, except for disclosure: (a) to its Affiliates and to other Lenders and their respective Affiliates; (b) to legal counsel, accountants, and other professional advisors to that Lender or to a Transferee; (c) to regulatory officials; (d) to any Person as requested pursuant to, or as required by, applicable law, regulation, or legal process; (e) to any Person in connection with any legal proceeding to which that Lender is a party; and (f) permitted by Section 12.4.

**9.13 Nonreliance**. Each Lender hereby represents that it is not relying on, or looking to, any margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System) for the repayment of the Loans provided for herein.

**9.14 Disclosure**. Each Lender hereby: (a) acknowledges and agrees that: (i) one or more Affiliates of ANB are or may become direct or indirect equity investors in Borrower or any Subsidiary or Affiliate of Borrower; and (ii) ANB and/or its Affiliates from time to time may hold other investments in, make other loans to, or have other relationships with, the Borrower or any Subsidiary or Affiliate of the Borrower; and (b) waives any liability of ANB or such Affiliate to any Lender arising out of, or resulting from, such investments, loans, or relationships.

## ARTICLE X
## THE AGENT

**10.1 Appointment; Nature of Relationship**. American National Bank and Trust Company of Chicago is hereby appointed by the Lenders as the Agent hereunder and under each other Loan Document, and each of the Lenders irrevocably authorizes the Agent to act as the contractual representative of such Lender with the rights and duties expressly set forth herein and in the other Loan Documents. The Agent agrees to act as such contractual

representative upon the express conditions contained in this Article X. Notwithstanding the use of the defined term "Agent," the Lenders and the Borrower hereby expressly acknowledge and agree that the Agent shall not have any fiduciary responsibilities to any Lender by reason of this Agreement or any other Loan Document and that the Agent is merely acting as the representative of the Lenders with only those duties as are expressly set forth in this Agreement and the other Loan Documents. In its capacity as the Lenders' contractual representative, the Agent: (a) does not hereby assume any fiduciary duties to any of the Lenders; (b) is a "representative" of the Lenders within the meaning of Section 9-105 of the Uniform Commercial Code; and (c) is acting as an independent contractor, the rights and duties of which are limited to those expressly set forth in this Agreement and the other Loan Documents. Except as otherwise required in this Agreement, in connection with the routine administration of this Agreement and the Loans, the Lenders agree that the Borrower may deal solely with the Agent as the representative of the Lenders. Each of the Lenders hereby agrees to assert no claim against the Agent on any agency theory or any other theory of liability for breach of fiduciary duty, all of which claims each Lender hereby waives.

**10.2  Powers**. The Agent shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Agent by the terms of each thereof, together with such powers as are reasonably incidental thereto. The Agent shall have no implied duties to the Lenders, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Agent.

**10.3  General Immunity**. Neither the Agent nor any of its directors, officers, agents, or employees shall be liable to the Borrower, the Lenders, or any Lender for: (a) any action taken or omitted to be taken by it or them hereunder or under any other Loan Document or in connection herewith or therewith, except for its or their own willful misconduct or gross negligence; or (b) any determination by the Agent that compliance with any law or any governmental or quasi-governmental rule, regulation, order, policy, guideline, or directive (whether or not having the force of law) requires the Advances and Commitments hereunder to be classified as being part of a "highly leveraged transaction."

**10.4  No Responsibility for Loans, Recitals, etc.** Neither the Agent nor any of its directors, officers, agents, or employees shall be responsible for, or have any duty to ascertain, inquire into, or verify: (a) any statement, warranty, or representation made in connection with any Loan Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements of any obligor under any Loan Document, including, without limitation, any agreement by an obligor to furnish information directly to each Lender; (c) the satisfaction of any condition specified in Article IV, except receipt of items required to be delivered to the Agent; (d) the validity, enforceability, effectiveness, sufficiency, or genuineness of any Loan Document or any other instrument or writing furnished in connection therewith; or (e) the value, sufficiency, creation, perfection, or priority of any interest in any collateral security. The Agent shall have no duty to disclose to the Lenders information that is not required to be furnished by the Borrower to the Agent at such time, but is voluntarily furnished by the Borrower to the Agent (either in its capacity as Agent or in its individual capacity).

**10.5  Action on Instructions of Lenders**.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder and under any other Loan Document in accordance with written instructions signed by the Required Lenders, and such instructions and any action taken or failure to act pursuant thereto shall be binding on all of the Lenders and on all holders of Notes.  The Lenders hereby acknowledge that the Agent shall be under no duty to take any discretionary action permitted to be taken by it pursuant to the provisions of this Agreement or any other Loan Document unless it shall be requested in writing to do so by the Required Lenders.  The Agent shall be fully justified in failing or refusing to take any action hereunder and under any other Loan Document unless it shall first be indemnified to its satisfaction by the Lenders pro rata against any and all liability, cost, and expense that it may incur by reason of taking or continuing to take any such action.

**10.6  Employment of Agents and Counsel**.  The Agent may execute any of its duties as Agent hereunder and under any other Loan Document by or through employees, agents, and attorneys-in-fact and shall not be answerable to the Lenders, except as to money or securities received by it or its authorized agents, for the default or misconduct of any such agents or attorneys-in-fact selected by it with reasonable care.  The Agent shall be entitled to advice of counsel concerning all matters pertaining to the agency hereby created and its duties hereunder and under any other Loan Document.

**10.7  Reliance on Documents; Counsel**.  The Agent shall be entitled to rely upon any Note, notice, consent, certificate, affidavit, letter, telegram, statement, paper, contract, agreement, instrument, document, and certificate believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, and, in respect to legal matters, upon the opinion of counsel selected by the Agent, which counsel may be employees of the Agent.

**10.8  Agent's Reimbursement and Indemnification**.  The Lenders agree to reimburse and indemnify the Agent ratably in proportion to their respective Commitments (or, if the Commitments have been terminated, in proportion to their Commitments immediately prior to such termination):  (a) for any amounts not reimbursed by the Borrower for which the Agent is entitled to reimbursement by the Borrower under the Loan Documents; (b) for any other expenses incurred by the Agent on behalf of the Lenders, in connection with the preparation, execution, delivery, administration, and enforcement of the Loan Documents; and (c) for any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind and nature whatsoever which may be imposed on, incurred by, or asserted against, the Agent in any way relating to, or arising out of, the Loan Documents or any other document delivered in connection therewith or the transactions contemplated thereby, or the enforcement of any of the terms thereof or of any such other documents, provided that no Lender shall be liable for any of the foregoing to the extent they arise from the gross negligence or willful misconduct of the Agent.  The obligations of the Lenders under this Section 10.8 shall survive the execution and delivery of the Loan Documents, the payment of the Obligations, and termination of the Loan Documents.

**10.9  Notice of Default.**  The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Unmatured Default hereunder unless the Agent has received written notice from a Lender or the Borrower referring to this Agreement describing such Default or Unmatured Default and stating that such notice is a "notice of default". In the event that the Agent receives such a notice, the Agent shall give prompt notice thereof to the Lenders.

**10.10  Rights as a Lender.**  In the event the Agent is a Lender, the Agent shall have the same rights and powers hereunder and under any other Loan Document as any Lender and may exercise the same as though it were not the Agent, and the term "Lender" or "Lenders" shall, at any time when the Agent is a Lender, unless the context otherwise indicates, include the Agent in its individual capacity. The Agent may accept deposits from, lend money to, and generally engage in any kind of trust, debt, equity, or other transaction, in addition to those contemplated by this Agreement or any other Loan Document, with the Borrower or any of its Subsidiaries in which the Borrower or such Subsidiary is not restricted hereby from engaging with any other Person. The Agent, in its individual capacity, is not obligated to remain a Lender.

**10.11  Lender Credit Decision.**  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on the financial statements prepared by the Borrower and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Loan Documents. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents.

**10.12  Successor Agent.**  The Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower, such resignation to be effective upon the appointment of a successor Agent or, if no successor Agent has been appointed, forty-five days after the retiring Agent gives notice of its intention to resign. Upon any such resignation, the Required Lenders, with the written consent of the Borrower, which consent shall not unreasonably be withheld or delayed, shall have the right to appoint, on behalf of the Borrower and the Lenders, a successor Agent. If no successor Agent shall have been so appointed by the Required Lenders within thirty days after the resigning Agent's giving notice of its intention to resign, then the resigning Agent with the written consent of the Borrower, which consent shall not unreasonably be withheld or delayed, may appoint, on behalf of the Borrower and the Lenders, a successor Agent. If the Agent has resigned and no successor Agent has been appointed, the Lenders may perform all the duties of the Agent hereunder and the Borrower shall make all payments in respect of the Obligations to the applicable Lender and for all other purposes shall deal directly with the Lenders. No successor Agent shall be deemed to be appointed hereunder until such successor Agent has accepted the appointment. Any such successor Agent shall be a commercial bank having capital and retained earnings of at least $50,000,000. Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights,

powers, privileges and duties of the resigning Agent. Upon the acceptance of the appointment by the Successor Agent, the resigning Agent shall be discharged from its duties and obligations hereunder and under the Loan Documents. After the effectiveness of the resignation of an Agent, the provisions of this Article X shall continue in effect for the benefit of such Agent in respect of any actions taken or omitted to be taken by it while it was acting as the Agent hereunder and under the other Loan Documents.

**10.13 Agent's Fee**. The Borrower agrees to pay to the Agent, for its own account, the fees agreed to by the Borrower and the Agent pursuant to that certain letter agreement dated December 1, 1998, or as otherwise agreed from time to time.

**ARTICLE XI**
**SETOFF; RATABLE PAYMENTS**

**11.1 Setoff**. In addition to, and without limitation of, any rights of the Lenders under applicable law, if the Borrower becomes insolvent, however evidenced, or any Default or Unmatured Default occurs, any and all deposits (including all account balances, whether provisional or final and whether or not collected or available) and any other Indebtedness at any time held or owing by any Lender to, or for the credit or account of, the Borrower may be offset and applied toward the payment of the Obligations owing to such Lender, whether or not the Obligations, or any part hereof, shall then be due. The Lenders acknowledge that the Lenders shall not have the right to setoff against any account of the Depository Institution Subsidiaries.

**11.2 Ratable Payments**. If any Lender, whether by setoff or otherwise, has payment made to it upon its Loans (other than payments received pursuant to Section 3.2) in a greater proportion than that received by any other Lender, such Lender agrees, promptly upon demand, to purchase a portion of the Loans held by the other Lenders so that after such purchase each Lender will hold its ratable proportion of Loans. If any Lender, whether in connection with setoff or amounts which might be subject to setoff or otherwise, receives collateral or other protection for its Obligations or such amounts which may be subject to setoff, such Lender agrees, promptly upon demand, to take such action necessary such that all Lenders share in the benefits of such collateral ratably in proportion to their Loans. In case any such payment is disturbed by legal process, or otherwise, appropriate further adjustments shall be made.

**ARTICLE XII**
**BENEFIT OF AGREEMENT; ASSIGNMENTS; PARTICIPATIONS**

**12.1 Successors and Assigns**. The terms and provisions of the Loan Documents shall be binding upon, and inure to the benefit of, the Borrower and the Lenders and their respective successors and assigns, except that: (a) the Borrower shall not have the right to assign its rights or obligations under the Loan Documents; and (b) any assignment by any Lender must be made in compliance with Section 12.3. Notwithstanding clause (b) of this Section, any Lender may at any time, without the consent of the Borrower or the Agent, assign

all or any portion of its rights under this Agreement and its Notes to a Federal Reserve Bank; provided, however, that no such assignment to a Federal Reserve Bank shall release the transferor Lender from its obligations hereunder. The Agent may treat the payee of any Note as the owner thereof for all purposes hereof unless and until such payee complies with Section 12.3 in the case of an assignment thereof or, in the case of any other transfer, a written notice of the transfer is filed with the Agent. Any assignee or transferee of a Note agrees by acceptance thereof to be bound by all the terms and provisions of the Loan Documents. Any request, authority or consent of any Person, who at the time of making such request or giving such authority or consent is the holder of any Note, shall be conclusive and binding on any subsequent holder, transferee or assignee of such Note or of any Note or Notes issued in exchange therefor.

### 12.2 Participations.

(a) Permitted Participants; Effect. Any Lender may, with the prior written consent of the Borrower (except with respect to any sale to an Affiliate of a Lender), in the ordinary course of its business and in accordance with applicable law, at any time sell to one or more banks or other entities ("Participants") participating interests in any Loan owing to such Lender, any Note held by such Lender, any Commitment of such Lender or any other interest of such Lender under the Loan Documents. In the event of any such sale by a Lender of participating interests to a Participant, such Lender's obligations under the Loan Documents shall remain unchanged, such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, such Lender shall remain the holder of any such Note for all purposes under the Loan Documents, all amounts payable by the Borrower under this Agreement shall be determined as if such Lender had not sold such participating interests, and the Borrower and the Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents.

(b) Voting Rights. Each Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, modification or waiver of any provision of the Loan Documents other than any amendment, modification or waiver with respect to any Loan or Commitment in which such Participant has an interest which forgives principal, interest or fees or reduces the interest rate or fees payable with respect to any such Loan or Commitment, postpones any date fixed for any regularly-scheduled payment of principal of, or interest or fees on, any such Loan or Commitment, releases any guarantor of any such Loan or releases any substantial portion of collateral, if any, securing any such Loan.

(c) Benefit of Setoff. The Borrower agrees that each Participant shall be deemed to have the right of setoff provided in Section 11.1 in respect of its participating interest in amounts owing under the Loan Documents to the same extent as if the amount of its participating interest were owing directly to it as a Lender under the Loan Documents, provided that each Lender shall retain the right of setoff provided in Section 11.1 with respect to the amount of participating interests sold to each

Participant. The Lenders agree to share with each Participant, and each Participant, by exercising the right of setoff provided in Section 11.1, agrees to share with each Lender, any amount received pursuant to the exercise of its right of setoff, such amounts to be shared in accordance with Section 11.2 as if each Participant were a Lender.

**12.3 Assignments**.

(a) Permitted Assignments. Any Lender may, in the ordinary course of its business and in accordance with applicable law, at any time assign to one or more banks or other entities ("Purchasers") all or any part of its rights and obligations under the Loan Documents. Such assignment shall be substantially in the form of Exhibit F hereto or in such other form as may be agreed to by the parties thereto. The prior written consent of the Borrower, and the Agent shall be required prior to an assignment becoming effective with respect to a Purchaser which is not a Lender, or an Affiliate of a Lender, listed on the signature page hereof; provided, however, that if a Default or an Unmatured Default has occurred and is continuing, the consent of the Borrower shall not be required. Such consent shall not be unreasonably withheld or delayed in connection with any assignment by a Lender to any of its Affiliates.

(b) Effect; Effective Date. Upon: (i) delivery to the Agent of a notice of assignment, substantially in the form attached as Schedule I to Exhibit F hereto (a "Notice of Assignment"), together with any consents required by Section 12.3(a); and (ii) payment of a $3,500 fee to the Agent for processing such assignment, such assignment shall become effective on the effective date specified in such Notice of Assignment. The Notice of Assignment shall contain a representation by the Purchaser to the effect that none of the consideration used to make the purchase of the Commitment and Loans under the applicable assignment agreement are "plan assets" as defined under ERISA and that the rights and interests of the Purchaser in and under the Loan Documents will not be "plan assets" under ERISA. On and after the effective date of such assignment, such Purchaser shall for all purposes be a Lender party to this Agreement and any other Loan Document executed by the Lenders and shall have all the rights and obligations of a Lender under the Loan Documents, to the same extent as if it were an original party hereto, and no further consent or action by the Borrower, the Lenders or the Agent shall be required to release the transferor Lender with respect to the percentage of the Aggregate Commitment and Loans assigned to such Purchaser. Upon the consummation of any assignment to a Purchaser pursuant to this Section 12.3(b), the transferor Lender, the Agent and the Borrower shall make appropriate arrangements so that replacement Notes are issued to such transferor Lender and new Notes or, as appropriate, replacement Notes, are issued to such Purchaser, in each case in principal amounts reflecting their Commitment, as adjusted pursuant to such assignment.

**12.4 Dissemination of Information**. The Borrower provided that it has given its written consent, if such consent is required, authorizes each Lender to disclose to any

Participant or Purchaser or any other Person acquiring an interest in the Loan Documents by operation of law (each a "Transferee") and any prospective Transferee any and all information in such Lender's possession concerning the creditworthiness of the Borrower and its Subsidiaries; provided that each Transferee and prospective Transferee agrees to be bound by Section 9.12 of this Agreement.

**12.5 Tax Treatment**. If any interest in any Loan Document is transferred to any Transferee which is organized under the laws of any jurisdiction other than the United States or any State thereof, the transferor Lender shall cause such Transferee, concurrently with the effectiveness of such transfer, to comply with the provisions of Section 4.3.

**ARTICLE XIII**
**NOTICES**

**13.1 Notices**. Except as otherwise permitted by Section 2.13 with respect to borrowing notices, all notices, requests, and other communications to any party hereunder shall be in writing (including bank wire, facsimile transmission, or similar writing) and shall be given to such party: (a) if to the Borrower or the Agent, at its address or facsimile number set forth on the signature pages hereof; (b) if to any Lender, at its address or facsimile number set forth below its signature hereto; or (c) if to any party, such other address or facsimile number as such party may hereafter specify for the purpose by notice to the Agent and the Borrower. Each such notice, request or other communication shall be effective: (a) if given by facsimile transmission, when transmitted to the facsimile number specified in this Section and confirmation of receipt is received; (b) if given by mail, 72 hours after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid; or (c) if given by any other means, when delivered at the address specified in this section; provided that notices to the Agent under Article II shall not be effective until received.

**13.2 Change of Address**. The Borrower, the Agent, and any Lender may each change the address for service of notice upon it by a notice in writing to the other parties hereto.

**ARTICLE XIV**
**COUNTERPARTS**

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart. This Agreement shall be effective when it has been executed by the Borrower, the Agent and the Lenders and each party has notified the Agent by telex or telephone, that it has taken such action.

## ARTICLE XV
### CHOICE OF LAW, CONSENT TO JURISDICTION, WAIVER OF JURY TRIAL

**15.1  CHOICE OF LAW.**  THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

**15.2  CONSENT TO JURISDICTION.**  THE BORROWER AND THE LENDERS HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, OR RELATING TO, ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDERS HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION, SUIT, OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION, SUIT, OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM.  ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

**15.3  WAIVER OF JURY TRIAL.**  THE BORROWER, THE AGENT, AND EACH LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

* * * * *

IN WITNESS WHEREOF, the Borrower, the Lenders and the Agent have executed this Agreement as of the date first above written.

**FBOP CORPORATION**

By: _____

Print Name: _____

Title: _____

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois 60302
Attention: Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook
115 South LaSalle Street
Suite 3100
Chicago, Illinois 60602
Attention: Edward C. Fitzpatrick, Esq.

| Commitments | |
| Term | Revolving |
| $1,428,571 | $3,571,429 |

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO,**
as Agent and as a Lender

By: _James Pridmore_

Print Name: _James K. Pridmore_

Title: _First Vice President_

(address)

American National Bank and Trust
Company of Chicago
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. James K. Pridmore
                    First Vice President

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg
333 West Wacker Drive, Suite 2700
Chicago, Illinois  60606
Attention:  Edwin S. del Hierro, Esq.

| Commitments | |
| Term | Revolving |
| $5,714,286 | $14,285,714 |

**ASSOCIATED BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Associated Bank
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention:  Mr. Mark A. Matthiesen

| Commitments | |
| Term | Revolving |
| $1,428,571 | $3,571,429 |

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO,**
as Agent and as a Lender


By: _____

Print Name: _____

Title: _____

(address)

American National Bank and Trust
Company of Chicago
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. James K. Pridmore
              First Vice President

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg
333 West Wacker Drive, Suite 2700
Chicago, Illinois 60606
Attention: Edwin S. del Hierro, Esq.

| Commitments | |
| Term | Revolving |
| $5,714,286 | $14,285,714 |

**ASSOCIATED BANK,** as a Lender


By: _____

Print Name: Mark A. Matthiesen

Title: Vice President

(address)

Associated Bank
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention: Mr. Mark A. Matthiesen

CAFINAL

47

8:41 AM

| Commitments | |
|---|---|
| Term | Revolving |
| $11,428,571 | $28,571,429 |

**FIRSTAR BANK, N. A.**
(f/k/a Mercantile
Bank, National Association)

By: ⟋⟋.Q.⟋⟋⟋

Print Name: ⟋⟋⟋⟋⟋ C. ⟋⟋⟋⟋⟋⟋

Title: ⟋⟋⟋ ⟋⟋⟋⟋⟋⟋⟋

(address)

Tram 001/1001/11-5
Seventh and Washington
St. Louis, Missouri 63101
Attention: Mr. David C. Buettner

| Commitments | |
|---|---|
| Term | Revolving |
| $10,000,000 | $25,000,000 |

**HARRIS TRUST AND SAVINGS
BANK**, as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603

| Commitments | |
|---|---|
| Term | Revolving |
| $11,428,571 | $28,571,429 |

**FIRSTAR BANK, N. A.**
(f/k/a Mercantile
Bank, National Association)

By:_____

Print Name:_____

Title:_____

(address)

Tram 001/1001/11-5
Seventh and Washington
St. Louis, Missouri 63101
Attention: Mr. David C. Buettner

| Commitments | |
|---|---|
| Term | Revolving |
| $10,000,000 | $25,000,000 |

**HARRIS TRUST AND SAVINGS
BANK,** as a Lender

By: _Michael S. Cameli._

Print Name: _Michael S. Cameli_

Title: _V.P._

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603

Attention:  Steven G. Hastings, Esq.

| Commitments | |
| Term | Revolving |
| $14,285,714 | $35,714,286 |

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name:  **JAY C. GOLDNER**

Title: _Sr. Vice President_

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention:  Mr. Jay Goldner

| Commitments | |
| Term | Revolving |
| $10,000,000 | $25,000,000 |

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By: _____

Print Name: _____

Title: _____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention:  Mr. Phillip D. Koepke

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:  K. Thor Lundsren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $14,285,714 | $35,714,286 |

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By:_____

Print Name:_____

Title:_____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Jay Goldner

| Commitments | |
| --- | --- |
| Term | Revolving |
| $10,000,000 | $25,000,000 |

**M&I MARSHALL & ILSLEY BANK**, as a Lender

By: *Gregg R Weyer*

Print Name: *Gregg R Weyer*

Title: *Vice President*

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention: Mr. Phillip D. Koepke

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: K. Thor Lundsren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $4,285,714 | $10,714,286 |

**FIFTH THIRD BANK**, as a
Lender

By: _Patrick A. Horne_

Print Name: _Patrick A. Horne_

Title: _Vice President_

(address)

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois  60008
Attn:  Mr. Patrick A. Horne
      Vice President

| Commitments | |
| --- | --- |
| Term | Revolving |
| $2,857,143 | $7,142,857 |

**UNION BANK OF CALIFORNIA, N.A.**,
as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angeles, California 90071
Attn:  Dennis A. Cattell
      Vice President

CAFINAL

9:02 AM

| Commitments | |
| --- | --- |
| Term | Revolving |
| $4,285,714 | $10,714,286 |

**FIFTH THIRD BANK**, as a
Lender

By:_____

Print Name:_____

Title:_____

(address)

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois  60008
Attn:  Mr. Patrick A. Horne
        Vice President

| Commitments | |
| --- | --- |
| Term | Revolving |
| $2,857,143 | $7,142,857 |

**UNION BANK OF CALIFORNIA, N.A.**,
as a Lender

By:_____

Print Name:___WILLIAM J. MC GILL, JR.___

Title:___SR VICE PRESIDENT___

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angeles, California 90071
Attn:  Dennis A. Cattell
        Vice President

## EXHIBIT A

### FORM OF RESTATED REVOLVING NOTE

$_____                           Restatement Date:  April 30, 2001

     FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of _____ ("Lender") the lesser of the principal sum of _____ Dollars and the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the Borrower pursuant to Article II of the Agreement (as hereinafter defined), in immediately available funds at the main office of American National Bank and Trust Company of Chicago in Chicago, Illinois, as Agent, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement.  The Borrower shall pay the principal of, and accrued and unpaid interest on, the Revolving Loans in full on the Revolving Facility Termination Date.

     The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Revolving Loan and the date and amount of each principal payment hereunder.

     This Revolving Note is one of the Revolving Notes issued pursuant to, and is entitled to the benefits of, that certain Amended and Restated Credit Agreement, dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed, or extended and in effect from time to time, is herein called the "Agreement"), by and among the Borrower, the Lenders party thereto, including the Lender, and American National Bank and Trust Company of Chicago, as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Revolving Note, including the terms and conditions under which this Revolving Note may be prepaid or its maturity date accelerated. Capitalized terms used, but not otherwise defined, herein shall have the meanings attributed to them in the Agreement.

     It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time.  Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Revolving Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, or charged or received, under the Agreement or this Revolving Note or otherwise in connection with the Agreement or this Revolving Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender). All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors, and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release, surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or that may hereafter be held as security for the payment of this Revolving Note, and may extend the time for payment or (with the consent of the Borrowers) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby.

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT, OF OR RELATING TO, ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION, SUIT, OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION, SUIT, OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT, AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

IN WITNESS WHEREOF, the Borrower has caused this Revolving Note to be duly executed as of the date first above written.

**FBOP CORPORATION**

By:_____

Print Name:_____

Title:_____

ATTEST:

By:_____

Print Name:_____

Title:_____

SCHEDULE OF REVOLVING LOANS AND PAYMENTS OF PRINCIPAL
TO
REVOLVING NOTE OF FBOP CORPORATION,
DATED AS OF APRIL 30, 2001

| Date | Principal Amount of Loan | Maturity of Interest Period | Maturity Principal Amount Paid | Unpaid Balance |
|------|--------------------------|-----------------------------|--------------------------------|----------------|
|      |                          |                             |                                |                |

**EXHIBIT B**

**FORM OF RESTATED TERM NOTE**

$_____                                    Restatement Date:  April 30, 2001

FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of _____ ("Lender") the lesser of the principal sum of _____ Dollars and the aggregate unpaid principal amount of all Term Loans made by the Lender to the Borrower pursuant to Article II of the Agreement (as hereinafter defined), in immediately available funds at the main office of American National Bank and Trust Company of Chicago in Chicago, Illinois, as Agent, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement.  The Borrower shall pay the principal of, and accrued and unpaid interest on, the Term Loans in full on the Term Loans Termination Date and shall make such mandatory payments as are required to be made under the terms of Article II of the Agreement.

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Term Loan and the date and amount of each principal payment hereunder.

This Term Note is one of the Term Notes issued pursuant to, and is entitled to the benefits of, that certain Amended and Restated Credit Agreement, dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed, or extended and in effect from time to time, is herein called the "Agreement"), by and among the Borrower, the Lenders party thereto, including the Lender, and American National Bank and Trust Company of Chicago, as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Term Note, including the terms and conditions under which this Term Note may be prepaid or its maturity date accelerated. Capitalized terms used, but not otherwise defined, herein shall have with the meanings attributed to them in the Agreement.

It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time.  Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Term Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, or charged or received, under the Agreement or this Term Note or otherwise in connection with the Agreement or this Term Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender). All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors, and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release, surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or that may hereafter be held as security for the payment of this Term Note, and may extend the time for payment or (with the consent of the Borrowers) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby.

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, OR RELATING TO, ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION, SUIT, OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION, SUIT, OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

IN WITNESS WHEREOF, the Borrower has caused this Term Note to be duly executed as of the date first above written.

**FBOP CORPORATION**

By:_____

Print Name:_____

Title:_____

ATTEST:

By:_____

Print Name:_____

Title:_____

SCHEDULE OF TERM LOANS AND PAYMENTS OF PRINCIPAL
TO
TERM NOTE OF FBOP CORPORATION,
DATED AS OF APRIL 30, 2001

| Date | Principal Amount of Loan | Maturity of Interest Period | Maturity Principal Amount Paid | Unpaid Balance |
|------|--------------------------|-----------------------------|--------------------------------|----------------|
|      |                          |                             |                                |                |

76579_8

B-4

11:19 AM

# EXHIBIT C

## FORM OF OPINION OF BORROWER'S COUNSEL

# EXHIBIT B

EXECUTION COPY

# FIRST AMENDMENT

## TO

# AMENDED AND RESTATED CREDIT AGREEMENT

### AMONG

### FBOP CORPORATION,

### AMERICAN NATIONAL BANK AND TRUST

### COMPANY OF CHICAGO, AS AGENT AND AS A LENDER,

### AND

### THE INSTITUTIONS THAT ARE FROM TIME TO TIME
### PARTIES HERETO AS LENDERS

First Amendment dated as of March 31, 2002
Original Amended and Restated Credit Agreement dated as of April 30, 2001

First Amendment to Credit Agreement (8).DOC

# FIRST AMENDMENT TO
# AMENDED AND RESTATED CREDIT AGREEMENT

This FIRST AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT (this "First Amendment"), dated as of the 31st day of March, 2002, is entered into among FBOP CORPORATION, a bank holding company incorporated under the laws of the State of Illinois and having its principal place of business at 11 West Madison Street, Oak Park, Illinois 60302, and the institutions that are from time to time parties hereto as Lenders (whether by execution of this Agreement or an Assignment and Acceptance), and AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a national banking association having its principal place of business at 120 South LaSalle Street, Chicago, Illinois 60603-3400, in its capacity as the Agent and as a Lender.

## R E C I T A L S :

A.      The parties hereto have entered into a certain Amended and Restated Credit Agreement dated as of April 30, 2001, as previously amended, restated, supplemented or modified from time to time (the "2001 Credit Agreement").

B.      The parties hereto desire to amend and modify the 2001 Credit Agreement in accordance with the terms and subject to the conditions set forth in this First Amendment.  As amended and modified by this First Amendment, the 2001 Credit Agreement may be referred to as the "Agreement".

C.      The parties desire to amend the terms of the 2001 Credit Agreement (i) to extend the Revolving Facility Termination Date and (ii) to consent to certain Indebtedness.  The parties agree to undertake such modification in accordance with the terms, subject to the conditions and in reliance upon the recitals, representations, warranties and covenants set forth herein, in the Agreement and in the other Loan Documents, whether entered into or delivered on or after April 30, 2001.

D.      Capitalized terms used but not otherwise defined in this First Amendment shall have the meanings respectively ascribed to them in the 2001 Credit Agreement.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## A G R E E M E N T :

A.      **Amendment to the Revolving Facility Termination Date**.   The Revolving Facility Termination Date is hereby amended to be May 31, 2002.

**B.     Approval of Certain Indebtedness**.  The Borrower agrees to deliver to each Lender promptly following Borrower's receipt of the New Indebtedness Documents (as defined below), but in no event later than the close of business on May 31, 2002, certified copies of all documents (the "New Indebtedness Documents") evidencing and relating to all Indebtedness (including all issuances of trust preferred securities of the Borrower and all subsidiaries of the Borrower) incurred after December 28, 2001 (the "Approved Indebtedness").  Subject to the Lenders' receipt of the New Indebtedness Documents in accordance with the immediately preceding sentence, the Lenders hereby consent to the Approved Indebtedness as evidenced by the New Indebtedness Documents and hereby waive the violations of the Borrower, as of the date hereof, under Section 6.8 and 6.13 of the Agreement with respect to the Approved Indebtedness.

**C.     Conditions**.  In addition to other conditions set forth in the 2001 Credit Agreement, including, without limitation, those applicable to the making of Advances, the obligations of the Lenders under the Agreement shall be subject to the performance by the Borrower of all of its agreements theretofore to be performed under the Agreement and to the receipt of copies, certified by the Secretary or Assistant Secretary of the Borrower, of its Board of Directors' resolutions authorizing the execution, delivery and performance, respectively, of this First Amendment and any other documents to be executed, delivered or performed in connection with this First Amendment (collectively, "Amendment-Related Documents"), which certificate shall be dated the date hereof and shall be in form and substance satisfactory to the Agent and its counsel.

**D.     Additional Terms**.

(i)     _Acknowledgments_.  Borrower acknowledges and confirms that as of the date hereof, the Borrower is indebted to the Lenders, without defense, setoff or counterclaim, in the aggregate principal amount of Fifty-Three Million Five Hundred Seventy-One Thousand Four Hundred Twenty-Nine and No/100 Dollars ($53,571,429.00) in Term Loans and in the aggregate principal amount of One Hundred Thirty-One Million Eight Hundred Twenty-Eight Thousand Five Hundred Sixty-Five and No/100 Dollars ($131,828,565.00) in Revolving Loans made under the 2001 Credit Agreement.

(ii)     _Effectiveness_.  The provisions of this First Amendment will become effective upon its execution by the parties hereto.

(iii)     _The Term Loans Commitment and Revolving Loans Commitment_.  The amount of the respective Term Loans Commitment of each Lender as of the date hereof, after giving effect to all payments of principal under the Term Loans, is the amount set forth opposite its signature below.  The Revolving Loans Commitment of each Lender set forth opposite its signature below is identical to the Revolving Loans Commitments provided on the signature pages to the 2001 Credit Agreement.

(iv)     _The Agreement_.  All references in the 2001 Credit Agreement to the term "Agreement" shall be deemed to refer to the Agreement referenced in this First Amendment.

2

(v)     The Lenders.  All references in the Agreement to the "Lenders" shall be deemed to refer to the lending institutions listed on the signature pages to this First Amendment and their respective permitted successors and assigns.  Each Lender hereby acknowledges that it has received a copy of all of the documents that constitute the 2001 Credit Agreement, and that it is a Lender under all of the Loan Documents and that it will perform in accordance with the terms of such Loan Documents all of the obligations which are required to be performed by it as a Lender.

(vi)     First Amendment and 2001 Credit Agreement to be Read Together.  This First Amendment supplements and is part of the 2001 Credit Agreement, and the 2001 Credit Agreement and this First Amendment shall henceforth be read together and shall constitute the Agreement.  Except as otherwise set forth herein, the 2001 Credit Agreement shall remain in full force and effect.

(vii)     Transaction Documents.  The terms "Transaction Documents" and "Loan Documents," as used in the Agreement, shall include the Amendment-Related Documents.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Borrower, the Lenders and the Agent have executed this Fifth Amendment as of the date first above written.

**FBOP CORPORATION**

By: _____

Print Name: _____

Title: _____

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois 60302
Attention: Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook
115 S. LaSalle Street, 31st Floor
Chicago, Illinois 60602
Attention: Edward C. Fitzpatrick, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $1,275,510.21 | $3,571,429 |

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO**, as Agent and as a Lender

By: _____

Print Name: _Scott J. Steiner_

Title: _Commercial Loan Officer_

(address)

American National Bank and Trust Company
of Chicago
120 South LaSalle Street
Chicago, Illinois 60603
Attention:      Mr. Scott J. Steiner

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLC
333 West Wacker Drive, Suite 2700
Chicago, Illinois  60606
Attention:      Edwin S. del Hierro, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $5,102,040.86 | $14,285,714 |

**ASSOCIATED BANK**, as a Lender

By: _____

Print Name: _____

Title: _____

(address)

Associated Bank
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention:      Mr. Mark A. Matthiesen

| Commitments | |
| Term | Revolving |
| $1,275,510.21 | $3,571,429 |

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO,**
as Agent and as a Lender

By:_____

Print Name:_____

Title:_____

(address)

American National Bank and Trust Company
of Chicago
120 South LaSalle Street
Chicago, Illinois 60603
Attention:    Mr. Scott J. Steiner

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLC
333 West Wacker Drive, Suite 2700
Chicago, Illinois  60606
Attention:    Edwin S. del Hierro, Esq.

| Commitments | |
| Term | Revolving |
| $5,102,040.86 | $14,285,714 |

**ASSOCIATED BANK,** as a Lender

By:_____

Print Name: Mark Matthiesen

Title: Vice President

(address)

Associated Bank
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention:    Mr. Mark A. Matthiesen

| Commitments | |
| --- | --- |
| Term | Revolving |
| $10,204,081.71 | $28,571,429 |

**FIRSTAR BANK, N. A.**
(f/k/a Mercantile
Bank, National Association)

By: *Gary D. Taylor*

Print Name: *Gary D. Taylor*

Title: *Vice President*

(address)

Tram 001/1001/11-5
Seventh and Washington
St. Louis, Missouri 63101
Attention:    Mr. David C. Buettner

| Commitments | |
| --- | --- |
| Term | Revolving |
| $8,928,571.50 | $25,000,000 |

**HARRIS TRUST AND SAVINGS BANK,**
as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention:    Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention:    Steven G. Hastings, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $10,204,081.71 | $28,571,429 |

**FIRSTAR BANK, N. A.**
(f/k/a Mercantile
Bank, National Association)

By:_____

Print Name:_____

Title:_____

(address)

Tram 001/1001/11-5
Seventh and Washington
St. Louis, Missouri 63101
Attention:    Mr. David C. Buettner

| Commitments | |
| --- | --- |
| Term | Revolving |
| $8,928,571.50 | $25,000,000 |

**HARRIS TRUST AND SAVINGS BANK,**
as a Lender

By: _Michael S. Cameli_____

Print Name: _Michael S. Cameli___

Title: _V.P._____

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention:    Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention:    Steven G. Hastings, Esq.

S-3

| Commitments | |
| --- | --- |
| Term | Revolving |
| $12,755,102.14 | $35,714,286 |

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _[signature]_

Print Name: _Jay Goldner_

Title: _SVP_

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention:    Mr. James A. Pridmore

| Commitments | |
| --- | --- |
| Term | Revolving |
| $8,928,571.50 | $25,000,000 |

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention:    Mr. Phillip D. Koepke

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:    K. Thor Lundsren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $12,755,102.14 | $35,714,286 |

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By:_____

Print Name:_____.

Title:_____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention:    Mr. James A. Pridmore

| Commitments | |
| --- | --- |
| Term | Revolving |
| $8,928,571.50 | $25,000,000 |

**M&I MARSHALL & ILSLEY BANK**, as a Lender

By: _____

Print Name: _____

Title: _____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention:    Mr. Phillip D. Koepke

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:    K. Thor Lundsren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $3,826,530.64 | $10,714,286 |

**FIFTH THIRD BANK,** as a Lender

By: *Patrick C. Horne*

Print Name: *Patrick A. Horne*

Title: *Vice President*

(address)

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois 60008
Attention:     Mr. Patrick A. Horne
                    Vice President

| Commitments | |
| --- | --- |
| Term | Revolving |
| $2,551,020.43 | $7,142,857 |

**UNION BANK OF CALIFORNIA, N.A.,**
as a Lender

By:

Print Name:

Title:

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention:     Dennis A. Cattell
                    Vice President

S-5

| Commitments | |
| --- | --- |
| Term | Revolving |
| $3,826,530.64 | $10,714,286 |

**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois 60008
Attention:     Mr. Patrick A. Horne
                    Vice President

| Commitments | |
| --- | --- |
| Term | Revolving |
| $2,551,020.43 | $7,142,857 |

**UNION BANK OF CALIFORNIA, N.A.,** as a Lender

By: _D/Cattell_____

Print Name: _D. A. CATTELL_____

Title: _V.P._____

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention:     Dennis A. Cattell
                    Vice President

# EXHIBIT C

# SECOND AMENDMENT

## TO

# AMENDED AND RESTATED CREDIT AGREEMENT

### AMONG

## FBOP CORPORATION,

## AMERICAN NATIONAL BANK AND TRUST

## COMPANY OF CHICAGO, AS AGENT AND AS A LENDER,

### AND

## THE INSTITUTIONS THAT ARE FROM TIME TO TIME
## PARTIES HERETO AS LENDERS

Second Amendment dated as of May 31, 2002
First Amendment dated as of March 31, 2002
Original Amended and Restated Credit Agreement dated as of April 30, 2001

**AMENDMENT PROVISIONS:**                                                    <u>PAGE</u>

A.   Amendment to the Revolving Facility Termination Date
     and the Term Loans Termination Date...........................................................2

B.   Amendment to the Amount of the Aggregate
     Term Loans Commitment ...............................................................................2

C.   Amendment to the Allocations of the Amounts
     of the Revolving Loans Commitment and the
     Term Loans Commitment ...............................................................................2

D.   Amendment to Required Payments ................................................................2

E.   Addition of Certain Definitions......................................................................2

F.   Assumption of Indebtedness...........................................................................3

G.   Subordination of Indebtedness .......................................................................3

H.   Conditions.......................................................................................................3

I.   Additional Terms.............................................................................................5

**EXHIBITS:**

EXHIBIT A   -   Form of Revolving Note

EXHIBIT B   -   Form of Term Note

EXHIBIT C   -   Incumbency Certificate

EXHIBIT D   -   Form of Legal Opinion

# SECOND AMENDMENT TO
# AMENDED AND RESTATED CREDIT AGREEMENT

This SECOND AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT ("Second Amendment"), dated as of May 31, 2002, is entered into among FBOP CORPORATION, a bank holding company incorporated under the laws of the State of Illinois and having its principal place of business at 11 West Madison Street, Oak Park, Illinois 60302, and the institutions that are from time to time parties hereto as Lenders (whether by execution of this Agreement or an Assignment and Acceptance), and AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a national banking association having its principal place of business at 120 South LaSalle Street, Chicago, Illinois 60603-3400, in its capacity as the Agent and as a Lender.

## R E C I T A L S :

A.      The parties hereto have entered into that certain Amended and Restated Credit Agreement, dated as of April 30, 2001, as previously amended, restated, supplemented or modified from time to time, including by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002 ("2001 Credit Agreement").

B.      The parties hereto desire to amend and modify the 2001 Credit Agreement in accordance with the terms and subject to the conditions set forth in this Second Amendment. As amended and modified by this Second Amendment, the 2001 Credit Agreement may be referred to as the "Agreement."

C.      The parties desire to amend the terms of the 2001 Credit Agreement to: (i) extend the Revolving Facility Termination Date and the Term Loans Termination Date; (ii) modify the amounts of the Aggregate Term Loans Commitment; (iii) modify the allocations of the amounts of the respective Revolving Loans Commitment and Term Loans Commitment of each Lender; (iv) amend the procedure for repaying the Term Loans; (v) add certain covenants concerning the assumption by the Borrower of certain Indebtedness; and (vi) add certain representations and warranties by the Borrower concerning the subordination of certain Indebtedness. The parties agree to undertake such modification in accordance with the terms, subject to the conditions, and in reliance upon the recitals, representations, warranties, and covenants set forth herein, in the Agreement, and in the other Loan Documents, irrespective of whether entered into or delivered on or after April 30, 2001.

D.      Capitalized terms used but not otherwise defined in this Second Amendment shall have the meanings respectively ascribed to them in the 2001 Credit Agreement.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

A G R E E M E N T:

**A.  Amendment to the Revolving Facility Termination Date and the Term Loans Termination Date**. The Revolving Facility Termination Date is hereby amended to be May 31, 2003. The Term Loans Termination Date is hereby amended to be May 31, 2007.

**B.  Amendment to the Amount of the Aggregate Term Loans Commitment**. The Aggregate Term Loans Commitment of the Lenders is hereby increased to an amount up to Seventy-Three Million One Hundred Sixty-Three Thousand Two Hundred Sixty-Five Dollars and No/100 ($73,163,265.00).

**C.  Amendment to the Allocations of the Amounts of the Revolving Loans Commitment and the Term Loans Commitment**. The amount of the respective Revolving Loans Commitment of each Lender shall be reallocated to be the amount set forth opposite its signature to this Second Amendment. The amount of the respective Term Loans Commitment of each Lender shall be reallocated to be the amount set forth opposite its signature to this Second Amendment.

**D.  Amendment to Required Payments**. Section 2.2(a) of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"(a)  Term Loans. The Term Loans shall be payable in installments of Two Million Six Hundred Twelve Thousand Nine Hundred Seventy-Three Dollars and 75/100 ($2,612,973.75) on the second Business Day of each January, April, July, and October during the period that the Term Loan is outstanding beginning July 2, 2002 and ending May 31, 2007. Any outstanding Term Loans Advances and any other unpaid Obligation shall be paid in full by the Borrower on the Term Loans Termination Date."

**E.  Addition of Certain Definitions**. Section 1.1 of the 2001 Credit Agreement is hereby amended to add the following definitions in alphabetical order:

"2001 Indebtedness" means the aggregate of all Indebtedness of the Borrower arising under, in connection with, or pursuant to, that certain Junior Subordinated Indenture, dated as of December 28, 2001, executed by and between the Borrower and BNY Midwest Trust Company, an Illinois corporation, as trustee.

"Pullman" means the Pullman Group, Inc., an Illinois corporation

"SDNB" means SDNB Financial Corp., a California corporation.

"Subsidiary Indebtedness" means the aggregate of all Indebtedness of Pullman and SDNB arising under, in connection with, or pursuant to, that certain Indenture, dated as of March 26, 2002, executed by and between SDNB and State Street Bank and Trust Company of Connecticut, National Association, as debenture trustee, and that certain Indenture, dated as of December 18, 2001, executed by and between Pullman and State Street Bank and Trust Company of Connecticut, National Association, as debenture trustee."

F.    **Assumption of Indebtedness.** The 2001 Credit Agreement is hereby amended by adding a new Section 6.15 as follows:

"**6.15 Assumption of Certain Indebtedness.** The Borrower shall, on terms and conditions satisfactory to the Lenders, as soon as practicable following the date hereof, but in no event later than December 31, 2002, assume, agree to pay, and become in all manners obligated with respect to, the Subsidiary Indebtedness. Promptly following a request from the Lenders, the Borrower shall furnish to the Lenders evidence of its compliance with this section, in form and substance satisfactory to the Lenders."

G.    **Subordination of Indebtedness.** The 2001 Credit Agreement is hereby amended by adding a new Section 5.21 as follows:

"**5.21 Subordination of Certain Indebtedness.**

(a)    All 2001 Indebtedness is, as of the date hereof, and will forever be, expressly subordinate and junior in all respects (including, without limitation, with respect to a right of payment) to the Obligations. The Obligations constitute "Senior Debt" as defined in the Junior Subordinated Indenture creating the 2001 Indebtedness or pursuant to which such 2001 Indebtedness was issued, and the Obligations are entitled to the benefits of the subordination provisions contained in such Junior Subordinated Indenture.

(b)    From and after the assumption of the Subsidiary Indebtedness pursuant to this Agreement, such Subsidiary Indebtedness will forever be expressly subordinate and junior in all respects (including, without limitation, with respect to a right of payment) to the Obligations. From and after the assumption of the Subsidiary Indebtedness pursuant to this Agreement, the Obligations will constitute "Senior Indebtedness" as defined in each of the indentures creating the Subsidiary Indebtedness or pursuant to which such Subsidiary Indebtedness was issued, and the Obligations will be entitled to the benefits of the subordination provisions contained in each such indenture.

(c)    The Borrower hereby agrees to execute and deliver all documents, agreements, instruments, and certificates (including, without limitation, any subordination agreement) that shall be, in the opinion of the Lenders, necessary or appropriate to: (i) give full force and effect to the subordination of the 2001 Indebtedness and the Subsidiary Indebtedness; and (ii) ensure that the Obligations are entitled to the benefits of all documents, agreements, instruments, and certificates governing the subordination of the 2001 Indebtedness and the Subsidiary Indebtedness."

H.    **Conditions.**

(i)    _General._ The Borrower hereby acknowledges and agrees that, in addition to the other conditions and requirements of Section 4.2 of the 2001 Credit Agreement, the Lenders shall not be required to make any Advance, unless as of the date

hereof and on the applicable Borrowing Date, the representations and warranties contained in this Second Amendment and the 2001 Credit Agreement (including all exhibits and schedules attached hereto and thereto) shall be true, accurate, and complete as of the date hereof and such Borrowing Date, and the Borrower shall have fully complied with each of its promises and covenants contained in this Second Amendment and the 2001 Credit Agreement. Each Borrowing Notice with respect to each such Advance shall constitute a representation and warranty by the Borrower that the conditions contained in this Second Amendment and the 2001 Credit Agreement shall have been satisfied.

(ii)    Second Amendment.   In addition to other conditions set forth in this Second Amendment and the 2001 Credit Agreement, including, without limitation, those applicable to the making of Advances, the obligations of the Lenders under the Agreement shall be subject to the performance by the Borrower of all of its agreements theretofore to be performed under the Agreement and to the receipt of all of the following, duly executed and dated the date hereof, and in form and substance satisfactory to the Agent and its counsel:

(a)    the restated Revolving Notes for the benefit of each Lender, each in the form set forth on Exhibit A to this Second Amendment;

(b)    the restated Term Notes for the benefit of each Lender, each in the form set forth on Exhibit B to this Second Amendment;

(c)    copies of the articles of incorporation of the Borrower, together with all amendments through the date hereof, and a certificate of good standing, both certified by the appropriate governmental officer in its jurisdiction of incorporation and dated within the five business days preceding the date hereof;

(d)    copies, certified by the Secretary or Assistant Secretary of the Borrower, of its by-laws and of its Board of Directors' resolutions authorizing the execution, delivery, and performance, respectively, of this Second Amendment, the restated Revolving Notes and the restated Term Notes, and any other documents to be executed, delivered, or performed in connection with this Second Amendment (collectively, "Amendment-Related Documents");

(e)    an incumbency certificate, substantially in the form of Exhibit C attached hereto, executed by the Secretary or Assistant Secretary of the Borrower, which shall identify by name and title and bear the signature of the officers of the Borrower authorized to sign the Amendment-Related Documents and to make borrowings hereunder and under the 2001 Credit Agreement, upon which certificate the Agent and the Lenders shall be entitled to rely until informed of any change in writing by the Borrower; and

(f)    a written opinion of the Borrower's counsel, addressed to the Lenders, in substantially the form set forth on Exhibit D attached hereto.

I.    **Additional Terms**.

(i)    **Acknowledgments**.  Borrower acknowledges and confirms that, as of the date hereof, the Borrower is indebted to the Lenders, without defense, setoff, or counterclaim, in the aggregate principal amount of Fifty-One Million Four Hundred Twenty-Eight Thousand Five Hundred Seventy-Two Dollars and No/100 ($51,428,572.00) in Term Loans, and in the aggregate principal amount of One Hundred Forty-Seven Million Eight Hundred Twenty-Eight Thousand Five Hundred Sixty-Five Dollars and No/100 ($147,828,565.00) in Revolving Loans, made under the 2001 Credit Agreement.

(ii)    **Effectiveness**.  The provisions of this Second Amendment will become effective upon its execution by the parties hereto.  Notwithstanding the foregoing, it shall be a condition precedent to the effectiveness of this Second Amendment that legal counsel to the Borrower shall have issued and delivered to the Lenders and their counsel a legal opinion, in form and substance acceptable to the Lenders and their counsel, with respect to the good standing and corporate authority of each Depository Institution Subsidiary; provided, however, that the Lenders hereby waive such condition for a period of thirty (30) days from the date hereof.

(iii)    **The Agreement**.  All references in the 2001 Credit Agreement to the term "Agreement" shall be deemed to refer to the Agreement referenced in this Second Amendment.

(iv)    **The Lenders**.  All references in the Agreement to the "Lenders" shall be deemed to refer to the lending institutions listed on the signature pages to this Second Amendment and their respective permitted successors and assigns.  Each Lender hereby acknowledges that it has received a copy of all of the documents that constitute the 2001 Credit Agreement, that it is a Lender under all of the Loan Documents, and that it will perform in accordance with the terms of such Loan Documents all of the obligations that are required to be performed by it as a Lender.

(v)    **Second Amendment and 2001 Credit Agreement to be Read Together**.  This Second Amendment supplements and is hereby made part of the 2001 Credit Agreement, and the 2001 Credit Agreement and this Second Amendment shall from and after the date hereof be read together and shall constitute the Agreement.  Except as otherwise set forth herein, the 2001 Credit Agreement shall remain in full force and effect.

(vi)    **Transaction Documents**.  The terms "Transaction Documents" and "Loan Documents," as used in the Agreement, shall from and after the date hereof include the Amendment-Related Documents.

(vii)    **Counterparts**.  This Second Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same document.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Second Amendment as of the date first written above.

FBOP CORPORATION

By:_____

Print Name:_____

Title:_____

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois  60302
Attention:  Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook
115 S. LaSalle Street, 31st Floor
Chicago, Illinois  60602
Attention: Edward C. Fitzpatrick, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $19,670,781.84 | $40,329,218.16 |

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO,**
as Agent and as a Lender

By: _____

Print Name: Scott Steiner

Title: Commercial Loan Officer

(address)

American National Bank and Trust Company
of Chicago
120 South LaSalle Street
Chicago, Illinois 60603
Attention:    Mr. Scott J. Steiner

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLC
333 West Wacker Drive, Suite 2700
Chicago, Illinois 60606
Attention:    Edwin S. del Hierro, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $6,556,927.28 | $13,443,072.72 |

**ASSOCIATED BANK,** as a Lender

By: _____

Print Name: _____

Title: _____

(address)

Associated Bank
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention:    Mr. Mark A. Matthiesen

| Commitments | |
|---|---|
| Term | Revolving |
| $19,670,781.84 | |
| $40,329,218.16 | |

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO,**
as Agent and as a Lender

By:_____

Print Name:_____

Title:_____

(address)

American National Bank and Trust Company
of Chicago
120 South LaSalle Street
Chicago, Illinois 60603
Attention:   Mr. Scott J. Steiner

with a copy to

Barack Ferrazzano Kirschbaum Perlman
& Nagelberg LLC
333 West Wacker Drive, Suite 2700
Chicago, Illinois 60606
Attention:   Edwin S. del Hierro, Esq.

| Commitments | |
|---|---|
| Term | Revolving |
| $6,556,927.28 | |
| $13,443,072.72 | |

**ASSOCIATED BANK,** as a Lender

By _____

Print Name: MARK MATTHIESEN

Title: VICE PRESIDENT

(address)

Associated Bank
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention:   Mr. Mark A. Matthiesen

| Commitments | |
| Term | Revolving |
| $11,006,270.60 | |
| $22,565,157.40 | |

**HARRIS TRUST AND SAVINGS BANK,**
as a Lender

By: _[signature]_____

Print Name: _Michael S. Cameli_____

Title: _V.P._____

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention:   Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention:   Steven G. Hastings, Esq.

| Commitments | |
| Term | Revolving |
| $16,392,318.20 | |
| $33,607,681.80 | |

**LASALLE BANK NATIONAL
ASSOCIATION, as a Lender**

By: _____

Print Name: _____

Title: _____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention:   Mr. James A. Pridmore

Clean

S-3

| Commitments | |
| --- | --- |
| Term | Revolving |
| $11,006,270.60 | $22,565,157.40 |

**HARRIS TRUST AND SAVINGS BANK**, as
a Lender

By:_____

Print Name:_____

Title:_____

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention:     Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention:     Steven G. Hastings, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $16,392,318.20 | $33,607,681.80 |

**LASALLE BANK NATIONAL
ASSOCIATION**, as a Lender

By:_____

Print Name: _James K. Pridmore_

Title: _Senior Vice President_

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention:     Mr. James K. Pridmore

| Commitments | |
| --- | --- |
| Term | Revolving |
| $11,474,622.74 | $23,525,377.26 |

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By: *Gregg R Weyer*

Print Name: *Gregg R Weyer*

Title: *Vice President*

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention:     Mr. Phillip D. Koepke

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:     K. Thor Lundsren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $4,917,695.46 | $10,082,304.54 |

**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois 60008
Attention:     Mr. Patrick A. Horne
                    Vice President

Clean

S-4

| Commitments | | |
| --- | --- | --- |
| Term | Revolving | |
| $11,474,622.74 | | |
| $23,525,377.26 | | |

**M&I MARSHALL & ILSLEY BANK**, as a Lender

By:_____

Print Name:_____

Title:_____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention:    Mr. Phillip D. Koepke

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:    K. Thor Lundsren, Esq.

| Commitments | | |
| --- | --- | --- |
| Term | Revolving | |
| $4,917,695.46 | | |
| $10,082,304.54 | | |

**FIFTH THIRD BANK**, as a Lender

By: _Patrick C. Horne_

Print Name: _Patrick A. Horne_

Title: _Vice President_

(address)

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois 60008
Attention:    Mr. Patrick A. Horne
                   Vice President

Class.doc

S-4

| Commitments | |
| --- | --- |
| Term | Revolving |
| $3,144,648.88 | $6,447,188.12 |

**UNION BANK OF CALIFORNIA, N.A.,** as
a Lender

By: _____

Print Name:   D. A. Cattell

Title:   VP, IDM Credit Management

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention:      Dennis A. Cattell
                Vice President

# EXHIBIT D

30702



*2940252038*



*000*



*FBOP  CORPORATIO*

# DOCUMENT TYPE SEPARATOR SHEET

CRITICAL

# LOAN AGREEMENT



# THIRD AMENDMENT

## TO

# AMENDED AND RESTATED CREDIT AGREEMENT

### AMONG

### FBOP CORPORATION,

### BANK ONE, NA
**(successor in interest to**
**American National Bank and Trust Company of Chicago),**

### AS AGENT AND AS A LENDER,

### AND

### THE INSTITUTIONS THAT ARE FROM TIME TO TIME
### PARTIES HERETO AS LENDERS

Third Amendment dated as of May 31, 2003
Second Amendment dated as of May 31, 2002
First Amendment dated as of March 31, 2002
Original Amended and Restated Credit Agreement dated as of April 30, 2001

**AMENDMENT PROVISIONS:**            **PAGE**

A.   Amendment to the Revolving Facility Termination Date ............................................. 2

B.   Amendment to the Amount of the Aggregate Revolving Loans Commitment and
Aggregate Term Loans Commitment ............................................................................ 2

C.   Amendment to the Allocation of the Amounts of the Revolving Loans Commitment;
Allocation of Amount of Term Loans Commitment ....................................................... 2

D.   Amendment to Certain Definitions in Section 1.1 ........................................................ 2

E.   Amendment to Permitted Indebtedness ........................................................................... 2

F.   Amendment to Minimum Return on Assets .................................................................... 3

G.   Amendment to Permitted Acquisitions............................................................................ 3

H.   Conditions.......................................................................................................................... 3

I.   Additional Terms............................................................................................................... 4

**EXHIBITS:**

EXHIBIT A  -  Form of Revolving Note

EXHIBIT B  -  Incumbency Certificate

EXHIBIT C  -  Form of Legal Opinion Regarding Third Amendment

EXHIBIT D -  Form of Legal Opinion Regarding Trust Preferred Indebtedness

177793_4

# THIRD AMENDMENT TO
## AMENDED AND RESTATED CREDIT AGREEMENT

This THIRD AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT ("Third Amendment"), dated as of May 31, 2003, is entered into among FBOP CORPORATION, a bank holding company incorporated under the laws of the State of Illinois and having its principal place of business at 11 West Madison Street, Oak Park, Illinois 60302, and the institutions that are from time to time parties hereto as Lenders (whether by execution of this Agreement or an Assignment and Acceptance), and BANK ONE, NA (successor in interest to American National Bank and Trust Company of Chicago), a national banking association having a place of business at 120 South LaSalle Street, Chicago, Illinois 60603-3400, in its capacity as the Agent and as a Lender.

## R E C I T A L S :

A.    The parties hereto have entered into that certain Amended and Restated Credit Agreement, dated as of April 30, 2001, as previously amended, restated, supplemented or modified from time to time, including by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, and that certain Second Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2002 ("2001 Credit Agreement").

B.    The parties hereto desire to amend and modify the 2001 Credit Agreement in accordance with the terms and subject to the conditions set forth in this Third Amendment. As amended and modified by this Third Amendment, the 2001 Credit Agreement may be referred to as the "Agreement."

C.    The parties desire to amend the terms of the 2001 Credit Agreement to: (i) extend the Revolving Facility Termination Date; (ii) modify the amounts of the Aggregate Revolving Loans Commitment and the Aggregate Term Loans Commitment; (iii) modify the allocations of the amounts of the respective Revolving Loans Commitment and Term Loans Commitment of each Lender; (iv) modify certain definitions; and (v) modify certain covenants concerning permitted indebtedness, the minimum return on total assets, and permitted acquisitions. The parties agree to undertake such modification in accordance with the terms, subject to the conditions, and in reliance upon the recitals, representations, warranties, and covenants set forth herein, in the Agreement, and in the other Loan Documents, irrespective of whether entered into or delivered on or after April 30, 2001.

D.    Capitalized terms used but not otherwise defined in this Third Amendment shall have the meanings respectively ascribed to them in the 2001 Credit Agreement.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

177793_4

1

# A G R E E M E N T :

**A.**    **Amendment to the Revolving Facility Termination Date**. The Revolving Facility Termination Date is hereby amended to be May 31, 2004.

**B.**    **Amendment to the Amount of the Aggregate Revolving Loans Commitment and Aggregate Term Loans Commitment**. The Aggregate Revolving Loans Commitment of the Lenders is hereby increased to One Hundred Ninety-Five Million Dollars and No/100 ($195,000,000.00). The Aggregate Term Loans Commitment of the Lenders is hereby decreased to an amount up to Sixty-Two Million Seven Hundred Eleven Thousand Three Hundred Seventy Dollars and No/100 ($62,711,370.00).

**C.**    **Amendment to the Allocation of the Amounts of the Revolving Loans Commitment; Allocation of the Amount of the Term Loans Commitment**. The amount of the respective Revolving Loans Commitment of each Lender shall be reallocated to be the amount set forth opposite its signature to this Third Amendment. The amount of the respective Term Loans Commitment of each Lender shall be the amount set forth opposite its signature to this Third Amendment.

**D.**    **Amendment to Certain Definitions in Section 1.1**.

(i)    The definition of "ANB" is deleted in its entirety and replaced with the following:

""ANB" means Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago) in its individual capacity and its successors or assigns."

(ii)    The definition of "Agent" is hereby deleted in its entirety and replaced with the following:

""Agent" means Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago) in its capacity as agent for the Lenders pursuant to Article X, and not in its individual capacity as a Lender, and any successor Agent appointed pursuant to Article X."

**E.**    **Amendment to Permitted Indebtedness**.    Section 6.8 of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"6.8    **Indebtedness**. Without the prior written consent of the Required Lenders, which consent shall not unreasonably be withheld, the Borrower will not, nor will it permit any Subsidiary to, create, incur or suffer to exist any Indebtedness, except:

(a)    Indebtedness existing on the date hereof and described in Schedule 6.8 hereto or other indebtedness incurred by any Depository Institution Subsidiary arising in the ordinary course of its banking business (including FHLB advances, purchases of federal funds and repurchase agreements); and

(b) Any Indebtedness arising under, in connection with or pursuant to an indenture if, and only if, such Indebtedness (i) is issued by the Borrower, (ii) is issued in connection with the issuance by a trust of securities representing an undivided interest in such trust, and (iii) is subordinate and junior in all respects to the Obligations as provided by the express terms of the indenture governing such Indebtedness, and provided that (A) Borrower delivers within seven days of the date of any instrument evidencing such Indebtedness a legal opinion addressed to, and for the benefit of, the Agent and the Lenders substantially in the form of Exhibit D to that certain Third Amendment to Amended and Restated Credit Agreement among Borrower, Agent and the Lenders, dated as of May 31, 2003; and (B) Borrower delivers to the Agent for the benefit of the Agent and the Lenders, within 30 days of the date of any instrument evidencing such Indebtedness (1) true, accurate, and complete (with no fewer signatures than those of Borrower and any Subsidiary that may be party to any of such documents) copies of the final offering circulars (in the case of stand-alone transactions, but not pooled transactions), trust agreements, guarantees, indentures, and other documentation evidencing or relating to such Indebtedness (and Borrower agrees to deliver to Agent fully executed copies of such documents within ten days of their receipt by Borrower), and (2) a true, accurate, and complete copy of the approval order, if required, issued by the Board of Governors of the Federal Reserve System with respect to such Indebtedness. The Lenders acknowledge that the Borrower may organize a business trust (that would constitute a Subsidiary) to issue the securities referenced in clause (ii) above and Borrower and such Subsidiary may execute such documents as may be required in connection with the Indebtedness that the Subsidiary is intended to facilitate."

**F.** **Amendment to Permitted Acquisitions**. Section 6.10(c) of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"(c) Acquisitions of unrelated depository institutions (or their holding companies) with consolidated assets of less than $1,000,000,000."

**G.** **Amendment to Minimum Return on Assets**. The first sentence of Section 6.14(g) is hereby deleted in its entirety and is replaced with the following:

"Borrower (on a consolidated basis) shall maintain a return on assets of not less than 1.00%."

**H.** **Conditions**.

(i) General. The Borrower hereby acknowledges and agrees that, in addition to the other conditions and requirements of Section 4.2 of the 2001 Credit Agreement, the Lenders shall not be required to make any Advance, unless as of the date hereof and on the applicable Borrowing Date, the representations and warranties contained in this Third Amendment and the 2001 Credit Agreement (including all exhibits and schedules attached hereto and thereto) shall be true, accurate, and complete as of the date hereof and such Borrowing Date, and the Borrower shall have fully complied with each of its promises and

covenants contained in this Third Amendment and the 2001 Credit Agreement. Each Borrowing Notice with respect to each such Advance shall constitute a representation and warranty by the Borrower that the conditions contained in this Third Amendment and the 2001 Credit Agreement shall have been satisfied.

(ii)     Third Amendment. In addition to other conditions set forth in this Third Amendment and the 2001 Credit Agreement, including, without limitation, those applicable to the making of Advances, the obligations of the Lenders under the Agreement shall be subject to the performance by the Borrower of all of its agreements theretofore to be performed under the Agreement and to the receipt of all of the following, duly executed and dated the date hereof, and in form and substance satisfactory to the Agent and its counsel:

(a)     the restated Revolving Notes for the benefit of each Lender, each in the form set forth on Exhibit A to this Third Amendment;

(b)     copies of the articles of incorporation of the Borrower, together with all amendments through the date hereof, and a certificate of good standing, both certified by the appropriate governmental officer in its jurisdiction of incorporation and dated within the five business days preceding the date hereof;

(c)     copies, certified by the Secretary or Assistant Secretary of the Borrower, of its by-laws and of its Board of Directors' resolutions authorizing the execution, delivery, and performance, respectively, of this Third Amendment, the restated Revolving Notes and the restated Term Notes, and any other documents to be executed, delivered, or performed in connection with this Third Amendment (collectively, "Amendment-Related Documents");

(d)     an incumbency certificate, substantially in the form of Exhibit B attached hereto, executed by the Secretary or Assistant Secretary of the Borrower, which shall identify by name and title and bear the signature of the officers of the Borrower authorized to sign the Amendment-Related Documents and to make borrowings hereunder and under the 2001 Credit Agreement, upon which certificate the Agent and the Lenders shall be entitled to rely until informed of any change in writing by the Borrower; and

(e)     a written opinion of the Borrower's counsel, addressed to the Lenders, in substantially the form set forth on Exhibit C attached hereto.

**1.     Additional Terms.**

(i)     Acknowledgment of Indebtedness under Agreement. The Borrower acknowledges and confirms that, as of the date hereof, the Borrower is indebted to the Lenders, without defense, setoff, or counterclaim (a) in the aggregate principal amount of Sixty-Two Million Seven Hundred Eleven Thousand Three Hundred Seventy Dollars and No/100 ($62,711,370.00) in Term Loans, and (b) in the aggregate principal amount of Fifty-One Million Ninety-Three

Thousand Eight Hundred Seventy-Two Dollars and No/100 ($51,093,872.00) in Revolving Loans, all made under the 2001 Credit Agreement.

(ii) <u>Acknowledgement of Certain Lender Consents</u>. The parties acknowledge that the Lenders have consented to the following actions of the Borrower subject, where applicable, to compliance with the requirements set forth in the consents executed by the parties:

(a) On June 26, 2002, SDNB Financial Corp. ("SDNB"), a Subsidiary of the Borrower, issued subordinated debentures (which debentures have been assumed by the Borrower in accordance with the terms of <u>Section 6.15</u> of the Agreement) and, through a special purpose subsidiary, issued trust preferred securities, each in an aggregate principal amount of $25,000,000;

(b) On June 27, 2002, the Borrower issued subordinated debentures and, through a special purpose subsidiary, issued trust preferred securities, each in an aggregate principal amount of $15,000,000;

(c) On July 11, 2002, the Borrower issued subordinated debentures and, through a special purpose subsidiary, issued trust preferred securities, each in an aggregate principal amount of $10,000,000;

(d) On July 30, 2002, the Borrower issued subordinated debentures and, through a special purpose subsidiary, issued trust preferred securities, each in an aggregate principal amount of $12,000,000;

(e) On September 26, 2002, SDNB issued subordinate debentures (which debentures have been assumed by the Borrower in accordance with the terms of <u>Section 6.15</u> of the Agreement) and, through a special purpose subsidiary, issued trust preferred securities, each in an aggregate principal amount of $25,000,000;

(f) On October 17, 2002, the Lenders consented to the issuance by the Borrower, in one or more transactions prior to December 31, 2002, of up to $60,000,000 of subordinated debentures in connection with the issuance of trust preferred securities through a special purpose subsidiary—pursuant to such consent, the Borrower issued $58,500,000 in aggregate principal amount of subordinated debentures in three separate transactions on October 29, 2002 ($27,000,000), December 10, 2002 ($14,000,000) and December 19, 2002 ($17,500,000); and

(g) As of December 17, 2002, the Lenders consented to the issuance by the Borrower, in one or more transactions, of up to $70,000,000 of subordinated debentures in connection with the issuance of trust preferred securities through a special purpose subsidiary—pursuant to such consent, the Borrower issued $66,640,000 in aggregate principal amount of subordinated debentures in four transactions on December 19, 2002 ($25,000,000), March 26, 2003 ($17,640,000), March 27, 2003 ($10,000,000) and April 10, 2003 ($14,000,000).

(iii)  Effectiveness.  The provisions of this Third Amendment will become effective upon its execution by the parties hereto.  Notwithstanding the foregoing, it shall be a condition precedent to the effectiveness of this Third Amendment that legal counsel to the Borrower shall have issued and delivered to the Lenders and their counsel a legal opinion, in form and substance acceptable to the Lenders and their counsel, with respect to the good standing and corporate authority of each Depository Institution Subsidiary; provided, however, that the Lenders hereby waive such condition for a period of thirty (30) days from the date hereof.

(iv)  The Agreement.  All references in the 2001 Credit Agreement to the term "Agreement" shall be deemed to refer to the Agreement referenced in this Third Amendment.

(v)  The Lenders.  All references in the Agreement to the "Lenders" shall be deemed to refer to the lending institutions listed on the signature pages to this Third Amendment and their respective permitted successors and assigns. Each Lender hereby acknowledges that it has received a copy of all of the documents that constitute the 2001 Credit Agreement, that it is a Lender under all of the Loan Documents, and that it will perform in accordance with the terms of such Loan Documents all of the obligations that are required to be performed by it as a Lender.

(vi)  Third Amendment and 2001 Credit Agreement to be Read Together.  This Third Amendment supplements and is hereby made part of the 2001 Credit Agreement, and the 2001 Credit Agreement and this Third Amendment shall from and after the date hereof be read together and shall constitute the Agreement. Except as otherwise set forth herein, the 2001 Credit Agreement shall remain in full force and effect.

(vii)  Transaction Documents.  The terms "Transaction Documents" and "Loan Documents," as used in the Agreement, shall from and after the date hereof include the Amendment-Related Documents.

(viii) Counterparts.  This Third Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same document.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Third Amendment as of the date first written above.

**FBOP CORPORATION**

By: _____

Print Name: _MICHAEL DUNNING_

Title: _Senior Vice President & Chief Financial Officer_

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois  60302
Attention:  Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook
115 S. LaSalle Street, 31st Floor
Chicago, Illinois  60602
Attention: Edward C. Fitzpatrick, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $16,860,670.14 | $80,329,218.15 |

**BANK ONE, NA,** as Agent and as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Bank One, NA
120 South LaSalle Street
Chicago, Illinois 60603
Attention:     Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLC
333 West Wacker Drive, Suite 2700
Chicago, Illinois  60606
Attention:     Edwin S. del Hierro, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $5,620,223.38 | $13,443,072.72 |

**ASSOCIATED BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Associated Bank
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention:     Mr. Daniel Holzhauer

| Commitments | |
| --- | --- |
| Term | Revolving |
| $16,860,670.14 | $80,329,218.15 |

**BANK ONE, NA,** as Agent and as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Bank One, NA
120 South LaSalle Street
Chicago, Illinois 60603
Attention:     Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLC
333 West Wacker Drive, Suite 2700
Chicago, Illinois  60606
Attention:     Edwin S. del Hierro, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $5,620,223.38 | $13,443,072.72 |

**ASSOCIATED BANK,** as a Lender

By:_____

Print Name: Joseph J. Gehrke

Title: Vice President

(address)

Associated Bank
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention:     Mr. Daniel Holzhauer

| Commitments | |
| --- | --- |
| Term | Revolving |
| $9,433,946.23 | $22,565,157.40 |

**HARRIS TRUST AND SAVINGS BANK**, as a Lender

By: _M̅icha̅el S. Ca̅me̅li̅_

Print Name: _Michael S. Cameli_

Title: _V.P._

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention:     Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention:     Steven G. Hastings, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $14,050,558.46 | $33,607,681.82 |

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By:_____

Print Name:_____

Title:_____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention:     Mr. James K. Pridmore

| Commitments | |
| --- | --- |
| Term | Revolving |
| $9,433,946.23 | $22,565,157.40 |

**HARRIS TRUST AND SAVINGS BANK,**
as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention:    Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention:    Steven G. Hastings, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $14,050,558.46 | $33,607,681.82 |

**LASALLE BANK NATIONAL ASSOCIATION,** as a Lender

By:_____

Print Name:_____James K. Pridmore_____

Title:_____Sr. V.P._____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention:    Mr. James K. Pridmore

| Commitments | |
| --- | --- |
| Term | Revolving |
| $9,835,390.92 | $23,525,377.26 |

**M&I MARSHALL & ILSLEY BANK**, as a Lender

By: _Gregg R Weyer_

Print Name: _Gregg R Weyer_

Title: _Vice President_

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention:     Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:     K. Thor Lundsren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $4,215,167.54 | $10,082,304.54 |

**FIFTH THIRD BANK**, as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois 60008
Attention:     Mr. Patrick A. Horne
                    Vice President

|   | Commitments |   |
|---|---|---|
| Term | | Revolving |
| $9,835,390.92 | | $23,525,377.26 |

**M&I MARSHALL & ILSLEY BANK**, as a Lender

By:_____

Print Name:_____

Title:_____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention:     Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:     K. Thor Lundsren, Esq.

|   | Commitments |   |
|---|---|---|
| Term | | Revolving |
| $4,215,167.54 | | $10,082,304.54 |

**FIFTH THIRD BANK**, as a Lender

By: _Patrick A. Horne_

Print Name: _Patrick A. Horne_

Title: _Vice President_

(address)

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois 60008
Attention:     Mr. Patrick A. Horne
                     Vice President

| Commitments | |
| --- | --- |
| Term | Revolving |
| $2,695,413.33 | $11,447,188.12 |

**UNION BANK OF CALIFORNIA, N.A.,** as a Lender

By: _____

Print Name: **D. A. Cattell**

Title: **V. P.**

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention:     Dennis A. Cattell
                      Vice President

177793_4                                         S-5

## EXHIBIT A

## FORM OF REVOLVING NOTE

**[updated Commitment amount]**
Restatement Date: May 31, 2003
Original Note Date: April 30, 2001

FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of **[LENDER]** ("Lender") the lesser of the principal sum of [updated Commitment amount] and No/100 Dollars ($_____) or the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the Borrower pursuant to <u>Article II</u> of the Agreement (as hereinafter defined), in immediately available funds at the office of Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent, located at 120 South LaSalle Street, Chicago, Illinois, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement. The Borrower shall pay the principal of, and accrued and unpaid interest on, the Revolving Loans in full on the Revolving Facility Termination Date.

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Revolving Loan and the date and amount of each principal payment hereunder.

This Revolving Note is one of the Revolving Notes issued pursuant to, and is entitled to the benefits of, that certain Amended and Restated Credit Agreement, dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed, or extended and in effect from time to time, is herein called the "Agreement"), by and among the Borrower, the Lenders party thereto, including the Lender, and Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Revolving Note, including the terms and conditions under which this Revolving Note may be prepaid or its maturity date accelerated. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time. Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Revolving Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged or received under the Agreement or this Revolving Note or otherwise in connection with the Agreement or this Revolving Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender). All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized, prorated,

A-1

allocated, and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release or surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or that may hereafter be held as security for the payment of this Revolving Note, and may extend the time for payment or (with the consent of the Borrower) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby.

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT, AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

IN WITNESS WHEREOF, the Borrower has caused this Revolving Note to be duly executed as of the date first above written.

**FBOP CORPORATION**

By:_____

Print Name:_____

Title:_____

ATTEST:

By:_____

Print Name:_____

Title:_____

SCHEDULE OF REVOLVING LOANS
AND PAYMENTS OF PRINCIPAL

REVOLVING NOTE OF FBOP CORPORATION,
DATED APRIL 30, 2001
AND RESTATED MAY 31, 2003

| Date | Principal Amount of Revolving Loan | Maturity of Interest Period | Maturity Principal Amount Paid | Unpaid Balance |
|------|------------------------------------|------------------------------|--------------------------------|----------------|

[COMPLETE AS NECESSARY]

## EXHIBIT B

### CERTIFICATE OF INCUMBENCY

I, Edward C. Fitzpatrick, Secretary of FBOP Corporation, an Illinois corporation, do hereby certify that the following persons have been duly elected to, are duly qualified for, have held, and on the date hereof do hold, the offices for FBOP Corporation set forth opposite their respective names:

| Name | Office |
|------|--------|
| MICHAEL E. KELLY | Chairman of the Board |
| ROBERT M. HESKETT | President and Director |
| MICHAEL F. DUNNING | Vice President and Chief Financial Officer |
| EDWARD C. FITZPATRICK | Secretary and Director |

I further certify that the sample signatures below are true signatures for each such officer.

Dated as of May 31, 2003

EDWARD C. FITZPATRICK,
Secretary

MICHAEL E. KELLY

ROBERT M. HESKETT

MICHAEL F. DUNNING

EDWARD C. FITZPATRICK

B-1

# EXHIBIT C

## FORM OF LEGAL OPINION REGARDING THIRD AMENDMENT

**EXHIBIT D**

**FORM OF LEGAL OPINION REGARDING TRUST PREFERRED INDEBTEDNESS**

May 31, 2003

Bank One, NA
120 South LaSalle Street
Chicago, Illinois 60603-3400

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603

Union Bank of California, N.A.
445 South Figuero Street
Los Angeles, California 90071

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois 60008

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53201-3593

Associated Bank
401 East Kilbourn Avenue
Milwaukee, Wisconsin 53201-0522

### Re: FBOP Corporation

Ladies and Gentlemen:

We have acted as special counsel for FBOP Corporation (the "Borrower") in connection with its execution and delivery of an Amended and Restated Credit Agreement, dated as of April 30, 2001 (the "Credit Agreement"), as amended by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement dated as of May 31, 2002, and as further amended by that certain Third Amendment to Amended and Restated Credit Agreement, dated as of the date hereof ("Third Amendment"), among the Borrower, the Lenders named above, and Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent. All capitalized terms used in this opinion and not otherwise defined herein shall have the meanings attributed to them in the Credit Agreement.

We have examined the Borrower's articles of incorporation, by-laws, resolutions, executed copies of the Transaction Documents, and unexecuted copies of the Third Amendment, the restated Revolving Notes, in substantially the form attached to the Third Amendment as Exhibit

May 31, 2003
Page 2

A ("Revolving Notes"), and such other matters of fact and law that we deem necessary in order to render this opinion. In our examination of all documents, we have assumed the genuineness of all signatures (other than those of Borrower), the authenticity of all documents submitted to us as originals, the conformity of all copies submitted to us with the originals to be delivered and the due authorization, execution and delivery by each party other than the Borrower of all documents to which it is or will be a party. We have made no independent investigation as to the accuracy, correctness or completeness of any representation or warranties made in the Third Amendment. The opinion expressed in paragraph 1 herein as to the good standing of the Borrower is based solely on the certificate of good standing attached hereto.

Based upon the foregoing and subject to the qualifications set forth herein, it is our opinion that:

1.    The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. Each Subsidiary (other than the Depository Institution Subsidiaries) is a corporation validly existing and in good standing under the laws of its state of incorporation except where any failure to be so existing or in good standing could not reasonably be expected to have a material and adverse effect on the Borrower and the Subsidiaries taken as a whole. The Borrower has all requisite corporate authority to conduct business in each jurisdiction in which its business is conducted. The Subsidiaries (other than the Depository Institution Subsidiaries) have all requisite corporate authority to conduct business in each jurisdiction in which their respective business is conducted, except where any such failure could not reasonably be expected to have a material and adverse effect on the Borrower and the Subsidiaries (including the Depository Institution Subsidiaries) taken as a whole.

2.    The execution and delivery of each of the Third Amendment and the Revolving Notes by the Borrower, and the performance by the Borrower of its obligations thereunder, have been duly authorized by all necessary corporation action and proceedings on the part of the Borrower and its shareholders.

3.    No order, permission, consent or approval of any federal or state governmental department, commission, board or regulatory authority or agency is required for the execution and delivery of, or for the performance by the Borrower of its obligations under, any of the Third Amendment or the Revolving Notes, or, if required, each such permission, consent or approval has been obtained.

4.    There is, to our knowledge, no charter, by-law or preferred or common stock provision, nor any indenture, instrument, contract or agreement to which the Borrower is a party, nor any statute, rule, regulation, order, judgment, injunction or decree binding on the Borrower that would be contravened by the execution and delivery of any of the Third Amendment or the Revolving Notes, or by the performance of any terms, provisions, conditions, agreements, covenants, or obligations of the Borrower contained therein.

739387_2

May 31, 2003
Page 3

5.   Each of the Third Amendment and the Revolving Notes has been duly executed and
     delivered by the Borrower and constitutes legal, valid and binding obligations of the
     Borrower enforceable in accordance with its respective terms except to the extent the
     enforcement thereof may be limited by bankruptcy, insolvency or similar laws affecting
     the enforcement of creditors' rights generally and subject also to the availability of
     equitable remedies if equitable remedies are sought.

6.   Borrower has assumed all obligations with respect to the Subsidiary Indebtedness, and to
     our knowledge, (i) the Obligations will be entitled to the benefits of the subordination
     provisions contained in each indenture entered into in connection with the Subsidiary
     Indebtedness and (ii) the Obligations constitute "Senior Indebtedness" as defined in such
     indentures.

The opinions set forth herein are subject to and qualified by the following limitations:

A.   The enforceability of the Third Amendment, the Term Notes, and the Revolving
     Notes is subject to the right of taxing authorities or other entities or persons which
     may by law have priority over the rights of the Lenders.

B.   Certain remedies and/or provisions under the Third Amendment, the Term Notes,
     and the Revolving Notes do or may require enforcement or interpretation by a
     court of equity, and such enforcement or interpretation is subject to the discretion
     of such court and to such principles of equity as the courts having jurisdiction
     may impose.

C.   Applicable federal, state and local laws, ordinances, regulations, court decisions
     and constitutional requirements may limit or render unenforceable certain of the
     rights and remedies of the Lenders under the Third Amendment, the Term Notes,
     and the Revolving Notes.

This opinion is provided to you as a legal opinion only, and not as a guarantee or warranty of the
matters discussed herein. We express no opinion with respect to the financial status or ability of
the Borrower to meet its obligations under any of the Transaction Documents. No opinion may
be inferred or implied beyond the matters expressly stated herein.

We do not express any opinion as to any law other than the laws of the State of Illinois and the
laws of the United States of America. We have assumed for purposes of this opinion, with your
permission and without having made any independent investigation, that the laws of the State of
Illinois are identical to the laws of the State of New York (without regard to conflict of law
provisions).

739387_2

May 31, 2003
Page 4

As you are aware, Edward C. Fitzpatrick is a director and Secretary to the Board of Directors of Borrower and certain Subsidiaries.

This opinion is addressed to you and is solely for your use; accordingly, it may not be used, relied upon or disclosed to any other person or entity (other than assignees, participants, transferees or successors of any Lender in accordance with the terms provided in the Transaction Documents) or used for any purpose other than in connection with this transaction. It is not to be used, circulated, quoted or otherwise referred to for any other purpose without the prior written

May 31, 2003
Page 5

consent of this firm. The opinion is based upon information furnished us as of the date hereof. We disclaim any undertaking to advise you of any changes concerning the above, whether or not deemed material, which may hereafter come to our attention.

Very truly yours,

Attachments

739387_2

<u>EXHIBIT D</u>

_____, 200__

Bank One, NA
120 South LaSalle Street
Chicago, Illinois 60603-3400

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603

Union Bank of California, N.A.
445 South Figuero Street
Los Angeles, California 90071

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois 60008

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53201-3593

Associated Bank
401 East Kilbourn Avenue
Milwaukee, Wisconsin 53201-0522

**Re:    FBOP Corporation**

Ladies and Gentlemen:

We have acted as special counsel for FBOP Corporation, an Illinois corporation (the "Company") and FBOP _____ Trust _____, a _____ statutory business trust (the "Trust") in connection with the issuance and sale by the Trust of its Floating Rate Capital Securities, liquidation amount $1,000 per capital security (the "Capital Securities") to _____ ("Purchaser") pursuant to the Placement Agreement ("Placement Agreement") dated _____, 200__ by and among the Company, the Trust, and _____ (collectively, the "Placement Agents").

The Capital Securities will represent undivided beneficial ownership interests in the assets of the Trust, and will be guaranteed by the Company as to the payment of distributions, and as to payments on liquidation or redemption, to the extent set forth in a guarantee agreement (the "Guarantee") dated as of _____, 200__ between the Company and ___ _____ as trustee (the "Guarantee Trustee"). The Capital Securities are to be issued pursuant to the Amended and Restated Declaration of Trust (the "Declaration") dated as of _____,200__,

739538_2

_____, 200_

Page 2



among _____, _____, and _____ (each an "Administrative Trustee" and, collectively, the "Administrative Trustees"), _____ as institutional trustee (the "Institutional Trustee") and the Company, as sponsor.

The proceeds of the sale by the Trust of the Capital Securities and its Common Securities, liquidation amount $1,000 per Common Security (the "Common Securities"), will be invested in the floating rate Junior Subordinated Debt Securities (the "Debentures") of the Company having an aggregate principal amount equal to the aggregate liquidation amount of the Capital Securities and the Common Securities, to be issued pursuant to a an Indenture, as supplemented from time to time (the "Indenture"), dated as of _____, 200__, between the Company and _____, as Trustee (the "Debenture Trustee").

In connection with the opinion hereinafter set forth, we have: (a) examined originals or copies, certified or otherwise identified to our satisfaction, of (i) the Declaration, (ii) the Indenture, (iii) the Guarantee, (iv) the Placement Agreement, (v) the Capital Securities, Debt Securities and Common Securities, and (vi) such other documents, instruments and certificates of public officials as we deemed necessary or appropriate; and (b) made such other examination of law and facts as we deemed necessary or appropriate for purposes of this opinion. With respect to factual matters, we have relied solely upon certificates of public officials, certificates of officers of the Company and the Trust and representations of the Company and the Trust in the Declaration, Indenture, Guarantee and Placement Agreement.

In our examination, we have assumed the authenticity of all documents submitted to us as originals, the conformity to the originals of all documents submitted to us as copies, and the authenticity of the originals of all documents submitted to us as copies. We also have assumed the genuineness of the signatures of persons signing all documents and instruments, the authority of such persons signing on behalf of the parties thereto, and the due authorization, execution and delivery of all documents by the parties thereto other than the Company or the Trust. We further have assumed, without independent verification, that the Placement Agents have and will comply with the provisions of Rule 144A(d)(1) promulgated pursuant to the Securities Act of 1933, and with the provisions of the Placement Agreement.

You have requested our opinion as special counsel for the Company pursuant to Section 6.8 of the Amended and Restated Credit Agreement, dated as of April 30, 2001 (the "Credit Agreement"), as amended by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement dated as of May 31, 2002, and that certain Third Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2003 ("Third Amendment"), among the Borrower, the Lenders named above, and Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent. All capitalized terms used in this opinion and not otherwise defined herein shall have the meanings attributed to them in the Credit Agreement.

_____, 200_

Page 3

Based on the foregoing and subject to the qualifications set forth herein, it is our opinion that:

1. To our knowledge, (i) the Obligations are entitled to the benefits of the subordination provisions contained in the Junior Subordinated Indenture, dated as of _____, 200__, between the Borrower and _____, as Trustee, (the "Indenture") and (ii) the Obligations constitute "Senior Indebtedness" as defined in the Indenture.

The opinions set forth herein are subject to and qualified by the following limitations:

      A. The enforceability of the Credit Agreement, the Term Notes, and the Revolving Notes is subject to the right of taxing authorities or other entities or persons which may by law have priority over the rights of the Lenders.

      B. Certain remedies and/or provisions under the Credit Agreement, the Term Notes, and the Revolving Notes do or may require enforcement or interpretation by a court of equity, and such enforcement or interpretation is subject to the discretion of such court and to such principles of equity as the courts having jurisdiction may impose.

      C. Applicable federal, state and local laws, ordinances, regulations, court decisions and constitutional requirements may limit or render unenforceable certain of the rights and remedies of the Lenders under the Credit Agreement, the Term Notes, and the Revolving Notes.

This opinion is provided to you as a legal opinion only, and not as a guarantee or warranty of the matters discussed herein. We express no opinion with respect to the financial status or ability of the Borrower to meet its obligations under any of the Transaction Documents. No opinion may be inferred or implied beyond the matters expressly stated herein.

We do not express any opinion as to any law other than the laws of the State of Illinois and the laws of the United States of America. We have assumed for purposes of this opinion, with your permission and without having made any independent investigation, that the laws of the State of Illinois are identical to the laws of the State of New York (without regard to conflict of law provisions).

As you are aware, Edward C. Fitzpatrick is a director and Secretary to the Board of Directors of Borrower and certain Subsidiaries.

This opinion is addressed to you and is solely for your use; accordingly, it may not be used, relied upon or disclosed to any other person or entity (other than assignees, participants, transferees or successors of any Lender in accordance with the terms provided in the Transaction

_____, 200_

Page 4

Documents) or used for any purpose other than in connection with this transaction.  It is not to be used, circulated, quoted or otherwise referred to for any other purpose without the prior written consent of this firm.  The opinion is based upon information furnished us as of the date hereof. We disclaim any undertaking to advise you of any changes concerning the above, whether or not deemed material, which may hereafter come to our attention.

Very truly yours,

Attachments

**Bank One, NA**

**Third Amendment**
to
**Amended and Restated Credit Agreement**
**among**
**FBOP Corporation,**
**Bank One, NA**
**(successor in interest to**
**American National Bank and Trust Company of Chicago),**
**as Agent and as a Lender,**
**and**
**the Institutions that are Parties thereto as Lenders**

**May 31, 2003**

**CLOSING DOCUMENTS**
(dated as of May 31, 2003, unless otherwise indicated)

1. Third Amendment to Amended and Restated Credit Agreement

2. Restated Revolving Note in favor of Bank One, NA

3. Certificate of Good Standing of Borrower, dated as of May 30, 2003

4. Secretary's Certificate with respect to ByLaws of Borrower

5. Secretary's Certificate with respect to Resolutions adopted by Borrower's Board of Directors

6. Borrower's Certificate of Incumbency

7. Legal Opinion from Borrower's Counsel[*]

8. Certified Articles of Incorporation of Borrower, dated as of May 29, 2003

---

[*] A Legal Opinion from Borrower's Counsel re good standing of Depository Institution Subsidiaries is required to be delivered by June 30, 2003.

# EXHIBIT E



**\*2940252038\***



**\*0000\***



**\*FBOP CORPORATION\***

DOCUMENT TYPE SEPARATOR SHEET

**Loan Agreement**



Version 1 1

EXECUTION COPY

# FOURTH AMENDMENT

## TO

# AMENDED AND RESTATED CREDIT AGREEMENT

### AMONG

### FBOP CORPORATION,

### BANK ONE, NA
**(successor in interest to**
**American National Bank and Trust Company of Chicago),**

### AS AGENT AND AS A LENDER,

### AND

### THE INSTITUTIONS THAT ARE FROM TIME TO TIME
### PARTIES HERETO AS LENDERS

Fourth Amendment dated as of May 28, 2004
Third Amendment dated as of May 31, 2003
Second Amendment dated as of May 31, 2002
First Amendment dated as of March 31, 2002
Original Amended and Restated Credit Agreement dated as of April 30, 2001

**AMENDMENT PROVISIONS:**                                             **PAGE**

A    Amendment to the Revolving Facility Termination Date ........................................ ........   2

B.    Amendment to the Term Loans Termination Date..........................................................   2

C.    Amendment to the Amount of the Aggregate Revolving Loans Commitment and   2
     Aggregate Term Loans Commitment................................................................. .... . .. .  ..

D    Amendment to the Allocation of the Amounts of the Revolving Loans Commitment
     and the Amounts of Term Loans Commitment.................................................................   2

E.    Amendments to Section 1.1 of the 2001 Credit Agreement............... ...........................   2

F.    Amendment to Section 2.2(a) of the 2001 Credit Agreement................................ ... ...   4

G.    Amendment to Article IV of the 2001 Credit Agreement...... ................ ....... .. . ..   .   4

H.    Conditions  . ..  ...........................................................................................................   5

I.    Additional Terms.... ..... .. .. .. .. ..  . ..     . ..      . . . .   6

**EXHIBITS:**

EXHIBIT A  -  Form of Revolving Note

EXHIBIT B  -  Form of Term Note

EXHIBIT C  -  Form of Incumbency Certificate

EXHIBIT D  -  Form of Legal Opinion Regarding Fourth Amendment

**SCHEDULE:**

SCHEDULE 5.8  -  Depository Institutions Subsidiaries

# FOURTH AMENDMENT TO
# AMENDED AND RESTATED CREDIT AGREEMENT

This FOURTH AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT ("Fourth Amendment"), dated as of May 28, 2004, is entered into among FBOP CORPORATION, a bank holding company incorporated under the laws of the State of Illinois and having its principal place of business at 11 West Madison Street, Oak Park, Illinois 60302, and the institutions that are from time to time parties hereto as Lenders (whether by execution of this Agreement, an Assignment and Acceptance or otherwise), and BANK ONE, NA (successor in interest to American National Bank and Trust Company of Chicago), a national banking association having a place of business at 120 South LaSalle Street, Chicago, Illinois 60603-3400, in its capacity as the Agent and as a Lender.

## R E C I T A L S :

A.     The parties hereto have entered into that certain Amended and Restated Credit Agreement, dated as of April 30, 2001, as previously amended, restated, supplemented or modified from time to time, including by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2002, and that certain Third Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2003 ("2001 Credit Agreement").

B.     The parties hereto desire to amend and modify the 2001 Credit Agreement in accordance with the terms and subject to the conditions set forth in this Fourth Amendment  As amended and modified by this Fourth Amendment, the 2001 Credit Agreement may be referred to as the "Agreement "

C     The parties desire to amend the terms of the 2001 Credit Agreement to· (i) extend the Revolving Facility Termination Date; (ii) extend the Term Loans Termination Date; (iii) modify the amount of the Aggregate Revolving Loans Commitment and the Aggregate Term Loans Commitment; (iv) modify the allocations of the amounts of the Revolving Loans Commitment and Term Loans Commitment of each Lender; (v) modify the repayment schedule for the Term Loans; (vi) provide conditions to any subsequent advance under the Term Loans relating to Borrower's acquisition of California Savings Bank, and (vii) otherwise modify the 2001 Credit Agreement as described in this Fourth Amendment  The parties agree to undertake such modification in accordance with the terms, subject to the conditions, and in reliance upon the recitals, representations, warranties and covenants set forth herein, in the Agreement, and in the other Loan Documents, irrespective of whether entered into or delivered on or after April 30, 2001

D     Capitalized terms used but not otherwise defined in this Fourth Amendment shall have the meanings respectively ascribed to them in the 2001 Credit Agreement

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## A G R E E M E N T :

**A.** **Amendment to the Revolving Facility Termination Date** The Revolving Facility Termination Date is hereby amended to be May 31, 2005.

**B.** **Amendment to the Term Loans Termination Date**. The Term Loans Termination Date is hereby amended to be May 31, 2009.

**C.** **Amendment to the Amount of the Aggregate Revolving Loans Commitment and Aggregate Term Loans Commitment**. Subject to Section F below, the Aggregate Revolving Loans Commitment of the Lenders is hereby decreased to One Hundred Seventy-Five Million and No/100 Dollars ($175,000,000 00). The Aggregate Term Loans Commitment of the Lenders is hereby increased to One Hundred Twenty-Five Million and No/100 Dollars ($125,000,000.00).

**D.** **Amendment to the Allocation of the Amounts of the Revolving Loans Commitment and the Amounts of the Term Loans Commitment**. The amount of the respective Revolving Loans Commitment and the Term Loans Commitment of each Lender shall be reallocated to be the amounts set forth opposite each Lender's signature to this Fourth Amendment

**E.** **Amendments to Section 1.1 of the 2001 Credit Agreement**.

(i)    Section 1.1 of the 2001 Credit Agreement is hereby amended by deleting the definition "Eurodollar Interest Period" in its entirety and replacing it with the following·

""Eurodollar Interest Period" means, with respect to a Eurodollar Advance, a period of one (1), two (2), three (3) or six (6) months, or such other period as the Borrower and Agent may agree upon in writing, commencing on a Business Day selected by the Borrower pursuant to this Agreement. Such Eurodollar Interest Period shall end on the day which corresponds numerically to such date one (1), two (2), three (3) or six (6) months, or such other agreed-upon period of time, thereafter; provided, however, that if there is no such numerically corresponding day in such next, second, third or sixth month (or in such other number of agreed-upon months), such Eurodollar Interest Period shall end on the last Business Day of such next, second, third or sixth succeeding month (or other agreed-upon number of succeeding months). If a Eurodollar Interest Period would otherwise end on a day which is not a Business Day, such Eurodollar Interest Period shall end on the next succeeding Business Day, provided, however, that if said next succeeding Business Day falls in a new calendar month, such Eurodollar Interest Period shall end on the immediately preceding Business Day."

(ii)    Section 1.1 of the 2001 Credit Agreement is hereby further amended to add the following definitions in the appropriate alphabetical order·

""CSB" means California Savings Bank, a federal savings bank "

""CSB Advance" means an Advance made under the Term Loans on or after May 28, 2004, the proceeds of which shall be used solely to pay the Merger Consideration (as defined in Section 2.3(c) of the CSB Merger Agreement)."

""CSB Merger" means the consummation of the transactions contemplated in the CSB Merger Agreement including, without limitation, the merger of a wholly owned interim federal savings bank Subsidiary of the Borrower with and into CSB."

""CSB Merger Agreement" means that certain Agreement and Plan of Merger between Borrower and CSB, dated as of March 5, 2004, as amended."

**F.**     **Amendment to Section 2.2(a) of the 2001 Credit Agreement**. Section 2.2(a) of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"(a)     Term Loans. The Term Loans shall be payable in installments of Two Million Six Hundred Twelve Thousand Nine Hundred Seventy-Three and 75/100 Dollars ($2,612,973.75) on the second Business Day of each January, April, July, and October during the period that the Term Loan is outstanding beginning July 2, 2004 and ending May 31, 2009; provided, however, if the Lenders fund the CSB Advance, the Term Loans shall thereafter be payable in installments of Four Million Four Hundred Sixty-Four Thousand Two Hundred Eighty-Five and 71/100 Dollars ($4,464,285.71) on such dates.   Any outstanding Term Loans' Advances and any other unpaid Obligation shall be paid in full by the Borrower on the Term Loans Termination Date."

**G.**     **Amendment to Article IV of the 2001 Credit Agreement**. Article IV of the 2001 Credit Agreement is hereby amended by adding the following as new Section 4.4 of the 2001 Credit Agreement:

"**4.4     CSB Advance**. The CSB Advance shall be the only Advance permitted to be made under the Term Loans on or after May 28, 2004. In addition to the conditions set forth in Section 4.2, the funding of the CSB Advance shall be subject to the following conditions precedent:

(i)     no litigation or proceeding by or before any Governmental Agency shall have been instituted or threatened against or affecting. (A) the Borrower, any of its Subsidiaries, CSB, any of its Subsidiaries, or any of their assets, officers, or shareholders which, in the sole discretion of the Agent, could reasonably be likely to adversely affect the validity or enforceability of the CSB Merger, the CSB Merger Agreement, or any of the documents, agreements, or instruments executed in connection therewith, or the consummation of the transactions contemplated thereby, or (B) CSB, any of its Subsidiaries, or any of their assets, officers, or shareholders which, in the sole discretion of the Agent, could reasonably be likely to adversely affect the financial condition, business, properties, assets, liabilities, operations, prospects, or results of operations of CSB or any of its Subsidiaries.

(ii)    the receipt by the Agent of all of the following, duly executed and dated as of the date on which the CSB Merger is to become effective, and in form and substance satisfactory to the Agent and its counsel·

    (A)    Certificate of the Senior Vice President and Chief Financial Officer of the Borrower, certifying: (1) copies of resolutions of the board of directors of the Borrower authorizing the execution and delivery by the Borrower of the CSB Merger Agreement and the documents, agreements, and instruments executed in connection therewith, and the performance by Borrower of its obligations thereunder; and (2) that no consents, approvals, or determinations of any Governmental Agency are required in connection with the execution and delivery by Borrower of the CSB Merger Agreement and the documents, agreements, and instruments executed in connection therewith, or the performance by Borrower of its obligations thereunder, except for such consents, approvals or determinations that have already been obtained;

    (B)    Certificate of the Secretary or Assistant Secretary of CSB, certifying: (1) copies of resolutions of the board of directors of CSB authorizing the execution and delivery by CSB of the CSB Merger Agreement and the documents, agreements, and instruments executed in connection therewith, and the performance by CSB of its obligations thereunder; and (2) that no consents, approvals, or determinations of any Governmental Agency are required in connection with the execution and delivery by CSB of the CSB Merger Agreement or the documents, agreements, and instruments executed in connection therewith, or the performance by CSB of its obligations thereunder, except for such consents, approvals or determinations that have already been obtained;

    (C)    true, correct and complete copies of the CSB Merger Agreement, including all amendments, and all documents, agreements, and instruments executed in connection therewith, and

    (D)    a certificate signed by the Senior Vice President and Chief Financial Officer of the Borrower certifying that all conditions to the closing of the CSB Merger and the other transactions contemplated by the CSB Merger Agreement have been fully satisfied (except the payment of the CSB Merger Consideration (as defined in the CSB Merger Agreement))."

**H.**    <u>**Conditions**</u>.

    (i)    <u>General</u>    The Borrower hereby acknowledges and agrees that, in addition to the other conditions and requirements of <u>Section 4.2</u> of the 2001 Credit Agreement, the Lenders shall not be required to make any Advance, unless as of the date hereof and on the

applicable Borrowing Date, the representations and warranties contained in this Fourth Amendment and the 2001 Credit Agreement (including all exhibits and schedules attached hereto and thereto) shall be true, accurate, and complete as of the date hereof and such Borrowing Date, and the Borrower shall have fully complied with each of its promises and covenants contained in this Fourth Amendment and the 2001 Credit Agreement. Each Borrowing Notice with respect to each such Advance shall constitute a representation and warranty by the Borrower that the conditions contained in this Fourth Amendment and the 2001 Credit Agreement shall have been satisfied.

(ii)     Fourth Amendment. In addition to other conditions set forth in this Fourth Amendment and the 2001 Credit Agreement, including, without limitation, those applicable to the making of Advances, the obligations of the Lenders under the Agreement shall be subject to the performance by the Borrower of all of its agreements theretofore to be performed under the Agreement and to the receipt of all of the following, duly executed and dated the date hereof, and in form and substance satisfactory to the Agent and its counsel.

(a)     the restated Revolving Notes for the benefit of each Lender, each in the form set forth on Exhibit A to this Fourth Amendment;

(b)     the restated Term Notes for the benefit of each Lender, each in the form set forth on Exhibit B to this Fourth Amendment;

(c)     copies of the articles of incorporation of the Borrower, together with all amendments through the date hereof, and a certificate of good standing, both certified by the appropriate governmental officer in its jurisdiction of incorporation and dated within the five business days preceding the date hereof;

(d)     copies, certified by the Secretary or Assistant Secretary of the Borrower, of its by-laws and of its Board of Directors' resolutions authorizing the execution, delivery, and performance, respectively, of this Fourth Amendment, the restated Revolving Notes and the restated Term Notes, and any other documents to be executed, delivered, or performed in connection with this Fourth Amendment (collectively, "Amendment-Related Documents");

(e)     an incumbency certificate, substantially in the form of Exhibit C attached hereto, executed by the Secretary or Assistant Secretary of the Borrower, which shall identify by name and title and bear the signature of the officers of the Borrower authorized to sign the Amendment-Related Documents and to make borrowings hereunder and under the 2001 Credit Agreement, upon which certificate the Agent and the Lenders shall be entitled to rely until informed of any change in writing by the Borrower; and

(f)     a written opinion of the Borrower's counsel, addressed to the Lenders, in substantially the form set forth on Exhibit D attached hereto

## I.  **Additional Terms**

(i)  <u>Acknowledgment of Indebtedness under Agreement</u>.  The Borrower acknowledges and confirms that, as of the date hereof, the Borrower is indebted to the Lenders, without defense, setoff, or counterclaim (a) in the aggregate principal amount of Fifty-Two Million Two Hundred Fifty-Nine Thousand Four Hundred Seventy-Five and 02/100 Dollars ($52,259,475.02) in Term Loans, and (b) in the aggregate principal amount of Ninety-Eight Million Ninety-Three Thousand Eight Hundred Seventy-Two and No/100 Dollars ($98,093,872.00) in Revolving Loans, all made under the 2001 Credit Agreement.

(ii)  <u>Effectiveness</u>.  The provisions of this Fourth Amendment will become effective upon its execution by the parties hereto.

(iii)  <u>The Agreement</u>.  All references in the 2001 Credit Agreement to the term "Agreement" shall be deemed to refer to the Agreement referenced in this Fourth Amendment.

(iv)  <u>The Lenders</u>  All references in the Agreement to the "Lenders" shall be deemed to refer to the lending institutions listed on the signature pages to this Fourth Amendment and their respective permitted successors and assigns  Each Lender hereby acknowledges that it has received a copy of all of the documents that constitute the 2001 Credit Agreement, that it is a Lender under all of the Loan Documents, and that it will perform in accordance with the terms of such Loan Documents all of the obligations that are required to be performed by it as a Lender.

(v)  <u>Fourth Amendment and 2001 Credit Agreement to be Read Together</u>.  This Fourth Amendment supplements and is hereby made part of the 2001 Credit Agreement, and the 2001 Credit Agreement and this Fourth Amendment shall from and after the date hereof be read together and shall constitute the Agreement.  Except as otherwise set forth herein, the 2001 Credit Agreement shall remain in full force and effect.

(vi)  <u>Transaction Documents</u>  The terms "Transaction Documents" and "Loan Documents," as used in the Agreement, shall from and after the date hereof include the Amendment-Related Documents.

(vii)  <u>Counterparts</u>.  This Fourth Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same document

(viii)  <u>Representations and Warranties</u>  The Borrower hereby represents and warrants to the Lenders and Agent as follows:

(a)  No Default or Unmatured Default has occurred and is continuing (or would result from the amendments contemplated hereby)

(b)  The execution, delivery and performance by the Borrower of this Fourth Amendment have been duly authorized by all necessary corporate and other action and do not and will not require any registration with, consent or approval of, or notice to or action by any person or entity (including any governmental agency) in order to be effective and enforceable.

(c)     This Fourth Amendment, the other Loan Documents (as amended by this Fourth Amendment), the CSB Merger Agreement and the documents, any recitals and instruments executed in connection with the CSB Merger Agreement constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms.

(d)     All representations and warranties of the Borrower in the 2001 Loan Agreement (as modified by this Fourth Amendment) are true and correct, except (1) for the purposes of this Fourth Amendment only, the reference in Section 5 4 of the 2001 Loan Agreement to the consolidated financial statements as of and for the period ending December 31, 2000 shall be deemed to refer to the consolidated financial statements of the Borrower and its Subsidiaries required to be delivered to the Lenders pursuant to Section 6 1(a) of the 2001 Loan Agreement as of and for the year ended December 31, 2003, and (2) Schedule 5 8 attached hereto shall be substituted for Schedule 5 8 attached to the 2001 Credit Agreement for all purposes under the Agreement from and after the date hereof.

(e)     The Borrower's obligations under the Agreement and under the other Loan Documents are not subject to any defense, counterclaim, set-off, right to recoupment, abatement or other claim

(f)     Borrower has delivered to Agent a true, accurate and complete copy of the CSB Merger Agreement as in effect on the date hereof, along with the documents, agreements and instruments executed in connection therewith.

(ix)     Government Regulation.  The Borrower shall not (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits any Lender from making any advance or extension of credit to the Borrower or from otherwise conducting business with the Borrower, or (b) fail to provide documentary or other evidence of Borrower's identity as may be requested by Agent or any Lender at any time to enable Agent or any Lender to verify the Borrower's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U S C. Section 5318.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Fourth Amendment as of the date first written above.

FBOP CORPORATION

By: _Matt Vann_

Print Name: _Michael Dunning_

Title: _Svr CFO_

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois 60302
Attention: Mr Michael E Kelly

with a copy to

Lord, Bissell & Brook LLP
115 S. LaSalle Street, 31st Floor
Chicago, Illinois 60602
Attention: Edward C. Fitzpatrick, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $39,583,333 34 | $55,416,666.66 |

**BANK ONE, NA**, as Agent and as a Lender

By _Rachel J. DeAngelis_

Print Name _Rachel J. DeAngelis_

Title _Commercial Banking Officer_

(address)

Bank One, NA
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLP
333 West Wacker Drive, Suite 2700
Chicago, Illinois 60606
Attention: Edwin S. del Hierro, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $8,333,333.33 | $11,666,666 67 |

**ASSOCIATED BANK, NA**, as a Lender

By _____

Print Name. _____

Title. _____

(address)

Associated Bank, NA
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention  Mr. Daniel Holzhauer

| Commitments | |
| --- | --- |
| Term | Revolving |
| $39,583,333 34 | $55,416,666 66 |

**BANK ONE, NA**, as Agent and as a Lender

By:_____

Print Name:_____

Title _____

(address)

Bank One, NA
120 South LaSalle Street
Chicago, Illinois 60603
Attention  Mr  John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLP
333 West Wacker Drive, Suite 2700
Chicago, Illinois  60606
Attention   Edwin S  del Hierro, Esq

| Commitments | |
| --- | --- |
| Term | Revolving |
| $8,333,333.33 | $11,666,666 67 |

**ASSOCIATED BANK, NA**, as a Lender

By _____

Print Name  Daniel Holzhauer

Title.  AVP

(address)

Associated Bank, NA
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention  Mr  Daniel Holzhauer

| Commitments | |
| --- | --- |
| Term | Revolving |
| $39,583,333 34 | $55,416,666 66 |

**BANK ONE, NA**, as Agent and as a Lender

By. _____

Print Name _____

Title _____

(address)

Bank One, NA
120 South LaSalle Street
Chicago, Illinois 60603
Attention·  Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLP
333 West Wacker Drive, Suite 2700
Chicago, Illinois  60606
Attention.  Edwin S. del Hierro, Esq

| Commitments | |
| --- | --- |
| Term | Revolving |
| $8,333,333 33 | $11,666,666.67 |

**ASSOCIATED BANK, NA**, as a Lender

By _____

Print Name  Daniel Holzhauer

Title  AVP

(address)

Associated Bank, NA
401 East Kilbourne Avenue
Milwaukee, Wisconsin 53201-0522
Attention   Mr. Daniel Holzhauer

| Commitments | |
| --- | --- |
| Term | Revolving |
| $16,666,666.67 | $23,333,333.33 |

**HARRIS TRUST AND SAVINGS BANK,**
as a Lender

By. _Paul N_

Print Name. _Paul J Kubrich_

Title: _Vice President_

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention:  Mr. Michael S. Cameli

with a copy to.

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention:  Steven G. Hastings, Esq

| Commitments | |
| --- | --- |
| Term | Revolving |
| $27,083,333.33 | $37,916,666.67 |

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name: _____

Title: _____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention:  Mr. James K. Pridmore

| Commitments | |
| --- | --- |
| Term | Revolving |
| $16,666,666.67 | $23,333,333 33 |

**HARRIS TRUST AND SAVINGS BANK,**
as a Lender

By: _Paul J M_

Print Name: _Paul J Rebrich_

Title _Vice President_

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq

| Commitments | |
| --- | --- |
| Term | Revolving |
| $27,083,333 33 | $37,916,666.67 |

**LASALLE BANK NATIONAL
ASSOCIATION,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. James K Pridmore

| Commitments | |
|---|---|
| Term | Revolving |
| $16,666,666 67 | $23,333,333 33 |

**HARRIS TRUST AND SAVINGS BANK,**
as a Lender

By _____

Print Name _____

Title _____

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention   Mr  Michael S  Cameli

with a copy to

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention   Steven G  Hastings, Esq

| Commitments | |
|---|---|
| Term | Revolving |
| $27,083,333 33 | $37,916,666 67 |

**LASALLE BANK NATIONAL
ASSOCIATION,** as a Lender

By _____

Print Name   *James K. Pridmore*

Title   *Senior Vice President*

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention   Mr  James K  Pridmore

| Commitments | |
|---|---|
| Term | Revolving |
| $16,666,666 67 | $23,333,333 33 |

**M&I MARSHALL & ILSLEY BANK**, as a Lender

By _~~Gregg Weyer~~_

Print Name ___Gregg R. Weyer___

Title ___Vice President___

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention  Mr  Gregg R  Weyer

with a copy to

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention  K  Thor Lundgren, Esq

| Commitments | |
|---|---|
| Term | Revolving |
| $8,333,333 33 | $11,666,666 67 |

**FIFTH THIRD BANK**, as a Lender

By _____

Print Name _____

Title._____

(address)

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention  Mr  Scott J  Steiner
                  Assistant Vice President

| Commitments | |
|---|---|
| Term | Revolving |
| $16,666,666.67 | $23,333,333 33 |

**M&I MARSHALL & ILSLEY BANK**, as a Lender

By _____

Print Name._____

Title._____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention   Mr  Gregg R  Weyer

with a copy to.

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention   K  Thor Lundgren, Esq

| Commitments | |
|---|---|
| Term | Revolving |
| $8,333,333 33 | $11,666,666 67 |

**FIFTH THIRD BANK**, as a Lender

By _~Scott Steiner~ (signature)_

Print Name _Scott Steiner_

Title. _AVP_

(address)

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention·  Mr  Scott J  Steiner
                    Assistant Vice President

| Commitments | |
| --- | --- |
| Term | Revolving |
| $8,333,333 33 | $11,666,666 67 |

**UNION BANK OF CALIFORNIA, N.A.,**
as a Lender

By _____

Print Name _____ Dennis A. Cattell

Title _____ Vice President

(address)

Union Bank of California, N A
445 South Figueroa Street
Los Angles, California 90071
Attention  Dennis A  Cattell
            Vice President

## EXHIBIT A

## FORM OF REVOLVING NOTE

**[updated Commitment amount]**                    Restatement Date: May 28, 2004
                                                   Original Note Date: April 30, 2001

FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of **[LENDER]** ("Lender") the lesser of the principal sum of [updated Commitment amount] and No/100 Dollars ($_____) or the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the Borrower pursuant to <u>Article II</u> of the Agreement (as hereinafter defined), in immediately available funds at the office of Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent, located at 120 South LaSalle Street, Chicago, Illinois, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement. The Borrower shall pay the principal of, and accrued and unpaid interest on, the Revolving Loans in full on the Revolving Facility Termination Date

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Revolving Loan and the date and amount of each principal payment hereunder.

This Revolving Note is one of the Revolving Notes issued pursuant to, and is entitled to the benefits of, that certain Amended and Restated Credit Agreement, dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed, or extended and in effect from time to time, is herein called the "Agreement"), by and among the Borrower, the Lenders party thereto, including the Lender, and Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Revolving Note, including the terms and conditions under which this Revolving Note may be prepaid or its maturity date accelerated. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time. Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Revolving Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged or received under the Agreement or this Revolving Note or otherwise in connection with the Agreement or this Revolving Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender). All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release or surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or that may hereafter be held as security for the payment of this Revolving Note, and may extend the time for payment or (with the consent of the Borrower) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT, AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER

IN WITNESS WHEREOF, the Borrower has caused this Revolving Note to be duly executed as of the date first above written.

**FBOP CORPORATION**

By:_____

Print Name:_____

Title:_____

ATTEST.

By:_____

Print Name:_____

Title:_____

SCHEDULE OF REVOLVING LOANS
AND PAYMENTS OF PRINCIPAL

REVOLVING NOTE OF FBOP CORPORATION,
DATED APRIL 30, 2001
AND RESTATED MAY 28, 2004

| Date | Principal Amount of Revolving Loan | Maturity of Interest Period | Maturity Principal Amount Paid | Unpaid Balance |
|------|------|------|------|------|

[COMPLETE AS NECESSARY]

## EXHIBIT B

## FORM OF TERM NOTE

**[updated Commitment amount]**

Restatement Date: May 28, 2004
Original Note Date: April 30, 2001

FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of **[LENDER]** ("Lender") the lesser of the principal sum of [updated Commitment amount] and No/100 Dollars ($_____) or the aggregate unpaid principal amount of all Term Loans made by the Lender to the Borrower pursuant to <u>Article II</u> of the Agreement (as hereinafter defined), in immediately available funds at the main office of Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent, located at 120 South LaSalle Street, Chicago, Illinois, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement. The Borrower shall pay the principal of, and accrued and unpaid interest on, the Term Loans in full on the Term Loans Termination Date and shall make such mandatory payments as are required to be made under the terms of <u>Article II</u> of the Agreement.

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Term Loan and the date and amount of each principal payment hereunder

This Term Note is one of the Term Notes issued pursuant to, and is entitled to the benefits of, the Amended and Restated Credit Agreement dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed or extended and in effect from time to time, is herein called the "Agreement"), among the Borrower, the Lenders party thereto, including the Lender, and Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Term Note, including the terms and conditions under which this Term Note may be prepaid or its maturity date accelerated. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time. Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Term Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged or received under the Agreement or this Term Note or otherwise in connection with the Agreement or this Term Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender). All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and

spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release or surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or which may hereafter be held as security for the payment of this Term Note, and may extend the time for payment or (with the consent of the Borrower) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT, AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

IN WITNESS WHEREOF, the Borrower has caused this Term Note to be duly executed as of the date first above written.

**FBOP CORPORATION**
By:_____
Print Name:_____
Title:_____

ATTEST:

By:_____
Print Name:_____
Title:_____

SCHEDULE OF TERM LOANS AND PAYMENTS
OF PRINCIPAL

TERM NOTE OF FBOP CORPORATION,
DATED APRIL 30, 2001
AND RESTATED MAY 28, 2004

| Date | Principal Amount of Term Loan | Maturity of Interest Period | Maturity Principal Amount Paid | Unpaid Balance |
|------|-------------------------------|------------------------------|-------------------------------|----------------|

[COMPLETE AS NECESSARY]

## EXHIBIT C

## CERTIFICATE OF INCUMBENCY

I, Edward C. Fitzpatrick, Secretary of FBOP Corporation, an Illinois corporation, do hereby certify that the following persons have been duly elected to, are duly qualified for, have held, and on the date hereof do hold, the offices for FBOP Corporation set forth opposite their respective names:

| Name | Office |
|------|--------|
| MICHAEL E. KELLY | Chairman of the Board |
| ROBERT M. HESKETT | President and Director |
| MICHAEL F DUNNING | Vice President and Chief Financial Officer |
| EDWARD C FITZPATRICK | Secretary and Director |

I further certify that the sample signatures below are true signatures for each such officer.

Dated as of May ___, 2004

_____
EDWARD C. FITZPATRICK,
Secretary


_____
MICHAEL E. KELLY

_____
ROBERT M. HESKETT


_____
MICHAEL F. DUNNING

_____
EDWARD C. FITZPATRICK


C-1

## EXHIBIT D

## FORM OF LEGAL OPINION

May __, 2004

Bank One, NA
120 South LaSalle Street
Chicago, Illinois 60603-3400

LaSalle Bank, N A
135 South La Salle Street
Chicago, Illinois 60603

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603

Union Bank of California, N.A.
445 South Figuero Street
Los Angeles, California 90071

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53201-3593

Associated Bank
401 East Kilbourn Avenue
Milwaukee, Wisconsin 53201-0522

Re: **FBOP Corporation**

Ladies and Gentlemen

We have acted as special counsel for FBOP Corporation (the "Borrower") in connection with its execution and delivery of an Amended and Restated Credit Agreement, dated as of April 30, 2001 (the "Credit Agreement"), as amended by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2002, that certain Third Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2003, and as further amended by that certain Fourth Amendment to Amended and Restated Credit Agreement, dated as of the date hereof (the "Fourth Amendment"), among the Borrower, the Lenders named above, and Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent. All capitalized terms used in this opinion and not otherwise defined herein shall have the meanings attributed to them in the Credit Agreement, as so amended.

We have examined the Borrower's articles of incorporation, by-laws, resolutions, executed copies of the CSB Merger Agreement and Transaction Documents and unexecuted copies of the Fourth Amendment, the restated Revolving Notes, in substantially the form attached to the Fourth Amendment as Exhibit A ("Revolving Notes"), the restated Term Notes, in substantially the form attached to the Fourth Amendment as Exhibit B ("Term Notes"), and such other matters of fact and law that we deem necessary in order to render this opinion. In our examination of all documents, we have assumed the genuineness of all signatures (other than

those of Borrower), the authenticity of all documents submitted to us as originals, the conformity of all copies submitted to us with the originals to be delivered and the due authorization, execution and delivery by each party other than the Borrower of all documents to which it is or will be a party. We have made no independent investigation as to the accuracy, correctness or completeness of any representation or warranties made in the Fourth Amendment. The opinion expressed in paragraph 1 below as to the good standing of the Borrower is based solely on the certificate of good standing of the Borrower attached hereto. The opinions expressed in paragraph 2 below are based solely on certificates of good standing of the Depository Institution Subsidiaries attached hereto.

Based upon the foregoing and subject to the qualifications set forth herein, it is our opinion that:

1.    The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. Each Subsidiary (other than the Depository Institution Subsidiaries) is a corporation validly existing and in good standing under the laws of its state of incorporation except where any failure to be so existing or in good standing could not reasonably be expected to have a material and adverse effect on the Borrower and the Subsidiaries taken as a whole. The Borrower has all requisite corporate authority to conduct business in each jurisdiction in which its business is conducted. The Subsidiaries (other than the Depository Institution Subsidiaries) have all requisite corporate authority to conduct business in each jurisdiction in which their respective business is conducted, except when any such failure could not reasonably be expected to have a material and adverse effect on the Borrower and the Subsidiaries (including the Depository Institution Subsidiaries) taken as a whole

2.    Each of Regency Savings Bank, FSB, San Diego National Bank, Pullman Bank and Trust, Park National Bank and Trust of Chicago, Cosmopolitan Bank and Trust, First Bank of Oak Park, Madisonville State Bank, Citizens National Bank of Teague, Texas, North Houston Bank, California National Bank and Bank USA, FSB is a bank or savings association validly existing and in good standing under the laws of the jurisdiction of its organization

3.    Each Depository Institution Subsidiary listed in paragraph 2 above has all requisite corporate authority to conduct its business in each jurisdiction in which its respective business is conducted

4.    The execution and delivery of each of the Fourth Amendment, the Term Notes, the Revolving Notes and the CSB Merger Agreement by the Borrower, and the performance by the Borrower of its obligations thereunder, have been duly authorized by all necessary corporation action and proceedings on the part of the Borrower and its shareholders.

5.    No order, permission, consent or approval of any federal or state governmental department, commission, board or regulatory authority or agency is required for the execution and delivery of, or for the performance by the Borrower of its

obligations under, any of the Fourth Amendment, the Term Notes, or the Revolving Notes, or, if required, each such permission, consent or approval has been obtained

6    There is, to our knowledge, no charter, by-law or preferred or common stock provision, nor any indenture, instrument, contract or agreement to which the Borrower is a party, nor any statute, rule, regulation, order, judgment, injunction or decree binding on the Borrower which would be contravened by the execution and delivery of any of the Fourth Amendment, the Term Notes, or the Revolving Notes, or by the performance of any terms, provisions conditions, agreements, covenants, or obligations of the Borrower contained therein.

7.    Each of the Fourth Amendment, the Term Notes, and the Revolving Notes has been duly executed and delivered by the Borrower and constitutes legal, valid and binding obligations of the Borrower enforceable in accordance with its respective terms except to the extent the enforcement thereof may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject also to the availability of equitable remedies if equitable remedies are sought

The opinions set forth herein are subject to and qualified by the following limitations:

(1)    The enforceability of the Fourth Amendment, the Term Notes and the Revolving Notes is subject to the right of taxing authorities or other entities or persons which may by law have priority over the rights of the Lenders

(2)    Certain remedies and/or provisions under the Fourth Amendment, the Term Notes and the Revolving Notes do or may require enforcement or interpretation by a court of equity, and such enforcement or interpretation is subject to the discretion of such court and to such principles of equity as the courts having jurisdiction may impose.

(3)    Applicable federal, state and local laws, ordinances, regulations, court decisions and constitutional requirements may limit or render unenforceable certain of the rights and remedies of the Lenders under the Fourth Amendment, the Term Notes, and the Revolving Notes.

This opinion is provided to you as a legal opinion only, and not as a guarantee or warranty of the matters discussed herein. We express no opinion with respect to the financial status or ability of the Borrower to meet its obligations under any of the Transaction Documents. No opinion may be inferred or implied beyond the matters expressly stated herein

We do not express any opinion as to any law other than the laws of the State of Illinois and the laws of the United States of America.

As you are aware, Edward C. Fitzpatrick is a director and Secretary to the Board of Directors of Borrower and certain Subsidiaries.

D-3

This opinion is addressed to you and is solely for your use, accordingly, it may not be used, relied upon or disclosed to any other person or entity (other than assignees, participants, transferees or successors of any Lender in accordance with the terms provided in the Transaction Documents) or used for any purpose other than in connection with this transaction. It is not to be used, circulated, quoted or otherwise referred to for any other purpose without the prior written consent of this firm. The opinion is based upon information furnished us as of the date hereof. We disclaim any undertaking to advise you of any changes concerning the above, whether or not deemed material, which may hereafter come to our attention.

Very truly yours,

## SCHEDULE 5.8
## DEPOSITORY INSTITUTIONS SUBSIDIARIES

The attached organization chart is an accurate listing of the Borrower's Depository Institutions Subsidiaries along with a listing of all material Subsidiaries of the Depository Institutions as of the date of this Agreement.



FBOP CORPORATION
CORPORATE ORGANIZATION CHART
JUNE 30, 2004

**EXHIBIT A**

**FORM OF REVOLVING NOTE**

[updated Commitment amount]                    Restatement Date: May 28, 2004
                                               Original Note Date: April 30, 2001

FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of [LENDER] ("Lender") the lesser of the principal sum of [updated Commitment amount] and No/100 Dollars ($_____) or the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the Borrower pursuant to <u>Article II</u> of the Agreement (as hereinafter defined), in immediately available funds at the office of Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent, located at 120 South LaSalle Street, Chicago, Illinois, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement. The Borrower shall pay the principal of, and accrued and unpaid interest on, the Revolving Loans in full on the Revolving Facility Termination Date.

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Revolving Loan and the date and amount of each principal payment hereunder.

This Revolving Note is one of the Revolving Notes issued pursuant to, and is entitled to the benefits of, that certain Amended and Restated Credit Agreement, dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed, or extended and in effect from time to time, is herein called the "Agreement"), by and among the Borrower, the Lenders party thereto, including the Lender, and Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Revolving Note, including the terms and conditions under which this Revolving Note may be prepaid or its maturity date accelerated. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time. Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Revolving Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged or received under the Agreement or this Revolving Note or otherwise in connection with the Agreement or this Revolving Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender). All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release or surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or that may hereafter be held as security for the payment of this Revolving Note, and may extend the time for payment or (with the consent of the Borrower) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby.

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT, AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

IN WITNESS WHEREOF, the Borrower has caused this Revolving Note to be duly executed as of the date first above written.

**FBOP CORPORATION**

By:_____
Print Name:_____
Title:_____

ATTEST:

By:_____
Print Name:_____
Title:_____

A-3

SCHEDULE OF REVOLVING LOANS
AND PAYMENTS OF PRINCIPAL

REVOLVING NOTE OF FBOP CORPORATION,
DATED APRIL 30, 2001
AND RESTATED MAY 28, 2004

| Date | Principal Amount of Revolving Loan | Maturity of Interest Period | Maturity Principal Amount Paid | Unpaid Balance |
|------|------|------|------|------|

[COMPLETE AS NECESSARY]

## EXHIBIT B

## FORM OF TERM NOTE

[updated Commitment amount]                    Restatement Date: May 28, 2004
                                               Original Note Date: April 30, 2001

FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of [LENDER] ("Lender") the lesser of the principal sum of [updated Commitment amount] and No/100 Dollars ($_____) or the aggregate unpaid principal amount of all Term Loans made by the Lender to the Borrower pursuant to Article II of the Agreement (as hereinafter defined), in immediately available funds at the main office of Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent, located at 120 South LaSalle Street, Chicago, Illinois, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement. The Borrower shall pay the principal of, and accrued and unpaid interest on, the Term Loans in full on the Term Loans Termination Date and shall make such mandatory payments as are required to be made under the terms of Article II of the Agreement.

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Term Loan and the date and amount of each principal payment hereunder.

This Term Note is one of the Term Notes issued pursuant to, and is entitled to the benefits of, the Amended and Restated Credit Agreement dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed or extended and in effect from time to time, is herein called the "Agreement"), among the Borrower, the Lenders party thereto, including the Lender, and Bank One, NA (successor in interest to American National Bank and Trust Company of Chicago), as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Term Note, including the terms and conditions under which this Term Note may be prepaid or its maturity date accelerated. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time. Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Term Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged or received under the Agreement or this Term Note or otherwise in connection with the Agreement or this Term Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender). All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and

spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release or surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or which may hereafter be held as security for the payment of this Term Note, and may extend the time for payment or (with the consent of the Borrower) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby.

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT, AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

IN WITNESS WHEREOF, the Borrower has caused this Term Note to be duly executed as of the date first above written.

**FBOP CORPORATION**
By:_____
Print Name:_____
Title:_____

ATTEST:

By:_____
Print Name:_____
Title:_____

# EXHIBIT F

# FIFTH AMENDMENT

## TO

# AMENDED AND RESTATED CREDIT AGREEMENT

### AMONG
### FBOP CORPORATION,

### JPMORGAN CHASE BANK, N.A.
(successor by merger to
BankOne, N.A. (Illinois)),
### AS AGENT AND AS A LENDER,

### AND

### THE INSTITUTIONS THAT ARE FROM TIME TO TIME
### PARTIES HERETO AS LENDERS

**May 31, 2005**

**Closing Documents**

## Description of the Transaction

Fifth Amendment to Amended and Restated Credit Agreement to: (i) extend the Revolving Facility Termination Date and provide the Borrower with the option to further extend the Revolving Facility Termination Date; (ii) provide an option for the Borrower to increase the Aggregate Revolving Loans Commitment by up to $75,000,000; (iii) provide for up to $5,000,000 of Swingline Loans; and (iv) otherwise modify the 2001 Credit Agreement as described in the Fifth Amendment.

## Parties to the Transaction

| | |
|---|---|
| JPMorgan Chase Bank, N.A., as Agent and a Lender | ("Bank") |
| Associated Bank, NA, a Lender | ("AB") |
| Fifth Third Bank, a Lender | ("FTB") |
| Harris N.A. (successor by merger to Harris Trust and Savings Bank) | ("Harris") |
| LaSalle Bank National Association, a Lender | ("LBNA") |
| M&I Marshall & Ilsley Bank, a Lender | ("M&I") |
| Union Bank of California, a Lender | ("UBC") |
| FBOP Corporation, an Illinois corporation, the Borrower | ("Borrower") |
| Lord, Bissell & Brook LLP, Counsel to the Borrower | ("LBB") |

## TABLE OF CONTENTS

**Note: Unless otherwise indicated, all documents are dated as of May 31, 2005**

| CLOSING DOCUMENTS | Tab |
|---|---|
| Fifth Amendment to Amended and Restated Credit Agreement, by and among the Lenders and Borrower | 1 |
| Restated Revolving Note payable to Bank in the principal amount of Revolving Note $55,416,666.16 | 2 |
| Restated Revolving Note payable to Associated Bank in the principal amount of $11,666,666.67 | 3 |
| Restated Revolving Note payable to Harris in the principal amount of $23,333,333.33 | 4 |
| Restated Revolving Note payable to LBNA in the principal amount of $37,916,666.67 | 5 |
| Restated Revolving Note payable to M&I in the principal amount of $23,333,333.33 | 6 |
| Restated Revolving Note payable to FTB in the principal amount of $11,666,666.67 | 7 |
| Restated Revolving Note payable to UBC in the principal amount of $11,666,666.67 | 8 |
| Legal Opinion from LBB to Lenders | 9 |
| Certificate of Good Standing for Borrower issued by Illinois Secretary of State, dated May 31, 2005 | 10 |
| Secretary's Certificate of Borrower with respect to Bylaws | 11 |
| Secretary's Certificate of Borrower with respect to Resolutions | 12 |
| Certificate of Incumbency of Borrower | 13 |
| Articles of Incorporation of Borrower, certified by Illinois Secretary of State, dated May 31, 2005 | 14 |

Execution Copy

# FIFTH AMENDMENT

## TO

# AMENDED AND RESTATED CREDIT AGREEMENT

### AMONG

## FBOP CORPORATION,

## JPMORGAN CHASE BANK, N.A.
**(successor by merger to
Bank One, N.A. (Illinois)),**

## AS AGENT AND AS A LENDER,

### AND

## THE INSTITUTIONS THAT ARE FROM TIME TO TIME
## PARTIES HERETO AS LENDERS

Fifth Amendment dated as of May 31, 2005
Fourth Amendment dated as of May 28, 2004
Third Amendment dated as of May 31, 2003
Second Amendment dated as of May 31, 2002
First Amendment dated as of March 31, 2002
Original Amended and Restated Credit Agreement dated as of April 30, 2001

289622_5 DOC

**AMENDMENT PROVISIONS:**                                                          **PAGE**

A.    Amendments to Section 1.1 of the 2001 Credit Agreement ............................... 2

B.    Amendment to the Allocation of the Amounts of the Revolving Loans Commitment    4
      and the Amounts of the Term Loans Commitment.........................................

C.    Amendment to Section 2.1 of the 2001 Credit Agreement ............................... 4

D.    Amendment to Section 2.2 of the 2001 Credit Agreement ............................... 5

E.    Amendment to Section 2.4 of the 2001 Credit Agreement ............................... 6

F.    Amendment to Section 2.11 of the 2001 Credit Agreement.............................. 6

G.    Amendment to Article II of the 2001 Credit Agreement.................................. 6

H.    Amendment to Section 3.2 of the 2001 Credit Agreement ............................... 8

I.    Amendments to Article V of the 2001 Credit Agreement................................. 8

J.    Amendment to Section 8.2 of the 2001 Credit Agreement ............................... 8

K.    Amendment to Section 10.1 of the 2001 Credit Agreement.............................. 9

L.    Amendment to Section 10.4 of the 2001 Credit Agreement.............................. 10

M.    Amendment to Section 15.3 of the 2001 Credit Agreement.............................. 11

N.    Conditions ................................................................................ 11

O.    Additional Terms ........................................................................ 12

**EXHIBITS:**

EXHIBIT A   -   Form of Revolving Note

EXHIBIT B   -   Form of Incumbency Certificate

EXHIBIT C   -   Form of Legal Opinion Regarding Fifth Amendment

# FIFTH AMENDMENT TO
# AMENDED AND RESTATED CREDIT AGREEMENT

This FIFTH AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT ("Fifth Amendment"), dated as of May 31, 2005, is entered into among FBOP CORPORATION, a bank holding company incorporated under the laws of the State of Illinois and having its principal place of business at 11 West Madison Street, Oak Park, Illinois 60302, and the institutions that are from time to time parties hereto as Lenders (whether by execution of this Agreement, an Assignment and Acceptance or otherwise), and JPMORGAN CHASE BANK, N.A. (successor by merger to Bank One, N.A. (Illinois)), a national banking association having a place of business at 120 South LaSalle Street, Chicago, Illinois 60603-3400, in its capacity as the Agent and as a Lender.

## R E C I T A L S :

A.      The parties hereto have entered into that certain Amended and Restated Credit Agreement, dated as of April 30, 2001, as previously amended, restated, supplemented or modified from time to time, including by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2002, that certain Third Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2003, and that certain Fourth Amendment to Amended and Restated Credit Agreement, dated as of May 28, 2004 ("2001 Credit Agreement").

B.      The parties hereto desire to amend and modify the 2001 Credit Agreement in accordance with the terms and subject to the conditions set forth in this Fifth Amendment. As amended and modified by this Fifth Amendment, the 2001 Credit Agreement may be referred to as the "Agreement."

C.      The parties desire to amend the terms of the 2001 Credit Agreement to: (i) extend the Revolving Facility Termination Date and provide the Borrower with the option to further extend the Revolving Facility Termination Date; (ii) provide an option for the Borrower to increase the Aggregate Revolving Loans Commitment by up to $75,000,000; (iii) provide for up to $5,000,000 of Swingline Loans; and (iv) otherwise modify the 2001 Credit Agreement as described in this Fifth Amendment. The parties agree to undertake such modification in accordance with the terms, subject to the conditions, and in reliance upon the recitals, representations, warranties and covenants set forth herein, in the Agreement, and in the other Loan Documents, irrespective of whether entered into or delivered on or after April 30, 2001.

D.      Capitalized terms used but not otherwise defined in this Fifth Amendment shall have the meanings respectively ascribed to them in the 2001 Credit Agreement.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements hereinafter set forth, and for other good and valuable consideration,

the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## A G R E E M E N T :

### A.  Amendments to Section 1.1 of the 2001 Credit Agreement.

(i)     Section 1.1 of the 2001 Credit Agreement is hereby amended by deleting the definition "Agent" in its entirety and replacing it with the following:

""Agent" means JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)) in its capacity as agent for the Lenders pursuant to Article X, and not in its individual capacity as a Lender, and any successor Agent appointed pursuant to Article X."

(ii)     Section 1.1 of the 2001 Credit Agreement is hereby amended by deleting the definition "Alternate Base Rate" in its entirety and replacing it with the following:

""Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Base CD Rate in effect on such day plus 1% and (c) the Federal Funds Effective Rate in effect on such day plus ½ of 1%.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Base CD Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate, the Base CD Rate or the Federal Funds Effective Rate, respectively."

(iii)     Section 1.1 of the 2001 Credit Agreement is hereby amended by deleting the definition "ANB" in its entirety and replacing it with the following:

""ANB" means JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)) in its individual capacity and its successors and assigns."

(iv)     Section 1.1 of the 2001 Credit Agreement is hereby amended by deleting the definition "Eurodollar Rate" in its entirety and replacing it with the following:

""Eurodollar Rate" means, with respect to a Eurodollar Advance for the relevant Eurodollar Interest Period, the sum of:  (a) the quotient of: (i) the Eurodollar Base Rate applicable to such Eurodollar Interest Period; divided by (ii) one minus the Reserve Requirement (expressed as a decimal) applicable to such Eurodollar Interest Period; plus (b) (x) with respect to each Revolving Loan, one and one-quarter percent (1.25%) per annum and (y) with respect to each Term Loan, one and one-half percent (1.5%) per annum.  The Eurodollar Rate shall be rounded to the next higher multiple of 1/16 of 1% if the rate is not such a multiple."

(v)     Section 1.1 of the 2001 Credit Agreement is hereby amended by deleting the definition "Reserve Requirement" in its entirety and replacing it with the following:

2

""Reserve Requirement" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System (a) with respect to the Base CD Rate, for new negotiable nonpersonal time deposits in dollars of over $100,000 with maturities approximately equal to three months and (b) with respect to the Eurodollar Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Reserve Requirement shall be adjusted automatically on and as of the effective date of any change in any reserve percentage."

(vi) Section 1.1 of the 2001 Credit Agreement is hereby amended by deleting the definition "Revolving Facility Termination Date" in its entirety and replacing it with the following:

""Revolving Facility Termination Date" means May 31, 2007 or any later date (a) as may be specified by the Agent as the Revolving Facility Termination Date in accordance with Section 2.1(b) or (b) as may be elected by the Borrower pursuant to Section 2.2(c), or any earlier date on which the Aggregate Revolving Loans Commitment is reduced to zero or otherwise terminated pursuant to the terms hereof."

(vii) Section 1.1 of the 2001 Credit Agreement is hereby further amended to add the following definitions in the appropriate alphabetical order:

""Assessment Rate" means, for any day, the annual assessment rate in effect on such day that is payable by a member of the Bank Insurance Fund classified as "well capitalized" and within supervisory subgroup "B" (or a comparable successor risk classification) within the meaning of 12 C.F.R. Part 327 (or any successor provision) to the FDIC for insurance by the FDIC of time deposits made in dollars at the offices of such member in the United States; provided that if, as a result of any change in any law, rule or regulation, it is no longer possible to determine the Assessment Rate as aforesaid, then the Assessment Rate shall be such annual rate as shall be determined by the Agent to be representative of the cost of such insurance to the Lenders."

""Availability Period" means the period from and including the date of the 2001 Credit Agreement to but excluding the earlier of the Revolving Facility Termination Date and the date of termination of the Revolving Loans Commitments."

""Base CD Rate" means the sum of (a) the Three-Month Secondary CD Rate multiplied by the Reserve Requirement plus (b) the Assessment Rate."

3

""Prime Rate" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective."

""Swingline Exposure" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time. The Swingline Exposure of any Lender at any time shall be its Percentage Commitment of the total Swingline Exposure at such time."

""Swingline Lender" means JPMorgan Chase Bank, N.A., in its capacity as lender of Swingline Loans hereunder."

""Swingline Loan" means a Loan made pursuant to Section 2.19."

""Three-Month Secondary CD Rate" means, for any day, the secondary market rate for three month certificates of deposit reported as being in effect on such day (or, if such day is not a Business Day, the next preceding Business Day) by the Board of Governors of the Federal Reserve System through the public information telephone line of the Federal Reserve Bank of New York (which rate will, under the current practices of the Board of Governors of the Federal Reserve System, be published in Federal Reserve Statistical Release H.15(519) during the week following such day) or, if such rate is not so reported on such day or such next preceding Business Day, the average of the secondary market quotations for three month certificates of deposit of major money center banks in New York City received at approximately 10:00 a.m., New York City time, on such day (or, if such day is not a Business Day, on the next preceding Business Day) by the Agent from three negotiable certificate of deposit dealers of recognized standing selected by it."

**B.** **Amendment to the Allocation of the Amounts of the Revolving Loans Commitment and the Amounts of the Term Loans Commitment**. The amount of the respective Revolving Loans Commitment and the Term Loans Commitment of each Lender shall be reallocated to be the amounts set forth opposite each Lender's signature to this Fifth Amendment.

**C.** **Amendment to Section 2.1 of the 2001 Credit Agreement**. Section 2.1 of the 2001 Credit Agreement is hereby amended by adding the following as new clause (c) thereof:

"(c) Increase in Total Revolving Committed Amount. Subject to the terms and conditions set forth herein, the Borrower may at any time upon notice to the Agent increase the Aggregate Revolving Loans Commitment by up to Seventy-Five Million Dollars ($75,000,000) to not more than an aggregate principal amount of Two Hundred Fifty Million Dollars ($250,000,000); provided that:

(i) the Agent shall consent to each increase in the Revolving Loans Commitment of an existing Lender and each new Revolving Loans Commitment from a new Lender, and each such increase shall be in a minimum aggregate

4

principal amount of $5,000,000 and integral multiples of $1,000,000 in excess thereof (or the remaining amount, if less);

(ii)     the conditions to the making of a Revolving Loan set forth in Section 4.2 shall have been satisfied or waived;

(iii)     the Borrower shall obtain commitments for the amount of the increase from existing Lenders, Affiliates of existing Lenders or other commercial banks or financial institutions to which the Agent consents; provided that such Affiliates and other commercial banks and financial institutions join in this Agreement as Lenders by joinder agreement or other arrangement reasonably acceptable to the Agent;

(iv)     if any Revolving Loans are outstanding at the time of any such increase, the Borrower shall make such payments and adjustments on the Revolving Loans (including payment of any amounts owing under Section 3.2) as necessary to give effect to the revised commitment percentages and commitment amounts;

(v)     after giving effect to any such increase, the Total Commitments shall not exceed Two Hundred Fifty Million Dollars ($250,000,000); and

(vi)     in connection with any such increase, (A) an amendment to this Agreement shall be entered into, the signature pages of which shall reflect the Revolving Loans Commitments, Percentage Commitment and Term Loans Commitments of the Lenders after giving effect thereto, (B) the Borrower will provide supporting corporate resolutions, legal opinions, notes and other items as may be reasonably requested the Agent and the Lenders in connection therewith, and (C) the Borrower will pay reasonable all fees and expenses related thereto."

**D.     Amendment to Section 2.2 of the 2001 Credit Agreement**. Section 2.2 of the 2001 Credit Agreement is hereby amended by adding the following as new clause (c) thereof:

"(c)     Extension of Revolving Facility Termination Date. The Borrower shall have the option to request an extension of the Revolving Facility Termination Date to May 31, 2008, by providing written notice requesting such extension to be received by the Agent (i) no earlier than March 1, 2006 and no later than April 1, 2006, or (ii) no earlier than March 1, 2007 and no later than April 1, 2007; provided that no Default or Unmatured Default shall have occurred and be continuing on the date Agent receives such written notice. The Agent shall promptly deliver a copy of such written notice to the Lenders, and shall respond to the Borrower's request within 30 days of the date the Agent receives the Borrower's request. The Borrower's request shall be granted, whereupon the date "May 31, 2007" in the definition of "Revolving Facility Termination Date" in Section 1.1 shall be deemed to read "May 31, 2008," if (A) each Lender consents to such

5

request, and (B) the conditions set forth in Section 4.2 shall be satisfied or waived by the Lenders on May 31, 2007 and the Borrower shall give written confirmation thereof."

**E.     Amendment to Section 2.4 of the 2001 Credit Agreement**.  Section 2.4 of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"**2.4     Types of Advances**.  The Advances may be Alternate Base Rate Advances or Eurodollar Advances, or a combination thereof, selected by Borrower in accordance with Sections 2.8 and 2.9; provided, however, that all Advances with respect to Swingline Loans shall be Alternate Base Rate Advances."

**F.     Amendment to Section 2.14 of the 2001 Credit Agreement**.  Section 2.14 of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"**2.14  Interest Payment Dates; Interest and Fee Basis**.  Interest accrued on each Alternate Base Rate Advance shall be payable on each Payment Date, commencing with the first such date to occur after the date hereof, on any date on which the Alternate Base Rate Advance is prepaid, whether due to acceleration or otherwise, and at maturity. Interest accrued on that portion of the outstanding principal amount of any Alternate Base Rate Advance converted into a Eurodollar Advance on a day other than a Payment Date shall be payable on the date of conversion.  Interest accrued on each Eurodollar Advance shall be payable on the last day of its applicable Eurodollar Interest Period, on any date on which the Eurodollar Advance is prepaid, whether by acceleration or otherwise, and at maturity.  Interest accrued on each Eurodollar Advance having a Eurodollar Interest Period longer than three months shall also be payable on the last day of each three-month interval during such Eurodollar Interest Period.  Interest and commitment fees shall be calculated for actual days elapsed on the basis of a 360-day year, except that, with respect to Alternate Base Rate Advances pursuant to which the interest rate is based on the Prime Rate, interest shall be calculated for actual days elapsed on the basis of a 365- or 366-day year, as the case may be.  Interest shall be payable for the day an Advance is made but not for the day of any payment on the amount paid if payment is received prior to noon (local time) at the place of payment.  If any payment of principal of or interest on an Advance shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and, in the case of a principal payment, such extension of time shall be included in computing interest in connection with such payment."

**G.     Amendment to Article II of the 2001 Credit Agreement**.  Article II of the 2001 Credit Agreement is hereby amended by adding the following as new Section 2.19 of the 2001 Credit Agreement:

"**2.19  Swingline Loans**.  (a)  Subject to the terms and conditions set forth herein, the Swingline Lender agrees to make Swingline Loans to the Borrower from time to time during the Availability Period, in an aggregate principal amount at any time outstanding that will not result in (i) the aggregate principal amount of outstanding Swingline Loans exceeding $5,000,000; provided that the Swingline Lender shall not be required to make a

Swingline Loan to refinance an outstanding Swingline Loan. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Swingline Loans. The Swingline Exposure from time to time shall be considered as part of the aggregate principal amount of outstanding Revolving Loans from time to time, subject to the provisions of Section 2.4 and this Section 2.19.

(b)     To request a Swingline Loan, the Borrower shall notify the Agent of such request by telephone (confirmed by telecopy), not later than 11:00 a.m., Chicago time, on the day of a proposed Swingline Loan. Each such notice shall be irrevocable and shall specify the requested date (which shall be a Business Day) and amount of the requested Swingline Loan. The Agent will promptly advise the Swingline Lender of any such notice received from the Borrower. The Swingline Lender shall make each Swingline Loan available to the Borrower by means of a credit to the general deposit account of the Borrower with the Swingline Lender by 2:00 p.m., Chicago time, on the requested date of such Swingline Loan.

(c)     The Swingline Lender may by written notice given to the Agent not later than 10:00 a.m., Chicago time, on any Business Day require the Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding. Such notice shall specify the aggregate amount of Swingline Loans in which Lenders will participate. Promptly upon receipt of such notice, the Agent will give notice thereof to each Lender, specifying in such notice such Lender's Percentage Commitment of such Swingline Loan or Loans. Each Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay to the Agent, for the account of the Swingline Lender, such Lender's Percentage Commitment of such Swingline Loan or Loans. Each Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.8 with respect to Loans made by such Lender (and Section 2.8 shall apply, *mutatis mutandis*, to the payment obligations of the Lenders), and the Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Lenders. The Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph, and thereafter payments in respect of such Swingline Loan shall be made to the Agent and not to the Swingline Lender. Any amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Agent; any such amounts received by the Agent shall be promptly remitted by the Agent to the Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear; provided that any such payment so remitted shall be repaid to the Swingline Lender or to the Agent, as applicable, if and to the extent such payment is required to be refunded to

7

the Borrower for any reason. The purchase of participations in a Swingline Loan pursuant to this paragraph shall not relieve the Borrower of any default in the payment thereof."

**H.** **Amendment to Section 3.2 of the 2001 Credit Agreement.** Section 3.2 of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"**3.2** **Funding Indemnification.** In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of a Eurodollar Interest Period applicable thereto (including as a result of a Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Eurodollar Interest Period applicable thereto, or (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Eurodollar Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Eurodollar Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Eurodollar Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of any Lender setting forth in reasonable detail the calculations upon which the Lender determined any amount or amounts that such Lender is entitled to receive pursuant to this Section 3.2 shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof."

**I.** **Amendments to Article V of the 2001 Credit Agreement.** Article V of the 2001 Credit Agreement is hereby amended by adding the following as Section 5.21 thereof:

"**5.21** **Investment and Holding Company Status.** Neither the Borrower nor any of its Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935."

**J.** **Amendment to Section 8.2 of the 2001 Credit Agreement.** Section 8.2 of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"**8.2** **Amendments.** Subject to the provisions of this Article VIII, the Required Lenders (or the Agent with the consent in writing of the Required Lenders) and the Borrower may enter into agreements supplemental hereto for the purpose of adding or modifying any provisions to the Loan Documents or changing in any manner

8

the rights of the Lenders or the Borrower hereunder or waiving any Default hereunder; provided, however, that no such supplemental agreement shall, without the consent of each Lender affected thereby:

(a)    Extend the maturity of any Loan or Note or postpone any regularly scheduled payment of principal of any Loan or forgive all or any portion of the principal amount thereof, or reduce the rate or extend the time of payment of interest or fees thereon;

(b)    Extend the Revolving Facility Termination Date or the Term Loans Termination Date, or reduce the amount or extend the payment date for, the mandatory payments required under Section 2.2, or increase or decrease the amount of the Commitment of any Lender hereunder (except for a ratable decrease in the Commitments of all Lenders), or permit the Borrower to assign its rights under this Agreement;

(c)    Approve any Acquisition not otherwise permitted under Section 6.10(c); and

(d)    Approve any waiver or amendment of the requirements of, or any failure to maintain the required ratio set forth in, Section 6.14(f), or approve any amendment to Section 6.14(f).

Notwithstanding anything to the contrary in this Section 8.2, the written consent of all Lenders shall be required to approve any amendment that (i) permits the Borrower to assign its obligations under this Agreement, (ii) modifies any provision of this Section 8.2 or the definition of "Required Lenders" or any other provision of this Agreement specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, or (iii) modifies Section 11.1, 11.2 or 12.2(c) in a manner that would alter the pro rata sharing of payments required thereby.

No amendment of any provision of this Agreement relating to the Agent or Swingline Lender shall be effective without the written consent of the Agent or Swingline Lender, as the case may be.  The Agent may waive payment of the fee required under Section 12.3(b) without obtaining the consent of any other party to this Agreement.  Any Lender that does not consent to an extension of the Revolving Facility Termination Date pursuant to Section 2.2(c) when the conditions for an extension set forth in such section are otherwise met may be replaced at any time in the Agent's sole discretion."

K.    **Amendment to Section 10.1 of the 2001 Credit Agreement**.  Section 10.1 of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"**10.1 Appointment; Nature of Relationship**.  JPMorgan Chase Bank, N.A. is hereby appointed by the Lenders as the Agent hereunder and under each other Loan Document, and each of the Lenders irrevocably authorizes the Agent to act as the

9

contractual representative of such Lender with the rights and duties expressly set forth herein and in the other Loan Documents. The Agent agrees to act as such contractual representative upon the express conditions contained in this Article X. Notwithstanding the use of the defined term "Agent," the Lenders and the Borrower hereby expressly acknowledge and agree that the Agent shall not have any fiduciary responsibilities to any Lender by reason of this Agreement or any other Loan Document and that the Agent is merely acting as the representative of the Lenders with only those duties as are expressly set forth in this Agreement and the other Loan Documents. In its capacity as the Lenders' contractual representative, the Agent: (a) does not hereby assume any fiduciary duties to any of the Lenders; (b) is a "representative" of the Lenders within the meaning of Section 9-105 of the Uniform Commercial Code; and (c) is acting as an independent contractor, the rights and duties of which are limited to those expressly set forth in this Agreement and the other Loan Documents. Except as otherwise required in this Agreement, in connection with the routine administration of this Agreement and the Loans, the Lenders agree that the Borrower may deal solely with the Agent as the representative of the Lenders. Each of the Lenders hereby agrees to assert no claim against the Agent on any agency theory or any other theory of liability for breach of fiduciary duty, all of which claims each Lender hereby waives."

L.    **Amendment to Section 10.4 of the 2001 Credit Agreement**. Section 10.4 of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"**10.4 No Responsibility for Loans, Recitals, etc.** Neither the Agent nor any of its directors, officers, agents, or employees shall be responsible for, or have any duty to ascertain, inquire into, or verify: (a) any statement, warranty, or representation made in connection with any Loan Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements of any obligor under any Loan Document, including, without limitation, any agreement by an obligor to furnish information directly to each Lender; (c) the satisfaction of any condition specified in Article IV, except receipt of items required to be delivered to the Agent; (d) the validity, enforceability, effectiveness, sufficiency, or genuineness of any Loan Document or any other instrument or writing furnished in connection therewith; or (e) the value, sufficiency, creation, perfection, or priority of any interest in any collateral security. The Agent shall have no duty to disclose to the Lenders information that is not required to be furnished by the Borrower to the Agent at such time, but is voluntarily furnished by the Borrower to the Agent (either in its capacity as Agent or in its individual capacity). Except as expressly set forth in this Agreement, the Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the Agent or any of its Affiliates in any capacity."

**M.** **Amendment to Section 15.3 of the 2001 Credit Agreement**. Section 15.3 of the 2001 Credit Agreement is hereby deleted in its entirety and is replaced with the following:

"**15.3 WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION."

**N.** **Conditions**.

(i) General. The Borrower hereby acknowledges and agrees that, in addition to the other conditions and requirements of Section 4.2 of the 2001 Credit Agreement, the Lenders shall not be required to make any Advance, unless as of the date hereof and on the applicable Borrowing Date, (a) the representations and warranties contained in this Fifth Amendment and the 2001 Credit Agreement (including all exhibits and schedules attached hereto and thereto) shall be true, accurate, and complete as of the date hereof and such Borrowing Date, and (b) the Borrower shall have fully complied with each of its promises and covenants contained in this Fifth Amendment and the 2001 Credit Agreement. Each Borrowing Notice with respect to each such Advance shall constitute a representation and warranty by the Borrower that the conditions contained in this Fifth Amendment and the 2001 Credit Agreement shall have been satisfied.

(ii) Fifth Amendment. In addition to other conditions set forth in this Fifth Amendment and the 2001 Credit Agreement, including, without limitation, those applicable to the making of Advances, the obligations of the Lenders under the Agreement shall be subject to the performance by the Borrower of all of its agreements theretofore to be performed under the Agreement and to the receipt of all of the following, duly executed and dated the date hereof, and in form and substance satisfactory to the Agent and its counsel:

(a) the restated Revolving Notes for the benefit of each Lender, each in the form set forth on Exhibit A to this Fifth Amendment;

(b) copies of the articles of incorporation of the Borrower, together with all amendments through the date hereof, and a certificate of good standing, both certified by the appropriate governmental officer in its jurisdiction of incorporation and dated within the five business days preceding the date hereof;

(c)     copies, certified by the Secretary or Assistant Secretary of the Borrower, of its by-laws and of its Board of Directors' resolutions authorizing the execution, delivery, and performance, respectively, of this Fifth Amendment, the restated Revolving Notes and any other documents to be executed, delivered, or performed in connection with this Fifth Amendment (collectively, "Amendment-Related Documents");

(d)     an incumbency certificate, substantially in the form of <u>Exhibit B</u> attached hereto, executed by the Secretary or Assistant Secretary of the Borrower, which shall identify by name and title and bear the signature of the officers of the Borrower authorized to sign the Amendment-Related Documents and to make borrowings hereunder and under the 2001 Credit Agreement, upon which certificate the Agent and the Lenders shall be entitled to rely until informed of any change in writing by the Borrower; and

(e)     a written opinion of the Borrower's counsel, addressed to the Lenders, in substantially the form set forth on <u>Exhibit C</u> attached hereto.

**O.**   **Additional Terms**.

(i)     <u>Acknowledgment of Indebtedness under Agreement</u>.   The Borrower acknowledges and confirms that, as of the date hereof, the Borrower is indebted to the Lenders, without defense, setoff, or counterclaim (a) in the aggregate principal amount of One Hundred Seven Million One Hundred Forty-Two Thousand Eight Hundred Fifty-Seven and 17/100 Dollars ($107,142,857.17) in Term Loans, and (b) in the aggregate principal amount of One Hundred Forty Million and 00/100 Dollars ($140,000,000.00) in Revolving Loans, all made under the 2001 Credit Agreement.

(ii)     <u>Effectiveness</u>.   The provisions of this Fifth Amendment will become effective upon its execution by the parties hereto.

(iii)     <u>The Agreement</u>.   All references in the 2001 Credit Agreement to the term "Agreement" shall be deemed to refer to the Agreement referenced in this Fifth Amendment.

(iv)     <u>The Lenders</u>.   All references in the Agreement to the "Lenders" shall be deemed to refer to the lending institutions listed on the signature pages to this Fifth Amendment and their respective permitted successors and assigns.   Each Lender hereby acknowledges that it has received a copy of all of the documents that constitute the 2001 Credit Agreement, that it is a Lender under all of the Loan Documents, and that it will perform in accordance with the terms of such Loan Documents all of the obligations that are required to be performed by it as a Lender.

(v)     <u>Fifth Amendment and 2001 Credit Agreement to be Read Together</u>.   This Fifth Amendment supplements and is hereby made part of the 2001 Credit Agreement, and the 2001 Credit Agreement and this Fifth Amendment shall from and after the date hereof be read together and shall constitute the Agreement.   Except as otherwise set forth herein, the 2001 Credit Agreement shall remain in full force and effect.

(vi)   Transaction Documents.  The terms "Transaction Documents" and "Loan Documents," as used in the Agreement, shall from and after the date hereof include the Amendment-Related Documents.

(vii)   Counterparts.  This Fifth Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same document.

(viii)   Representations and Warranties.  The Borrower hereby represents and warrants to the Lenders and Agent as follows:

(a)   No Default or Unmatured Default has occurred and is continuing (or would result from the amendments contemplated hereby).

(b)   The execution, delivery and performance by the Borrower of this Fifth Amendment have been duly authorized by all necessary corporate and other action and do not and will not require any registration with, consent or approval of, or notice to or action by any person or entity (including any governmental agency) in order to be effective and enforceable.

(c)   This Fifth Amendment and the other Loan Documents (as amended by this Fifth Amendment) constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms.

(d)   All representations and warranties of the Borrower in the 2001 Loan Agreement (as modified by this Fifth Amendment) are true and correct, except (1) for the purposes of this Fifth Amendment only, the reference in Section 5.4 of the 2001 Loan Agreement to the consolidated financial statements as of and for the period ending December 31, 2000 shall be deemed to refer to the consolidated financial statements of the Borrower and its Subsidiaries required to be delivered to the Lenders pursuant to Section 6.1(a) of the 2001 Loan Agreement as of and for the year ended December 31, 2004, and (2) Schedule 5.8 attached hereto shall be substituted for Schedule 5.8 attached to the 2001 Credit Agreement for all purposes under the Agreement from and after the date hereof.

(e)   The Borrower's obligations under the Agreement and under the other Loan Documents are not subject to any defense, counterclaim, set-off, right to recoupment, abatement or other claim.

(ix)   Government Regulation.  The Borrower shall not (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits any Lender from making any advance or extension of credit to the Borrower or from otherwise conducting business with the Borrower, or (b) fail to provide documentary or other evidence of Borrower's identity as may be requested by Agent or any Lender at any time to enable Agent or any Lender to verify the Borrower's identity or to comply with any applicable law or

regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

        (x)    <u>USA Patriot Act</u>.   Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Act"), it is required to obtain, verify and record information that identifies the borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Fifth Amendment as of the date first written above.

**FBOP CORPORATION**

By: _____

Print Name: _____

Title: _____

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois 60302
Attention: Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook LLP
115 S. LaSalle Street, 31st Floor
Chicago, Illinois 60602
Attention: Edward C. Fitzpatrick, Esq.

| Commitments | |
| Term | Revolving |
| $33,928,571.45 | $55,416,666.66 |

**JPMORGAN CHASE BANK, N.A.**, as
Agent and as a Lender

By: _Gregory S. Pike Jr._

Print Name: _Gregory S. Pike Jr._

Title: _V. P._

(address)

JPMORGAN CHASE BANK, N.A.
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLP
333 West Wacker Drive, Suite 2700
Chicago, Illinois 60606
Attention: Edwin S. del Hierro, Esq.

| Commitments | |
| Term | Revolving |
| $7,142,857.14 | $11,666,666.67 |

**ASSOCIATED BANK, NA**, as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Associated Bank, NA
200 North Adams Street
Green Bay, Wisconsin 54307-9006
Attention: Mr. Brent D. Jensen

S-2

| Commitments | |
| --- | --- |
| Term | Revolving |
| $33,928,571.45 | $55,416,666.66 |

**JPMORGAN CHASE BANK, N.A.**, as Agent and as a Lender

By:_____

Print Name:_____

Title:_____

(address)

JPMORGAN CHASE BANK, N.A.
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLP
333 West Wacker Drive, Suite 2700
Chicago, Illinois 60606
Attention: Edwin S. del Hierro, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $7,142,857.14 | $11,666,666.67 |

**ASSOCIATED BANK, NA**, as a Lender

By: _Brent D. Jensen_

Print Name: _BRENT D. JENSEN_

Title: _SENIOR VICE PRESIDENT_

(address)

Associated Bank, NA
200 North Adams Street
Green Bay, Wisconsin 54307-9006
Attention: Mr. Brent D. Jensen

| Commitments | |
| --- | --- |
| Term | Revolving |
| $14,285,714.29 | $23,333,333.33 |

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By: _M̲i̲c̲h̲a̲e̲l̲ ̲S̲.̲ ̲C̲a̲m̲e̲l̲i̲_

Print Name: _Michael C. Cameli_

Title: _VP_

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention:  Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention:  Steven G. Hastings, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $23,214,285.72 | $37,916,666.67 |

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name: _____

Title: _____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention:  Mr. James K. Pridmore

| Commitments | |
| --- | --- |
| Term | Revolving |
| $14,285,714.29 | $23,333,333.33 |

**HARRIS TRUST AND SAVINGS BANK,**
as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Harris Trust and Savings Bank
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $23,214,285.72 | $37,916,666.67 |

**LASALLE BANK NATIONAL ASSOCIATION,** as a Lender

By: *Karen Bartman*

Print Name: *Karen Bartman*

Title: *Assistant Vice President*

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. James K. Pridmore

| Commitments | |
| --- | --- |
| Term | Revolving |
| $14,285,714.29 | $23,333,333.33 |

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By: _Gregg R Weyer_

Print Name:  Gregg R. Weyer

Title:  Vice President

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention: Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: K. Thor Lundgren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $7,142,857.14 | $11,666,666.67 |

**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention: Mr. Scott J. Steiner
            Assistant Vice President

| Commitments | |
| --- | --- |
| Term | Revolving |
| $14,285,714.29 | $23,333,333.33 |

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention: Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: K. Thor Lundgren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $7,142,857.14 | $11,666,666.67 |

**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name: Scott Steiner

Title: AVP

(address)

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention: Mr. Scott J. Steiner
                    Assistant Vice President

S-4

|           Commitments           |                 |
| ------------- | --------------- |
| Term | Revolving |
| $7,142,857.14 | $11,666,666.67 |

**UNION BANK OF CALIFORNIA, N.A.,**
as a Lender

By: _____

Print Name:Dennis A. Cattell          .

Title:_____Vice President_____

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention:  Dennis A. Cattell
                    Vice President

Fifth Amendment to Credit Agreement.3                 S-5

## EXHIBIT A

## FORM OF REVOLVING NOTE

**[updated Commitment amount]**                    Restatement Date:  May 31, 2005
                                                    Original Note Date:  April 30, 2001

FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of **[LENDER]** ("Lender") the lesser of the principal sum of [updated Commitment amount] and No/100 Dollars ($_____) or the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the Borrower pursuant to Article II of the Agreement (as hereinafter defined), in immediately available funds at the office of JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent, located at 120 South LaSalle Street, Chicago, Illinois, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement.  The Borrower shall pay the principal of, and accrued and unpaid interest on, the Revolving Loans in full on the Revolving Facility Termination Date.

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Revolving Loan and the date and amount of each principal payment hereunder.

This Revolving Note is one of the Revolving Notes issued pursuant to, and is entitled to the benefits of, that certain Amended and Restated Credit Agreement, dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed, or extended and in effect from time to time, is herein called the "Agreement"), by and among the Borrower, the Lenders party thereto, including the Lender, and JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Revolving Note, including the terms and conditions under which this Revolving Note may be prepaid or its maturity date accelerated.  Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time.  Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Revolving Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged or received under the Agreement or this Revolving Note or otherwise in connection with the Agreement or this Revolving Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender).  All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized,

prorated, allocated, and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release or surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or that may hereafter be held as security for the payment of this Revolving Note, and may extend the time for payment or (with the consent of the Borrower) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby.

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT, AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

IN WITNESS WHEREOF, the Borrower has caused this Revolving Note to be duly executed as of the date first above written.

**FBOP CORPORATION**

By:_____

Print Name:_____

Title:_____

ATTEST:

By:_____

Print Name:_____

Title:_____

SCHEDULE OF REVOLVING LOANS
AND PAYMENTS OF PRINCIPAL

REVOLVING NOTE OF FBOP CORPORATION,
DATED APRIL 30, 2001
AND RESTATED MAY 31, 2005

| Date | Principal Amount of Revolving Loan | Maturity of Interest Period | Maturity Principal Amount Paid | Unpaid Balance |
|------|------|------|------|------|

[COMPLETE AS NECESSARY]

A-4

## EXHIBIT B

### CERTIFICATE OF INCUMBENCY

I, Edward C. Fitzpatrick, Secretary of FBOP Corporation, an Illinois corporation, do hereby certify that the following persons have been duly elected to, are duly qualified for, have held, and on the date hereof do hold, the offices for FBOP Corporation set forth opposite their respective names:

| Name | Office |
|------|--------|
| MICHAEL E. KELLY | Chairman of the Board |
| ROBERT M. HESKETT | President and Director |
| MICHAEL F. DUNNING | Vice President and Chief Financial Officer |
| EDWARD C. FITZPATRICK | Secretary and Director |

I further certify that the sample signatures below are true signatures for each such officer.

Dated as of May 31, 2005

EDWARD C. FITZPATRICK,
Secretary


MICHAEL E. KELLY                    ROBERT M. HESKETT


MICHAEL F. DUNNING                   EDWARD C. FITZPATRICK

B-1

## EXHIBIT C

## FORM OF LEGAL OPINION

May 31, 2005

JPMorgan Chase Bank, N.A.
120 South LaSalle Street
Chicago, Illinois 60603-3400

LaSalle Bank, N.A
135 South La Salle Street
Chicago, Illinois 60603

Harris N.A.
111 West Monroe
Chicago, Illinois 60603

Union Bank of California, N.A.
445 South Figuero Street
Los Angeles, California 90071

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53201-3593

Associated Bank
200 North Adams
Green Bay, Wisconsin 54307-9006

Re:     FBOP Corporation

Ladies and Gentlemen:

We have acted as special counsel for FBOP Corporation (the "Borrower") in connection with its execution and delivery of an Amended and Restated Credit Agreement, dated as of April 30, 2001 (the "Credit Agreement"), as amended by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2002, that certain Third Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2003, that certain Fourth Amendment to Amended and Restated Credit Agreement, dated as of May 28, 2004, and as further amended by that certain Fifth Amendment to Amended and Restated Credit Agreement, dated as of the date hereof (the "Fifth Amendment"), among the Borrower, the Lenders named above, and JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent. All capitalized terms used in this opinion and not otherwise defined herein shall have the meanings attributed to them in the Credit Agreement, as so amended.

We have examined the Borrower's articles of incorporation, by-laws, resolutions, executed copies of the CSB Merger Agreement and Transaction Documents and unexecuted copies of the Fifth Amendment, the restated Revolving Notes, in substantially the form attached to the Fifth Amendment as Exhibit A ("Revolving Notes"), and such other matters of

fact and law that we deem necessary in order to render this opinion. In our examination of all documents, we have assumed the genuineness of all signatures (other than those of Borrower), the authenticity of all documents submitted to us as originals, the conformity of all copies submitted to us with the originals to be delivered and the due authorization, execution and delivery by each party other than the Borrower of all documents to which it is or will be a party. We have made no independent investigation as to the accuracy, correctness or completeness of any representation or warranties made in the Fifth Amendment. The opinion expressed in paragraph 1 below as to the good standing of the Borrower is based solely on the certificate of good standing of the Borrower attached hereto. The opinions expressed in paragraph 2 below are based solely on certificates of good standing of the Depository Institution Subsidiaries attached hereto.

Based upon the foregoing and subject to the qualifications set forth herein, it is our opinion that:

1.    The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. Each Subsidiary (other than the Depository Institution Subsidiaries) is a corporation validly existing and in good standing under the laws of its state of incorporation except where any failure to be so existing or in good standing could not reasonably be expected to have a material and adverse effect on the Borrower and the Subsidiaries taken as a whole. The Borrower has all requisite corporate authority to conduct business in each jurisdiction in which its business is conducted. The Subsidiaries (other than the Depository Institution Subsidiaries) have all requisite corporate authority to conduct business in each jurisdiction in which their respective business is conducted, except when any such failure could not reasonably be expected to have a material and adverse effect on the Borrower and the Subsidiaries (including the Depository Institution Subsidiaries) taken as a whole.

2.    Each of Regency Savings Bank, FSB, San Diego National Bank, Pullman Bank and Trust, Park National Bank and Trust of Chicago, Cosmopolitan Bank and Trust, First Bank of Oak Park, Madisonville State Bank, Citizens National Bank of Teague, Texas, North Houston Bank, California National Bank, California Savings Bank and Bank USA, FSB is a bank or savings association validly existing and in good standing under the laws of the jurisdiction of its organization.

3.    Each Depository Institution Subsidiary listed in paragraph 2 above has all requisite corporate authority to conduct its business in each jurisdiction in which its respective business is conducted.

4.    The execution and delivery of each of the Fifth Amendment and the Revolving Notes by the Borrower, and the performance by the Borrower of its obligations thereunder, have been duly authorized by all necessary corporation action and proceedings on the part of the Borrower and its shareholders.

5.  No order, permission, consent or approval of any federal or state governmental department, commission, board or regulatory authority or agency is required for the execution and delivery of, or for the performance by the Borrower of its obligations under, any of the Fifth Amendment or the Revolving Notes, or, if required, each such permission, consent or approval has been obtained.

6.  There is, to our knowledge, no charter, by-law or preferred or common stock provision, nor any indenture, instrument, contract or agreement to which the Borrower is a party, nor any statute, rule, regulation, order, judgment, injunction or decree binding on the Borrower which would be contravened by the execution and delivery of any of the Fifth Amendment or the Revolving Notes, or by the performance of any terms, provisions conditions, agreements, covenants, or obligations of the Borrower contained therein.

7.  Each of the Fifth Amendment and the Revolving Notes has been duly executed and delivered by the Borrower and constitutes legal, valid and binding obligations of the Borrower enforceable in accordance with its respective terms except to the extent the enforcement thereof may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject also to the availability of equitable remedies if equitable remedies are sought.

The opinions set forth herein are subject to and qualified by the following limitations:

(1)  The enforceability of the Fifth Amendment and the Revolving Notes is subject to the right of taxing authorities or other entities or persons which may by law have priority over the rights of the Lenders.

(2)  Certain remedies and/or provisions under the Fifth Amendment and the Revolving Notes do or may require enforcement or interpretation by a court of equity, and such enforcement or interpretation is subject to the discretion of such court and to such principles of equity as the courts having jurisdiction may impose.

(3)  Applicable federal, state and local laws, ordinances, regulations, court decisions and constitutional requirements may limit or render unenforceable certain of the rights and remedies of the Lenders under the Fifth Amendment and the Revolving Notes.

This opinion is provided to you as a legal opinion only, and not as a guarantee or warranty of the matters discussed herein. We express no opinion with respect to the financial status or ability of the Borrower to meet its obligations under any of the Transaction Documents. No opinion may be inferred or implied beyond the matters expressly stated herein.

We do not express any opinion as to any law other than the laws of the State of Illinois and the laws of the United States of America.

As you are aware, Edward C. Fitzpatrick is a director and Secretary to the Board of Directors of Borrower and certain Subsidiaries.

This opinion is addressed to you and is solely for your use; accordingly, it may not be used, relied upon or disclosed to any other person or entity (other than assignees, participants, transferees or successors of any Lender in accordance with the terms provided in the Transaction Documents) or used for any purpose other than in connection with this transaction. It is not to be used, circulated, quoted or otherwise referred to for any other purpose without the prior written consent of this firm. The opinion is based upon information furnished us as of the date hereof. We disclaim any undertaking to advise you of any changes concerning the above, whether or not deemed material, which may hereafter come to our attention.

Very truly yours,

## SCHEDULE 5.8

FBOP CORPORATION
CORPORATE ORGANIZATION CHART
JUNE 30, 2005

Board of Directors

Chairman: Michael Kelly

FBOP Corporation
Oak Park, Illinois

President: Robert Howard

**Holding Co Subsidiaries**

**Bank Subsidiaries**

First Bank of Oak Park
Oak Park, Illinois
President: Lemuel Hewitt

Cosmopolitan Bank and Trust
Chicago, Illinois
President: Gary Fait

Regency Savings Bank, a Federal Savings Bank
Naperville, Illinois
President: Michael E. Kelly

Park National Bank and Trust of Chicago
Chicago, Illinois
President: Chris Glavan

Pullman Bank and Trust Company
Chicago, Illinois
President: Daniel Watts

San Diego National Bank
San Diego, California
President: Michael Vanicek

California National Bank
Los Angeles, California
President: Greg Mitchell

California Savings Bank, FSB
San Francisco, California
President: James Gate

BankUSA, Federal Savings Bank
Phoenix, Arizona
President: Kyle Curtis

Madisonville State Bank
Madisonville, Texas
President: W. C. Newell

North Houston Bank
Houston, Texas
President: John Simmons

California National Bank
Fresno, California
President: James Lawson

**Regulatable Non-Bank Subsidiaries**

**Non-Regulatable Non-Bank Subsidiaries**

# EXHIBIT G

EXECUTION COPY

# SIXTH AMENDMENT

## TO

# AMENDED AND RESTATED CREDIT AGREEMENT

### AMONG

### FBOP CORPORATION,

### JPMORGAN CHASE BANK, N.A.
**(successor by merger to
Bank One, N.A. (Illinois)),**

### AS AGENT AND AS A LENDER,

### AND

### THE INSTITUTIONS THAT ARE FROM TIME TO TIME
### PARTIES HERETO AS LENDERS

Sixth Amendment dated as of February 9, 2007
Fifth Amendment dated as of May 31, 2005
Fourth Amendment dated as of May 28, 2004
Third Amendment dated as of May 31, 2003
Second Amendment dated as of May 31, 2002
First Amendment dated as of March 31, 2002
Original Amended and Restated Credit Agreement dated as of April 30, 2001

**AMENDMENT PROVISIONS:**                                                    **PAGE**

A.   Consent of Agent to Increase in Aggregate Revolving Loans Commitment ................. 2

B.   Reallocation of the Amounts of the Revolving Loans Commitment ........................... 2

C.   Amendment to Section 2.1 of the 2001 Credit Agreement ........................................... 2

D.   Conditions.................................................................................................................... 2

E.   Additional Terms.......................................................................................................... 3

**EXHIBITS:**

EXHIBIT A   -   Form of Restated Revolving Note

EXHIBIT B   -   Form of Incumbency Certificate

EXHIBIT C   -   Form of Legal Opinion Regarding Sixth Amendment

# SIXTH AMENDMENT TO
# AMENDED AND RESTATED CREDIT AGREEMENT

This SIXTH AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT ("Sixth Amendment"), dated as of February 9, 2007, is entered into among FBOP CORPORATION, a bank holding company incorporated under the laws of the State of Illinois and having its principal place of business at 11 West Madison Street, Oak Park, Illinois 60302, and the institutions that are from time to time parties hereto as Lenders (whether by execution of this Agreement, an Assignment and Acceptance or otherwise), and JPMORGAN CHASE BANK, N.A. (successor by merger to Bank One, N.A. (Illinois)), a national banking association having a place of business at 120 South LaSalle Street, Chicago, Illinois 60603-3400, in its capacity as the Agent and as a Lender.

## R E C I T A L S :

A.      The parties hereto have entered into that certain Amended and Restated Credit Agreement, dated as of April 30, 2001, as previously amended, restated, supplemented or modified from time to time, including by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2002, that certain Third Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2003, that certain Fourth Amendment to Amended and Restated Credit Agreement, dated as of May 28, 2004, and that certain Fifth Amendment to Amended and Restated Credit Agreement (the "Fifth Amendment"), dated as of May 31, 2005 ("2001 Credit Agreement").

B.      The parties hereto desire to amend and modify the 2001 Credit Agreement in accordance with the terms and subject to the conditions set forth in this Sixth Amendment. As amended and modified by this Sixth Amendment, the 2001 Credit Agreement may be referred to as the "Agreement."

C.      Pursuant to Section 2.1(c) of the 2001 Credit Agreement, the Borrower has the option to increase the Aggregate Revolving Loans Commitment by up to $75,000,000. The Borrower has notified Agent that it wishes to exercise such option and increase the Aggregate Revolving Loans Commitment by $50,000,000.

D.      The parties desire to amend the terms of the 2001 Credit Agreement to reflect a $50,000,000 increase in the Aggregate Revolving Loans Commitment as a result of the exercise by the Borrower of its option pursuant to Section 2.1(c) of the 2001 Credit Agreement.

E.      Capitalized terms used but not otherwise defined in this Sixth Amendment shall have the meanings respectively ascribed to them in the 2001 Credit Agreement.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1

# A G R E E M E N T :

**A.     Consent of Agent to Increase in Aggregate Revolving Loans Commitment.** The Agent acknowledges receipt of notice from the Borrower pursuant to Section 2.1(c) requesting a $50,000,000 increase in the Aggregate Revolving Loans Commitment to Two Hundred Twenty-Five Million Dollars ($225,000,000). Agent hereby consents to such increase, to be effected by an increase in the Revolving Loans Commitment of JPMorgan Chase Bank, N.A., as a Lender, as reflected opposite such Lender's signature to this Sixth Amendment, subject to satisfaction of the conditions for such increase set forth in Section 2.1(c) and the conditions set forth in this Sixth Amendment.

**B.     Reallocation of the Amounts of the Revolving Loans Commitment.** The amount of the respective Revolving Loans Commitment of each Lender shall be reallocated to be the amounts set forth opposite each Lender's signature to this Sixth Amendment.

**C.     Amendment to Section 2.1(c) of the 2001 Credit Agreement.** Section 2.1(c) of the 2001 Credit Agreement is hereby amended by deleting clause (v) thereof and replacing it with the following:

> "(v)     after giving effect to any such increase, the Aggregate Revolving Loans Commitment shall not exceed Two Hundred Fifty Million Dollars ($250,000,000); and"

**D.     Conditions.**

(i)     General. The Borrower hereby acknowledges and agrees that, in addition to the other conditions and requirements of Section 4.2 of the 2001 Credit Agreement, the Lenders shall not be required to make any Advance, unless as of the date hereof and on the applicable Borrowing Date, (a) the representations and warranties contained in this Sixth Amendment and the 2001 Credit Agreement (including all exhibits and schedules attached hereto and thereto) shall be true, accurate, and complete as of the date hereof and such Borrowing Date, and (b) the Borrower shall have fully complied with each of its promises and covenants contained in this Sixth Amendment and the 2001 Credit Agreement. Each Borrowing Notice with respect to each such Advance shall constitute a representation and warranty by the Borrower that the conditions contained in this Sixth Amendment and the 2001 Credit Agreement shall have been satisfied.

(ii)     Sixth Amendment. In addition to other conditions set forth in this Sixth Amendment and the 2001 Credit Agreement, including, without limitation, those applicable to the making of Advances, the obligations of the Lenders under the Agreement shall be subject to the performance by the Borrower of all of its agreements theretofore to be performed under the Agreement and to the receipt of all of the following, duly executed and dated the date hereof, and in form and substance satisfactory to the Agent and its counsel:

(a)     the restated Revolving Note for the benefit of JPMorgan Chase Bank, N.A., in the form set forth on Exhibit A to the Sixth Amendment;

(b)     copies of the articles of incorporation of the Borrower, together with all amendments through the date hereof, and a certificate of good standing, both certified by the appropriate governmental officer in its jurisdiction of incorporation and dated within the five Business Days preceding the date hereof;

(c)     copies, certified by the Secretary or Assistant Secretary of the Borrower, of its by-laws and of its Board of Directors' resolutions authorizing the execution, delivery, and performance, respectively, of this Sixth Amendment, the restated Revolving Note and any other documents to be executed, delivered, or performed in connection with this Sixth Amendment (collectively, "Amendment-Related Documents");

(d)     an incumbency certificate, substantially in the form of <u>Exhibit B</u> attached hereto, executed by the Secretary or Assistant Secretary of the Borrower, which shall identify by name and title and bear the signature of the officers of the Borrower authorized to sign the Amendment-Related Documents and to make borrowings hereunder and under the 2001 Credit Agreement, upon which certificate the Agent and the Lenders shall be entitled to rely until informed of any change in writing by the Borrower; and

(e)     a written opinion of the Borrower's counsel, addressed to the Lenders, in substantially the form set forth on <u>Exhibit C</u> attached hereto.

**E.     <u>Additional Terms</u>.**

(i)     <u>Acknowledgment of Indebtedness under Agreement</u>.     The Borrower acknowledges and confirms that, as of the date hereof, immediately prior to giving effect to any Advance in respect of the increase in the Aggregate Revolving Loans Commitment contemplated ty this Sixth Amendment, the Borrower is indebted to the Lenders, without defense, setoff, or counterclaim (a) in the aggregate principal amount of Zero Dollars ($0) in Term Loans, and (b) in the aggregate principal amount of One Hundred Seventy-Five Million and 00/100 Dollars ($175,000,000.00) in Revolving Loans, all made under the 2001 Credit Agreement.

(ii)     <u>Effectiveness</u>.     The provisions of this Sixth Amendment will become effective upon its execution by the Borrower, JP Morgan Chase Bank, N.A. and such other Lenders as is necessary for this Sixth Amendment to be executed by the Required Lenders as determined immediately prior to the effectiveness of this Sixth Amendment.

(iii)     <u>The Aggregate Term Loans Commitment</u>.     The Term Loans have been repaid.     Amounts paid under the Term Loans may not be reborrowed, and, accordingly, the Aggregate Term Loans Commitment is zero.

(iv)     <u>The Agreement</u>.     All references in the 2001 Credit Agreement to the term "Agreement" shall be deemed to refer to the Agreement referenced in this Sixth Amendment.

(v)     <u>The Lenders</u>.     All references in the Agreement to the "Lenders" shall be deemed to refer to the lending institutions listed on the signature pages to this Sixth Amendment and their respective permitted successors and assigns. Each Lender hereby acknowledges that it has

3

received a copy of all of the documents that constitute the 2001 Credit Agreement, that it is a Lender under all of the Loan Documents, and that it will perform in accordance with the terms of such Loan Documents all of the obligations that are required to be performed by it as a Lender.

(vi) <u>Sixth Amendment and 2001 Credit Agreement to be Read Together</u>. This Sixth Amendment supplements and is hereby made part of the 2001 Credit Agreement, and the 2001 Credit Agreement and this Sixth Amendment shall from and after the date hereof be read together and shall constitute the Agreement. Except as otherwise set forth herein, the 2001 Credit Agreement shall remain in full force and effect.

(vii) <u>Transaction Documents</u>. The terms "Transaction Documents" and "Loan Documents," as used in the Agreement, shall from and after the date hereof include the Amendment-Related Documents.

(viii) <u>Counterparts</u>. This Sixth Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same document.

(ix) <u>Representations and Warranties</u>. The Borrower hereby represents and warrants to the Lenders and Agent as follows:

(a) No Default or Unmatured Default has occurred and is continuing (or would result from the amendments contemplated hereby).

(b) The execution, delivery and performance by the Borrower of this Sixth Amendment have been duly authorized by all necessary corporate and other action and do not and will not require any registration with, consent or approval of, or notice to or action by any person or entity (including any governmental agency) in order to be effective and enforceable.

(c) This Sixth Amendment and the other Loan Documents (as amended by this Sixth Amendment) constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms.

(d) All representations and warranties of the Borrower in the 2001 Loan Agreement (as modified by this Sixth Amendment) are true and correct, except (1) for the purposes of this Sixth Amendment only, the reference in <u>Section 5.4</u> of the 2001 Loan Agreement to the consolidated financial statements as of and for the period ending December 31, 2000 shall be deemed to refer to the consolidated financial statements of the Borrower and its Subsidiaries required to be delivered to the Lenders pursuant to <u>Section 6.1(a)</u> of the 2001 Loan Agreement as of and for the year ended December 31, 2005, and (2) Schedule 5.8 attached hereto shall be substituted for Schedule 5.8 attached to the Fifth Amendment for all purposes under the Agreement from and after the date hereof.

(e) The Borrower's obligations under the Agreement and under the other Loan Documents are not subject to any defense, counterclaim, set-off, right to recoupment, abatement or other claim.

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Sixth Amendment as of the date first written above.

**FBOP CORPORATION**

By: _____

Print Name: _____

Title: _____

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois 60302
Attention: Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook LLP
111 South Wacker Drive
Chicago, Illinois 60606
Attention: Edward C. Fitzpatrick, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $105,416,666.66 |

Percentage Commitment

46.85%

**JPMORGAN CHASE BANK, N.A.,** as Agent and as a Lender

By: _Dust Va T_____

Print Name: _Dustin Van Peursem_

Title: _Vice President_

(address)

JPMORGAN CHASE BANK, N.A.
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
 & Nagelberg LLP
(prior to May 31, 2007) 333 West Wacker
Drive, Suite 2700
(after May 31, 2007) 200 West Madison Street,
Suite 3900
Chicago, Illinois 60606
Attention: Edwin S. del Hierro, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**ASSOCIATED BANK, NA,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Associated Bank, NA
200 North Adams Street
Green Bay, Wisconsin 54307-9006
Attention: Mr. Brent D. Jensen

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By: *Michael S. Camuli*

Print Name: *Michael S. Camuli*

Title: *Director*

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $37,916,666.67 |

Percentage Commitment

16.85%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By:

Print Name:

Title:

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

|                | Commitments      |
| -------------- | ---------------- |
| Term           | Revolving        |
| $0             | $23,333,333.33   |

Percentage Commitment

10.37%

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By:_____ _____

Print Name:_____ _____

Title:_____ _____

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

|                | Commitments      |
| -------------- | ---------------- |
| Term           | Revolving        |
| $0             | $37,916,666.67   |

Percentage Commitment

16.85%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name: _Richard T. Zell_____

Title: _First Vice President_____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

|       Commitments       |              |
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By: _Gregg R Weyer_

Print Name: _Gregg R Weyer_

Title: _Senior Vice President_

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention: Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: K. Thor Lundgren, Esq.

|       Commitments       |              |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**FIFTH THIRD BANK,** as a Lender


By:_____

Print Name:_____

Title:_____

(address)

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention: Mr. Peter Caligiuri

| Commitments | |
|---|---|
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**UNION BANK OF CALIFORNIA, N.A.,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention:  Dennis A. Cattell,
           Vice President

## EXHIBIT A

## FORM OF RESTATED REVOLVING NOTE

$105,416,666.66

Restatement Date: February 9, 2007
Original Note Date: April 30, 2001

FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of JPMORGAN CHASE BANK, N.A. ("Lender") the lesser of the principal sum of One Hundred Five Million Four Hundred Sixteen Thousand Six Hundred Sixty-Six and 66/100 Dollars ($105,416,666.66) or the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the Borrower pursuant to Article II of the Agreement (as hereinafter defined), in immediately available funds at the office of JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent, located at 120 South LaSalle Street, Chicago, Illinois, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement. The Borrower shall pay the principal of, and accrued and unpaid interest on, the Revolving Loans in full on the Revolving Facility Termination Date.

This Note represents a continuation of the indebtedness evidenced by that certain Revolving Note dated April 30, 2001 made by the Borrower to the order of Lender in the original principal amount of $3,571,429 (as amended, restated, supplemented and modified, the "Original Revolving Note"), which Original Revolving Note is amended, restated and replaced by this Note. This Note does not constitute a novation, discharge or satisfaction of the Original Revolving Note replaced hereby or of the indebtedness evidenced by said Original Revolving Note.

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Revolving Loan and the date and amount of each principal payment hereunder.

This Revolving Note is one of the Revolving Notes issued pursuant to, and is entitled to the benefits of, that certain Amended and Restated Credit Agreement, dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed, or extended and in effect from time to time, is herein called the "Agreement"), by and among the Borrower, the Lenders party thereto, including the Lender, and JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Revolving Note, including the terms and conditions under which this Revolving Note may be prepaid or its maturity date accelerated. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time. Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Revolving Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged or

received under the Agreement or this Revolving Note or otherwise in connection with the Agreement or this Revolving Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender). All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release or surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or that may hereafter be held as security for the payment of this Revolving Note, and may extend the time for payment or (with the consent of the Borrower) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby.

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT, AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

IN WITNESS WHEREOF, the Borrower has caused this Revolving Note to be duly executed as of the date first above written.

**FBOP CORPORATION**

By:_____

Print Name:_____

Title:_____

ATTEST:

By:_____

Print Name:_____

Title:_____

SCHEDULE OF REVOLVING LOANS
AND PAYMENTS OF PRINCIPAL

REVOLVING NOTE OF FBOP CORPORATION,
DATED APRIL 30, 2001
AND RESTATED FEBRUARY 9, 2007

| Date | Principal Amount of Revolving Loan | Maturity of Interest Period | Maturity Principal Amount Paid | Unpaid Balance |
|------|-----------------------------------|----------------------------|-------------------------------|----------------|

[COMPLETE AS NECESSARY]

A-4

## EXHIBIT B

## FORM OF CERTIFICATE OF INCUMBENCY

I, Edward C. Fitzpatrick, Secretary of FBOP Corporation, an Illinois corporation, do hereby certify that the following persons have been duly elected to, are duly qualified for, have held, and on the date hereof do hold, the offices for FBOP Corporation set forth opposite their respective names:

| Name | Office |
|------|--------|
| MICHAEL E. KELLY | Chairman of the Board |
| ROBERT M. HESKETT | President and Director |
| MICHAEL F. DUNNING | Vice President and Chief Financial Officer |
| EDWARD C. FITZPATRICK | Secretary and Director |

I further certify that the sample signatures below are true signatures for each such officer.

Dated as of February 9, 2007

EDWARD C. FITZPATRICK,
Secretary

MICHAEL E. KELLY                          ROBERT M. HESKETT

MICHAEL F. DUNNING                        EDWARD C. FITZPATRICK

B-1

## EXHIBIT C

## FORM OF LEGAL OPINION

February 9, 2007

JPMorgan Chase Bank, N.A.
120 South LaSalle Street
Chicago, Illinois 60603-3400

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603

Harris N.A.
111 West Monroe
Chicago, Illinois 60603

Union Bank of California, N.A.
445 South Figuero Street
Los Angeles, California 90071

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois 60008

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53201-3593

Associated Bank
200 North Adams
Green Bay, Wisconsin 54307-9006

 **Re: FBOP Corporation**

Ladies and Gentlemen:

  We have acted as special counsel for FBOP Corporation (the "Borrower") in connection with its execution and delivery of an Amended and Restated Credit Agreement, dated as of April 30, 2001 (the "Credit Agreement"), as amended by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2002, that certain Third Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2003, that certain Fourth Amendment to Amended and Restated Credit Agreement, dated as of May 28, 2004, that certain Fifth Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2005, and that certain Sixth Amendment to Amended and Restated Credit Agreement, dated as of the date hereof (the "Sixth Amendment"), among the Borrower, the Lenders named above, and JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent. All capitalized terms used in this opinion and not otherwise defined herein shall have the meanings attributed to them in the Credit Agreement, as so amended.

  We have examined the Borrower's articles of incorporation, by-laws, resolutions, unexecuted copies of the Sixth Amendment and the restated Revolving Note, in substantially the form attached to the Sixth Amendment as <u>Exhibit A</u> ("Revolving Note") (and which in each case we assume have been executed in the forms examined) and such other matters of fact and law that we deem necessary in order to render this opinion. In our examination of all documents, we

have assumed the genuineness of all signatures (other than those of Borrower), the authenticity of all documents submitted to us as originals, the conformity of all copies submitted to us with the originals to be delivered and the due authorization, execution and delivery by each party other than the Borrower of all documents to which it is or will be a party. We have made no independent investigation as to the accuracy, correctness or completeness of any representation or warranties made in the Sixth Amendment. The opinion expressed in paragraph 1 herein as to the good standing of the Borrower is based solely on the certificate of good standing attached hereto. We have assumed for purposes of our opinion in paragraph 2 that each of the banks listed therein is validly existing and in good standing.

Based upon the foregoing and subject to the qualifications set forth herein, it is our opinion that:

1. The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. The Borrower has all requisite corporate authority to conduct business in each jurisdiction in which its business is conducted.

2. Each of San Diego National Bank, Park National Bank, Madisonville State Bank, Citizens National Bank of Teague, Texas, North Houston Bank, California National Bank, Pacific National Bank and Bank USA, National Association has all requisite corporate authority to conduct its business in each jurisdiction in which its respective business is conducted.

3. The execution and delivery of each of the Sixth Amendment and the Revolving Note by the Borrower, and the performance by the Borrower of its obligations thereunder, have been duly authorized by all necessary corporation action and proceedings on the part of the Borrower and its shareholders.

4. No order, permission, consent or approval of any federal or state governmental department, commission, board or regulatory authority or agency is required for the execution and delivery of, or for the performance by the Borrower of its obligations under, any of the Sixth Amendment or the Revolving Note, or, if required, each such permission, consent or approval has been obtained.

5. There is, to our knowledge, no charter, by-law or preferred or common stock provision, nor any indenture, instrument, contract or agreement to which the Borrower is a party, nor any statute, rule, regulation, order, judgment, injunction or decree binding on the Borrower that would be contravened by the execution and delivery of any of the Sixth Amendment or the Revolving Note, or by the performance of any terms, provisions conditions, agreements, covenants, or obligations of the Borrower contained therein.

6. Each of the Sixth Amendment and the Revolving Note has been duly executed and delivered by the Borrower and constitutes the legal, valid and binding obligation of the Borrower enforceable in accordance with its respective terms

except to the extent the enforcement thereof may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject also to the availability of equitable remedies if equitable remedies are sought.

The opinions set forth herein are subject to and qualified by the following limitations:

(1)     The enforceability of the Sixth Amendment and the Revolving Note is subject to the right of taxing authorities or other entities or persons which may by law have priority over the rights of the Lenders.

(2)     Certain remedies and/or provisions under the Sixth Amendment and the Revolving Note do or may require enforcement or interpretation by a court of equity, and such enforcement or interpretation is subject to the discretion of such court and to such principles of equity as the courts having jurisdiction may impose.

(3)     Applicable federal, state and local laws, ordinances, regulations, court decisions and constitutional requirements may limit or render unenforceable certain of the rights and remedies of the Lenders under the Sixth Amendment and the Revolving Note.

We call your attention to the following matters as to which we express no opinion:

(i)     the agreement of the Borrower in the Credit Agreement for payment of any amount to the extent any such payment shall be determined by a court of competent jurisdiction to constitute a penalty or to be contrary to public policy;

(ii)     any provision in the Credit Agreement wherein the Borrower waives rights to the laying of venue or the right to jury trial or the Borrower agrees to be served with process by service upon a designated third party;

(iii)     the ordinances and statutes, the administrative decisions and orders and the rules and regulations of any municipality, county, or political subdivision of any state including the state of Illinois;

(iv)     (1) any of the remedies contained in the Credit Agreement, if such remedies are determined by a court of competent jurisdiction to conflict with mandatory provisions under applicable law (however, in our judgment, any such determination would not make the remedies set forth in the Credit Agreement, taken as a whole, inadequate for the practical realization of the principal benefits intended to be afforded thereby), or (2) any of the waivers or remedies contained in the Credit Agreement, if a court of competent jurisdiction shall determine that such waivers or remedies were not taken or exercised in good faith or in the absence of fraud by any Lender; and

(v)     any provision in the Credit Agreement that purports to preserve absolute and unconditional rights or obligations of any party irrespective of the lack of validity or enforceability of the Credit Agreement.

This opinion is provided to you as a legal opinion only, and not as a guarantee or warranty of the matters discussed herein. We express no opinion with respect to the financial status or ability of the Borrower to meet its obligations under any of the Transaction Documents. No opinion may be inferred or implied beyond the matters expressly stated herein.

We do not express any opinion as to any law other than the laws of the State of Illinois and the laws of the United States of America.

As you are aware, Edward C. Fitzpatrick, a partner in Lord, Bissell & Brook LLP, is a director and Secretary to the Board of Directors of Borrower and certain Subsidiaries.

This opinion is addressed to you and is solely for your use; accordingly, it may not be used, relied upon or disclosed to any other person or entity (other than assignees, participants, transferees or successors of any Lender in accordance with the terms provided in the Transaction Documents) or used for any purpose other than in connection with this transaction. It is not to be used, circulated, quoted or otherwise referred to for any other purpose without the prior written consent of this firm. The opinion is based upon information furnished us as of the date hereof. We disclaim any undertaking to advise you of any changes concerning the above, whether or not deemed material, which may hereafter come to our attention.

Very truly yours,

**SCHEDULE 5.8**

**UPDATED LIST OF SUBSIDIARIES**

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Sixth Amendment as of the date first written above.

**FBOP CORPORATION**

By: _____

Print Name: _____

Title: _____

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois  60302
Attention:  Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook LLP
111 South Wacker Drive
Chicago, Illinois  60606
Attention: Edward C. Fitzpatrick, Esq.

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Sixth Amendment as of the date first written above.

**FBOP CORPORATION**

By: _Mart E Kenny_

Print Name: _Michael Kenny_

Title: _EVP & CFO_

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois 60302
Attention: Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook LLP
111 South Wacker Drive
Chicago, Illinois 60606
Attention: Edward C. Fitzpatrick, Esq.

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Sixth Amendment as of the date first written above.

**FBOP CORPORATION**

By: _____

Print Name: _Michael Dunning_

Title: _EVP & CFO_

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois 60302
Attention: Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook LLP
111 South Wacker Drive
Chicago, Illinois 60606
Attention: Edward C. Fitzpatrick, Esq.

| Commitments | |
| Term | Revolving |
| $0 | $105,416,666.66 |

Percentage Commitment

46.85%

**JPMORGAN CHASE BANK, N.A.,** as
Agent and as a Lender

By: _Justin Van Peursem_

Print Name: _Justin Van Peursem_

Title: _Vice President_

(address)

JPMORGAN CHASE BANK, N.A.
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
  & Nagelberg LLP
(prior to May 31, 2007) 333 West Wacker
Drive, Suite 2700
(after May 31, 2007) 200 West Madison Street,
Suite 3900
Chicago, Illinois 60606
Attention: Edwin S. del Hierro, Esq.

| Commitments | |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**ASSOCIATED BANK, NA,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Associated Bank, NA
200 North Adams Street
Green Bay, Wisconsin 54307-9006
Attention: Mr. Brent D. Jensen

S-2

|      Commitments      |            |
| --- | --- |
| Term | Revolving |
| $0 | $105,416,666.66 |

Percentage Commitment

46.85%

**JPMORGAN CHASE BANK, N.A.,** as
Agent and as a Lender

By: *Edwid Va D*

Print Name: *Justin Van Pelusen*

Title: *Vice President*

(address)

JPMORGAN CHASE BANK, N.A.
120 South LaSalle Street
Chicago, Illinois 60603
Attention:  Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
 & Nagelberg LLP
(prior to May 31, 2007) 333 West Wacker
Drive, Suite 2700
(after May 31, 2007) 200 West Madison Street,
Suite 3900
Chicago, Illinois  60606
Attention:  Edwin S. del Hierro, Esq.

|      Commitments      |            |
| --- | --- |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**ASSOCIATED BANK, NA,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Associated Bank, NA
200 North Adams Street
Green Bay, Wisconsin 54307-9006
Attention:  Mr. Brent D. Jensen

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $105,416,666.66 |

Percentage Commitment

46.85%

**JPMORGAN CHASE BANK, N.A.**, as
Agent and as a Lender

By: _~~Dand Van D~~_____

Print Name: _Dustin Van Peurson_____

Title: _Vice President_____

(address)

JPMORGAN CHASE BANK, N.A.
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
 & Nagelberg LLP
(prior to May 31, 2007) 333 West Wacker
Drive, Suite 2700
(after May 31, 2007) 200 West Madison Street,
Suite 3900
Chicago, Illinois 60606
Attention: Edwin S. del Hierro, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**ASSOCIATED BANK, NA**, as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Associated Bank, NA
200 North Adams Street
Green Bay, Wisconsin 54307-9006
Attention: Mr. Brent D. Jensen

| Commitments | |
|---|---|
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By: _____

Print Name: _____

Title: Director

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

| Commitments | |
|---|---|
| Term | Revolving |
| $0 | $37,916,666.67 |

Percentage Commitment

16.85%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name: _____

Title: _____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By: _Michal M Kul_

Print Name: _Michael S. Cameli_

Title: _Director_

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $37,916,666.67 |

Percentage Commitment

16.85%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name: _____

Title: _____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By: _M̶i̶c̶h̶l̶ ̶l̶ ̶h̶w̶l̶_

Print Name: _Michael S. Cameli_

Title: _Director_

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $37,916,666.67 |

Percentage Commitment

16.85%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name: _____

Title: _____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

|  Commitments |  |
| --- | --- |
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By: _Mhhhh_

Print Name: _Michard S. Cameli_

Title: _Director_

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention:  Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention:  Steven G. Hastings, Esq.

|  Commitments |  |
| --- | --- |
| Term | Revolving |
| $0 | $37,916,666.67 |

Percentage Commitment

16.85%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name: _____

Title: _____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention:  Mr. Richard T. Zell

|      Commitments      | |
| --- | --- |
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

|      Commitments      | |
| --- | --- |
| Term | Revolving |
| $0 | $37,916,666.67 |

Percentage Commitment

16.85%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _(signature)_

Print Name: _Richard T. Zell_

Title: _First Vice President_

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $37,916,666.67 |

Percentage Commitment

16.85%

**LASALLE BANK NATIONAL ASSOCIATION,** as a Lender

By: _____

Print Name: _Richard T. Zell_

Title: _First Vice President_

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

| Commitments | |
|---|---|
| __Term__ | __Revolving__ |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

| Commitments | |
|---|---|
| __Term__ | __Revolving__ |
| $0 | $37,916,666.67 |

Percentage Commitment

16.85%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name: _Richard T. Zell_

Title: _First Vice President_

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention: Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: K. Thor Lundgren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention: Mr. Peter Caligiuri

|  Commitments  | |
| --- | --- |
|  Term  |  Revolving  |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention: Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: K. Thor Lundgren, Esq.

|  Commitments  | |
| --- | --- |
|  Term  |  Revolving  |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention: Mr. Peter Caligiuri

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

10.37%

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention: Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: K. Thor Lundgren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention: Mr. Peter Caligiuri

| Commitments | |
|---|---|
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**UNION BANK OF CALIFORNIA, N.A.,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention: Dennis A. Cattell,
               Vice President

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**UNION BANK OF CALIFORNIA, N.A.,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention: Dennis A. Cattell,
              Vice President

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

5.18%

**UNION BANK OF CALIFORNIA, N.A.,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention:  Dennis A. Cattell,
              Vice President

# EXHIBIT H

# SEVENTH AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT

### among

## FBOP CORPORATION,

## JPMORGAN CHASE BANK, N.A.,
### as Agent and as a Lender

### and

## THE INSTITUTIONS THAT ARE FROM TIME TO TIME PARTIES THERETO, AS LENDERS

## CLOSING CHECKLIST

### Closing Date:  March 26, 2007

Lender's Attorney:  Barack Ferrazzano, et al.
333 W. Wacker Drive, Suite 2700
Chicago, Illinois  60606
Attn:  Elliot I. Molk, Esq.
(312) 629-5111
elliot.molk@bfkpn.com

**Required Deliveries**:  (See Section D of Seventh Amendment)

1.  Seventh Amendment to Amended and Restated Credit Agreement dated as of March 23, 2007

2.  Restated Revolving Note issued to Harris Bank in the principal amount of $35,833,333.33

3.  Restated Revolving Note issued to LaSalle Bank National Association in the principal amount of $50,416,666.67

4.  Certificate of Good Standing

5.  Secretary's Certificate of Borrower Certifying to Articles of Incorporation, Bylaws and Authorizing Resolutions for Seventh Amendment

6.  Incumbency Certificate

7.  Legal Opinion

EXECUTION COPY

# SEVENTH AMENDMENT

## TO

# AMENDED AND RESTATED CREDIT AGREEMENT

### AMONG

## FBOP CORPORATION,

## JPMORGAN CHASE BANK, N.A.
**(successor by merger to
Bank One, N.A. (Illinois)),**

## AS AGENT AND AS A LENDER,

### AND

## THE INSTITUTIONS THAT ARE FROM TIME TO TIME
## PARTIES HERETO AS LENDERS

Seventh Amendment dated as of March 23, 2007
Sixth Amendment dated as of February 9, 2007
Fifth Amendment dated as of May 31, 2005
Fourth Amendment dated as of May 28, 2004
Third Amendment dated as of May 31, 2003
Second Amendment dated as of May 31, 2002
First Amendment dated as of March 31, 2002
Original Amended and Restated Credit Agreement dated as of April 30, 2001

Seventh Amendment to Credit Agreement (3)

**AMENDMENT PROVISIONS:** <span style="float:right">**PAGE**</span>

A.   Consent of Agent to Increase in Aggregate Revolving Loans Commitment ................. 2

B.   Reallocation of the Amounts of the Revolving Loans Commitment ............................ 2

C.   Conditions.................................................................................................................... 2

D.   Additional Terms........................................................................................................ 3

**EXHIBITS:**

EXHIBIT A   Form of Restated Revolving Note – LaSalle Bank National Association

EXHIBIT B   Form of Restated Revolving Note – Harris N.A.

EXHIBIT C   Form of Incumbency Certificate

EXHIBIT D   Form of Legal Opinion Regarding Seventh Amendment

# SEVENTH AMENDMENT TO
# AMENDED AND RESTATED CREDIT AGREEMENT

This SEVENTH AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT ("Seventh Amendment"), dated as of March 23, 2007, is entered into among FBOP CORPORATION, a bank holding company incorporated under the laws of the State of Illinois and having its principal place of business at 11 West Madison Street, Oak Park, Illinois 60302, and the institutions that are from time to time parties hereto as Lenders (whether by execution of this Agreement, an Assignment and Acceptance or otherwise), and JPMORGAN CHASE BANK, N.A. (successor by merger to Bank One, N.A. (Illinois)), a national banking association having a place of business at 120 South LaSalle Street, Chicago, Illinois 60603-3400, in its capacity as the Agent and as a Lender.

## R E C I T A L S :

A.       The parties hereto have entered into that certain Amended and Restated Credit Agreement, dated as of April 30, 2001, as previously amended, restated, supplemented or modified from time to time, including by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2002, that certain Third Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2003, that certain Fourth Amendment to Amended and Restated Credit Agreement, dated as of May 28, 2004, that certain Fifth Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2005, and that certain Sixth Amendment to Amended and Restated Credit Agreement (the "Sixth Amendment), dated as of February 9, 2007.

B.       The parties hereto desire to amend and modify the 2001 Credit Agreement in accordance with the terms and subject to the conditions set forth in this Seventh Amendment. As amended and modified by this Seventh Amendment, the 2001 Credit Agreement may be referred to as the "Agreement."

C.       Pursuant to Section 2.1(c) of the 2001 Credit Agreement, the Borrower has the option to increase the Aggregate Revolving Loans Commitment by up to $75,000,000. Pursuant to the Sixth Amendment, the Borrower executed such option to increase the Aggregate Revolving Loans Commitment by $50,000,000. The Borrower has notified Agent that it wishes to exercise such option again to increase the Aggregate Revolving Loans Commitment by the remaining $25,000,000, to $250,000,000.

D.       The parties desire to amend the terms of the 2001 Credit Agreement to reflect a $25,000,000 increase in the Aggregate Revolving Loans Commitment as a result of the exercise by the Borrower of its option pursuant to Section 2.1(c) of the 2001 Credit Agreement.

E.       Capitalized terms used but not otherwise defined in this Seventh Amendment shall have the meanings respectively ascribed to them in the 2001 Credit Agreement.

1

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

# A G R E E M E N T :

**A.      Consent of Agent to Increase in Aggregate Revolving Loans Commitment**. The Agent acknowledges receipt of notice from the Borrower pursuant to <u>Section 2.1(c)</u> requesting a $25,000,000 increase in the Aggregate Revolving Loans Commitment to Two Hundred Fifty Million Dollars ($250,000,000). Agent hereby consents to such increase, to be effected by an increase in the Revolving Loans Commitment of LaSalle Bank National Association and Harris, N.A., as reflected opposite each such Lender's signature to this Seventh Amendment, subject to satisfaction of the conditions for such increase set forth in <u>Section 2.1(c)</u> and the conditions set forth in this Seventh Amendment.

**B.      Reallocation of the Amounts of the Revolving Loans Commitment**. The amount of the respective Revolving Loans Commitment of each Lender shall be reallocated to be the amounts set forth opposite each Lender's signature to this Seventh Amendment.

**C.      Conditions**.

(i)      <u>General</u>. The Borrower hereby acknowledges and agrees that, in addition to the other conditions and requirements of <u>Section 4.2</u> of the 2001 Credit Agreement, the Lenders shall not be required to make any Advance, unless as of the date hereof and on the applicable Borrowing Date, (a) the representations and warranties contained in this Seventh Amendment and the 2001 Credit Agreement (including all exhibits and schedules attached hereto and thereto) shall be true, accurate, and complete as of the date hereof and such Borrowing Date, and (b) the Borrower shall have fully complied with each of its promises and covenants contained in this Seventh Amendment and the 2001 Credit Agreement. Each Borrowing Notice with respect to each such Advance shall constitute a representation and warranty by the Borrower that the conditions contained in this Seventh Amendment and the 2001 Credit Agreement shall have been satisfied.

(ii)      <u>Seventh Amendment</u>. In addition to other conditions set forth in this Seventh Amendment and the 2001 Credit Agreement, including, without limitation, those applicable to the making of Advances, the obligations of the Lenders under the Agreement shall be subject to the performance by the Borrower of all of its agreements theretofore to be performed under the Agreement and to the receipt of all of the following, duly executed and dated the date hereof, and in form and substance satisfactory to the Agent and its counsel:

(a)      the restated Revolving Note for the benefit of LaSalle Bank National Association and Harris, N.A., in the forms set forth on <u>Exhibit A</u> and <u>B</u> to the Seventh Amendment, respectively;

(b)      copies of the articles of incorporation of the Borrower, together with all amendments through the date hereof, and a certificate of good standing, both

2

certified by the appropriate governmental officer in its jurisdiction of incorporation and dated within the five Business Days preceding the date hereof;

        (c)    copies, certified by the Secretary or Assistant Secretary of the Borrower, of its by-laws and of its Board of Directors' resolutions authorizing the execution, delivery, and performance, respectively, of this Seventh Amendment, the restated Revolving Note and any other documents to be executed, delivered, or performed in connection with this Seventh Amendment (collectively, "Amendment-Related Documents");

        (d)    an incumbency certificate, substantially in the form of <u>Exhibit B</u> attached hereto, executed by the Secretary or Assistant Secretary of the Borrower, which shall identify by name and title and bear the signature of the officers of the Borrower authorized to sign the Amendment-Related Documents and to make borrowings hereunder and under the 2001 Credit Agreement, upon which certificate the Agent and the Lenders shall be entitled to rely until informed of any change in writing by the Borrower; and

        (e)    a written opinion of the Borrower's counsel, addressed to the Lenders, in substantially the form set forth on <u>Exhibit C</u> attached hereto.

## D.    <u>Additional Terms</u>.

        (i)    <u>Acknowledgment of Indebtedness under Agreement</u>.    The Borrower acknowledges and confirms that, as of the date hereof, immediately prior to giving effect to any Advance in respect of the increase in the Aggregate Revolving Loans Commitment contemplated ty this Seventh Amendment, the Borrower is indebted to the Lenders, without defense, setoff, or counterclaim (a) in the aggregate principal amount of Zero Dollars ($0) in Term Loans, and (b) in the aggregate principal amount of Two Hundred Twenty-Five Million and 00/100 Dollars ($225,000,000.00) in Revolving Loans, all made under the 2001 Credit Agreement.

        (ii)    <u>Effectiveness</u>.    The provisions of this Seventh Amendment will become effective upon its execution by the Borrower, JP Morgan Chase Bank, N.A. and such other Lenders as is necessary for this Seventh Amendment to be executed by the Required Lenders as determined immediately prior to the effectiveness of this Seventh Amendment.

        (iii)    <u>The Agreement</u>.    All references in the 2001 Credit Agreement to the term "Agreement" shall be deemed to refer to the Agreement referenced in this Seventh Amendment.

        (iv)    <u>The Lenders</u>.    All references in the Agreement to the "Lenders" shall be deemed to refer to the lending institutions listed on the signature pages to this Seventh Amendment and their respective permitted successors and assigns. Each Lender hereby acknowledges that it has received a copy of all of the documents that constitute the 2001 Credit Agreement, that it is a Lender under all of the Loan Documents, and that it will perform in accordance with the terms of such Loan Documents all of the obligations that are required to be performed by it as a Lender.

        (v)    <u>Seventh Amendment and 2001 Credit Agreement to be Read Together</u>. This Seventh Amendment supplements and is hereby made part of the 2001 Credit Agreement, and the

2001 Credit Agreement and this Seventh Amendment shall from and after the date hereof be read together and shall constitute the Agreement. Except as otherwise set forth herein, the 2001 Credit Agreement shall remain in full force and effect.

(vi)     Transaction Documents.  The terms "Transaction Documents" and "Loan Documents," as used in the Agreement, shall from and after the date hereof include the Amendment-Related Documents.

(vii)     Counterparts.  This Seventh Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same document.

(viii)     Representations and Warranties.  The Borrower hereby represents and warrants to the Lenders and Agent as follows:

(a)     No Default or Unmatured Default has occurred and is continuing (or would result from the amendments contemplated hereby).

(b)     The execution, delivery and performance by the Borrower of this Seventh Amendment have been duly authorized by all necessary corporate and other action and do not and will not require any registration with, consent or approval of, or notice to or action by any person or entity (including any governmental agency) in order to be effective and enforceable.

(c)     This Seventh Amendment and the other Loan Documents (as amended by this Seventh Amendment) constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms.

(d)     All representations and warranties of the Borrower in the 2001 Loan Agreement (as modified by this Seventh Amendment) are true and correct, except for the purposes of this Seventh Amendment only, the reference in Section 5.4 of the 2001 Loan Agreement to the consolidated financial statements as of and for the period ending December 31, 2000 shall be deemed to refer to the consolidated financial statements of the Borrower and its Subsidiaries required to be delivered to the Lenders pursuant to Section 6.1(a) of the 2001 Loan Agreement as of and for the year ended December 31, 2006.

(e)     The Borrower's obligations under the Agreement and under the other Loan Documents are not subject to any defense, counterclaim, set-off, right to recoupment, abatement or other claim.

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Seventh Amendment as of the date first written above.

**FBOP CORPORATION**

By: _Michael Kelly_

Print Name: _Michael Dunning_

Title: _EVP CFO_

(address)

FBOP Corporation
11 West Madison Street
Oak Park, Illinois  60302
Attention:  Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook LLP
111 South Wacker Drive
Chicago, Illinois  60606
Attention: Edward C. Fitzpatrick, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $105,416,666.66 |

Percentage Commitment

42.17%

**JPMORGAN CHASE BANK, N.A.**, as Agent and as a Lender

By: _[signature]_

Print Name: Kristin M. Pasquale

Title: VP

(address)

JPMORGAN CHASE BANK, N.A.
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. John L. Spalding

with a copy to

Barack Ferrazzano Kirschbaum Perlman
 & Nagelberg LLP
(prior to May 31, 2007) 333 West Wacker
Drive, Suite 2700
(after May 31, 2007) 200 West Madison
Street, Suite 3900
Chicago, Illinois 60606
Attention: Edwin S. del Hierro, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | 11,666,666.67 |

Percentage Commitment

4.67%

**ASSOCIATED BANK, NA**, as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Associated Bank, NA
200 North Adams Street
Green Bay, Wisconsin 54307-9006
Attention: Mr. Brent D. Jensen

| Commitments | |
| Term | Revolving |
| $0 | $35,833,333.33 |

Percentage Commitment

14.33%

**HARRIS N.A.** (successor by merger to Harris Trust and Savings Bank), as a Lender

By: _Th J Wil_

Print Name: _Thomas J. Wilson_

Title: _Vice President_

(address)

Harris N.A.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

| Commitments | |
| Term | Revolving |
| $0 | $50,416,666.67 |

Percentage Commitment

20.16%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name: _____

Title: _____

(address)

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

S-3

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $23,333,333.33 |

Percentage Commitment

9.33%

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention: Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: K. Thor Lundgren, Esq.

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

4.67%

**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention: Mr. Peter Caligiuri

| Commitments | |
| --- | --- |
| Term | Revolving |
| $0 | $11,666,666.67 |

Percentage Commitment

4.67%

**UNION BANK OF CALIFORNIA, N.A.,** as a Lender

By:_____

Print Name:_____

Title:_____

(address)

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention: Dennis A. Cattell,
Vice President

## EXHIBIT A

### FORM OF RESTATED REVOLVING NOTE

$50,416,666.67

Restatement Date: March 23, 2007
Original Note Date: April 30, 2001

FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of LASALLE BANK NATIONAL ASSOCIATION ("Lender") the lesser of the principal sum of Fifty Million Four Hundred Sixteen Thousand Six Hundred Sixty-Six and 67/100 Dollars ($50,416,666.67) or the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the Borrower pursuant to Article II of the Agreement (as hereinafter defined), in immediately available funds at the office of JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent, located at 120 South LaSalle Street, Chicago, Illinois, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement. The Borrower shall pay the principal of, and accrued and unpaid interest on, the Revolving Loans in full on the Revolving Facility Termination Date.

This Note represents a continuation of the indebtedness evidenced by that certain Revolving Note dated April 30, 2001 made by the Borrower to the order of Lender in the original principal amount of $3,714,286 (as amended, restated, supplemented and modified, the "Original Revolving Note"), which Original Revolving Note is amended, restated and replaced by this Note. This Note does not constitute a novation, discharge or satisfaction of the Original Revolving Note replaced hereby or of the indebtedness evidenced by said Original Revolving Note.

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Revolving Loan and the date and amount of each principal payment hereunder.

This Revolving Note is one of the Revolving Notes issued pursuant to, and is entitled to the benefits of, that certain Amended and Restated Credit Agreement, dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed, or extended and in effect from time to time, is herein called the "Agreement"), by and among the Borrower, the Lenders party thereto, including Lender, and JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Revolving Note, including the terms and conditions under which this Revolving Note may be prepaid or its maturity date accelerated. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time. Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Revolving Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged or

received under the Agreement or this Revolving Note or otherwise in connection with the Agreement or this Revolving Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender). All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release or surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or that may hereafter be held as security for the payment of this Revolving Note, and may extend the time for payment or (with the consent of the Borrower) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby.

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT, AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

IN WITNESS WHEREOF, the Borrower has caused this Revolving Note to be duly executed as of the date first above written.

**FBOP CORPORATION**

By: _____

Print Name: _____

Title: _____

ATTEST:

By: _____

Print Name: _____

Title: _____

A-3

## EXHIBIT B

### FORM OF RESTATED REVOLVING NOTE

$35,833,333.33                    Restatement Date: March 23, 2007
                                  Original Note Date: April 30, 2001

      FBOP CORPORATION, an Illinois corporation ("Borrower"), promises to pay to the order of HARRIS N.A. ("Lender") the lesser of the principal sum of Thirty-Five Million Eight Hundred Thirty-Three Thousand Three Hundred Thirty-Three and 33/100 Dollars ($35,833,333.33) or the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the Borrower pursuant to Article II of the Agreement (as hereinafter defined), in immediately available funds at the office of JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent, located at 120 South LaSalle Street, Chicago, Illinois, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement. The Borrower shall pay the principal of, and accrued and unpaid interest on, the Revolving Loans in full on the Revolving Facility Termination Date.

      This Note represents a continuation of the indebtedness evidenced by that certain Revolving Note dated April 30, 2001 made by the Borrower to the order of Lender in the original principal amount of $10,000,000 (as amended, restated, supplemented and modified, the "Original Revolving Note"), which Original Revolving Note is amended, restated and replaced by this Note. This Note does not constitute a novation, discharge or satisfaction of the Original Revolving Note replaced hereby or of the indebtedness evidenced by said Original Revolving Note.

      The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Revolving Loan and the date and amount of each principal payment hereunder.

      This Revolving Note is one of the Revolving Notes issued pursuant to, and is entitled to the benefits of, that certain Amended and Restated Credit Agreement, dated as of April 30, 2001 (which, as it may be amended, modified, restated, renewed, or extended and in effect from time to time, is herein called the "Agreement"), by and among the Borrower, the Lenders party thereto, including Lender, and JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Revolving Note, including the terms and conditions under which this Revolving Note may be prepaid or its maturity date accelerated. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

      It is the intention of the parties hereto to conform strictly to applicable usury laws as in effect from time to time. Accordingly, if any transaction contemplated hereby would be usurious under applicable law (including the laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable), then, in that event, notwithstanding anything to the contrary in the Agreement or this Revolving Note, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged or

received under the Agreement or this Revolving Note or otherwise in connection with the Agreement or this Revolving Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower by the Lender (or if such consideration shall have been paid in full, such excess refunded to the Borrower by the Lender). All sums paid, or agreed to be paid, to or for the benefit of the Lender in accordance with the terms of this paragraph shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform the full term thereof.

To the extent permitted by applicable law, the Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of nonpayment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption under insolvency laws, and consents that the Lender may release or surrender, exchange, or substitute any real estate and/or personal property or other collateral security now held or that may hereafter be held as security for the payment of this Revolving Note, and may extend the time for payment or (with the consent of the Borrower) otherwise modify the terms of payment for any part or the whole of the indebtedness evidenced hereby.

THE TRANSACTION DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ILLINOIS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

THE BORROWER AND THE LENDER HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR ILLINOIS STATE COURT SITTING IN CHICAGO IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENTS AND THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVE ANY OBJECTION EACH MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. ANY JUDICIAL PROCEEDING BY THE BORROWER AGAINST THE AGENT OR ANY LENDER OR ANY AFFILIATE OF THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH, ANY TRANSACTION DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN CHICAGO, ILLINOIS.

THE BORROWER, THE AGENT, AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY TRANSACTION DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

IN WITNESS WHEREOF, the Borrower has caused this Revolving Note to be duly executed as of the date first above written.

**FBOP CORPORATION**

By:_____

Print Name:_____

Title:_____

ATTEST:

By:_____

Print Name:_____

Title:_____

SCHEDULE OF REVOLVING LOANS
AND PAYMENTS OF PRINCIPAL

REVOLVING NOTE OF FBOP CORPORATION,
DATED APRIL 30, 2001
AND RESTATED MARCH __, 2007

| Date | Principal Amount of Revolving Loan | Maturity of Interest Period | Maturity Principal Amount Paid | Unpaid Balance |
|------|-----------------------------------|----------------------------|-------------------------------|----------------|

[COMPLETE AS NECESSARY]

## EXHIBIT C

## FORM OF CERTIFICATE OF INCUMBENCY

I, Edward C. Fitzpatrick, Secretary of FBOP Corporation, an Illinois corporation, do hereby certify that the following persons have been duly elected to, are duly qualified for, have held, and on the date hereof do hold, the offices for FBOP Corporation set forth opposite their respective names:

| Name | Office |
| --- | --- |
| MICHAEL E. KELLY | Chairman of the Board |
| ROBERT M. HESKETT | President and Director |
| MICHAEL F. DUNNING | Vice President and Chief Financial Officer |
| EDWARD C. FITZPATRICK | Secretary and Director |

I further certify that the sample signatures below are true signatures for each such officer.

Dated as of March __, 2007

_____
EDWARD C. FITZPATRICK,
Secretary


_____                    _____
MICHAEL E. KELLY                             ROBERT M. HESKETT


_____                    _____
MICHAEL F. DUNNING                           EDWARD C. FITZPATRICK

C-1

## EXHIBIT D

## FORM OF LEGAL OPINION

March __, 2007

JPMorgan Chase Bank, N.A.
120 South LaSalle Street
Chicago, Illinois 60603-3400

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603

Harris N.A.
111 West Monroe
Chicago, Illinois 60603

Union Bank of California, N.A.
445 South Figuero Street
Los Angeles, California 90071

Fifth Third Bank
1701 Golf Road, Tower 3
Suite 401
Rolling Meadows, Illinois 60008

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53201-3593

Associated Bank
200 North Adams
Green Bay, Wisconsin 54307-9006

    **Re:   FBOP Corporation**

Ladies and Gentlemen:

    We have acted as special counsel for FBOP Corporation (the "Borrower") in connection with its execution and delivery of an Amended and Restated Credit Agreement, dated as of April 30, 2001 (the "Credit Agreement"), as amended by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2002, that certain Third Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2003, that certain Fourth Amendment to Amended and Restated Credit Agreement, dated as of May 28, 2004, that certain Fifth Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2005, that certain Seventh Amendment to Amended and Restated Credit Agreement, dated as of February 9, 2007, and that certain Seventh Amendment to Amended and Restated Credit Agreement, dated as of the date hereof (the "Seventh Amendment"), among the Borrower, the Lenders named above, and JPMorgan Chase Bank, N.A. (successor by merger to Bank One, N.A. (Illinois)), as Agent. All capitalized terms used in this opinion and not otherwise defined herein shall have the meanings attributed to them in the Credit Agreement, as so amended.

    We have examined the Borrower's articles of incorporation, by-laws, resolutions, unexecuted copies of the Seventh Amendment and the restated Revolving Notes, in substantially the form attached to the Seventh Amendment as Exhibits A and B ("Revolving Notes") (and which in each case we assume have been executed in the forms examined) and such other

matters of fact and law that we deem necessary in order to render this opinion. In our examination of all documents, we have assumed the genuineness of all signatures (other than those of Borrower), the authenticity of all documents submitted to us as originals, the conformity of all copies submitted to us with the originals to be delivered and the due authorization, execution and delivery by each party other than the Borrower of all documents to which it is or will be a party. We have made no independent investigation as to the accuracy, correctness or completeness of any representation or warranties made in the Seventh Amendment. The opinion expressed in paragraph 1 herein as to the good standing of the Borrower is based solely on the certificate of good standing attached hereto. We have assumed for purposes of our opinion in paragraph 2 that each of the banks listed therein is validly existing and in good standing.

Based upon the foregoing and subject to the qualifications set forth herein, it is our opinion that:

1. The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. The Borrower has all requisite corporate authority to conduct business in each jurisdiction in which its business is conducted.

2. Each of San Diego National Bank, Park National Bank, Madisonville State Bank, Citizens National Bank of Teague, Texas, North Houston Bank, California National Bank, Pacific National Bank and Bank USA, National Association has all requisite corporate authority to conduct its business in each jurisdiction in which its respective business is conducted.

3. The execution and delivery of each of the Seventh Amendment and the Revolving Note by the Borrower, and the performance by the Borrower of its obligations thereunder, have been duly authorized by all necessary corporation action and proceedings on the part of the Borrower and its shareholders.

4. No order, permission, consent or approval of any federal or state governmental department, commission, board or regulatory authority or agency is required for the execution and delivery of, or for the performance by the Borrower of its obligations under, any of the Seventh Amendment or the Revolving Notes, or, if required, each such permission, consent or approval has been obtained.

5. There is, to our knowledge, no charter, by-law or preferred or common stock provision, nor any indenture, instrument, contract or agreement to which the Borrower is a party, nor any statute, rule, regulation, order, judgment, injunction or decree binding on the Borrower that would be contravened by the execution and delivery of any of the Seventh Amendment or the Revolving Notes, or by the performance of any terms, provisions conditions, agreements, covenants, or obligations of the Borrower contained therein.

6. Each of the Transaction Documents (including, without limitation, the Seventh Amendment and the Revolving Notes) has been duly executed and delivered by

the Borrower and constitutes the legal, valid and binding obligation of the Borrower enforceable in accordance with its respective terms except to the extent the enforcement thereof may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject also to the availability of equitable remedies if equitable remedies are sought.

Our opinion set forth in paragraph 6 above, subject to and qualified by the following limitations:

(1)     The right of taxing authorities or other entities or persons which may by law have priority over the rights of the Lenders.

(2)     Certain remedies and/or provisions of the Transaction Documents do or may require enforcement or interpretation by a court of equity, and such enforcement or interpretation is subject to the discretion of such court and to such principles of equity as the courts having jurisdiction may impose.

(3)     Applicable federal, state and local laws, ordinances, regulations, court decisions and constitutional requirements may limit or render unenforceable certain of the rights and remedies of the Lenders under the Transaction Documents.

We call your attention to the following matters as to which we express no opinion:

(i)     the agreement of the Borrower in the Credit Agreement for payment of any amount to the extent any such payment shall be determined by a court of competent jurisdiction to constitute a penalty or to be contrary to public policy;

(ii)     any provision in the Credit Agreement wherein the Borrower waives rights to the laying of venue or the right to jury trial or the Borrower agrees to be served with process by service upon a designated third party;

(iii)     the ordinances and statutes, the administrative decisions and orders and the rules and regulations of any municipality, county, or political subdivision of any state including the state of Illinois;

(iv)     (1) any of the remedies contained in the Credit Agreement, if such remedies are determined by a court of competent jurisdiction to conflict with mandatory provisions under applicable law (however, in our judgment, any such determination would not make the remedies set forth in the Credit Agreement, taken as a whole, inadequate for the practical realization of the principal benefits intended to be afforded thereby), or (2) any of the waivers or remedies contained in the Credit Agreement, if a court of competent jurisdiction shall determine that such waivers or remedies were not taken or exercised in good faith or in the absence of fraud by any Lender; and

(v)     any provision in the Credit Agreement that purports to preserve absolute and unconditional rights or obligations of any party irrespective of the lack of validity or enforceability of the Credit Agreement.

This opinion is provided to you as a legal opinion only, and not as a guarantee or warranty of the matters discussed herein. We express no opinion with respect to the financial status or ability of the Borrower to meet its obligations under any of the Transaction Documents. No opinion may be inferred or implied beyond the matters expressly stated herein.

We do not express any opinion as to any law other than the laws of the State of Illinois and the laws of the United States of America.

As you are aware, Edward C. Fitzpatrick, a partner in Lord, Bissell & Brook LLP, is a director and Secretary to the Board of Directors of Borrower and certain Subsidiaries.

This opinion is addressed to you and is solely for your use; accordingly, it may not be used, relied upon or disclosed to any other person or entity (other than assignees, participants, transferees or successors of any Lender in accordance with the terms provided in the Transaction Documents) or used for any purpose other than in connection with this transaction. It is not to be used, circulated, quoted or otherwise referred to for any other purpose without the prior written consent of this firm. The opinion is based upon information furnished us as of the date hereof. We disclaim any undertaking to advise you of any changes concerning the above, whether or not deemed material, which may hereafter come to our attention.

Very truly yours,

# EXHIBIT I

EXECUTION COPY

# EIGHTH AMENDMENT

## TO

## AMENDED AND RESTATED CREDIT AGREEMENT

## AMONG

## FBOP CORPORATION,

## JPMORGAN CHASE BANK, N.A.
### (successor by merger to Bank One, N.A. (Illinois)),

## AS AGENT AND AS A LENDER,

## AND

## THE INSTITUTIONS THAT ARE FROM TIME TO TIME PARTIES HERETO AS LENDERS

Eighth Amendment dated as of May 31, 2007
Seventh Amendment dated as of March 23, 2007
Sixth Amendment dated as of February 9, 2007
Fifth Amendment dated as of May 31, 2005
Fourth Amendment dated as of May 28, 2004
Third Amendment dated as of May 31, 2003
Second Amendment dated as of May 31, 2002
First Amendment dated as of March 31, 2002
Original Amended and Restated Credit Agreement dated as of April 30, 2001

421749_4.DOC

**AMENDMENT PROVISIONS:**                                  <u>**PAGE**</u>

A.  Amendment to Section 1.1. of the 2001 Credit Agreement ........................................... 2

B.  Amendment to Section 2.1 of the 2001 Credit Agreement ........................................... 2

C.  Reallocation of the Amounts of the Revolving Loans Commitment ............................ 2

D.  Amendment to Section 6.14(g) of the 2001 Credit Agreement. ....................................... 2

E.  Conditions......................................................................................................................... 3

F.  Additional Terms............................................................................................................... 4

**EXHIBITS:**

EXHIBIT A   Form of Restated Revolving Note

EXHIBIT B   Form of Revolving Note

EXHIBIT C   Form of Incumbency Certificate

EXHIBIT D   Form of Legal Opinion Regarding Eighth Amendment

## EIGHTH AMENDMENT TO
## AMENDED AND RESTATED CREDIT AGREEMENT

This EIGHTH AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT ("Eighth Amendment"), dated as of May 31, 2007, is entered into among FBOP CORPORATION, a bank holding company incorporated under the laws of the State of Illinois and having its principal place of business at 11 West Madison Street, Oak Park, Illinois 60302, and the institutions that are from time to time parties hereto as Lenders (whether by execution of this Agreement, an Assignment and Acceptance or otherwise), and JPMORGAN CHASE BANK, N.A. (successor by merger to Bank One, N.A. (Illinois)), a national banking association having a place of business at 120 South LaSalle Street, Chicago, Illinois 60603-3400, in its capacity as the Agent and as a Lender.

## R E C I T A L S :

A.     The parties hereto have entered into that certain Amended and Restated Credit Agreement, dated as of April 30, 2001, as previously amended, restated, supplemented or modified from time to time (collectively, the "2001 Credit Agreement"), including by that certain First Amendment to Amended and Restated Credit Agreement, dated as of March 31, 2002, that certain Second Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2002, that certain Third Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2003, that certain Fourth Amendment to Amended and Restated Credit Agreement, dated as of May 28, 2004, that certain Fifth Amendment to Amended and Restated Credit Agreement, dated as of May 31, 2005, that certain Sixth Amendment to Amended and Restated Credit Agreement, dated as of February 9, 2007 and that certain Seventh Amendment to Amended and Restated Credit Agreement, dated as of March 23, 2007.

B.     As amended and modified by this Eighth Amendment, the 2001 Credit Agreement may be referred to as the "Agreement."

C.     The parties to this Eighth Amendment desire to amend and modify the 2001 Credit Agreement in accordance with the terms and subject to the conditions set forth in this Eighth Amendment to:  (i) extend the Revolving Facility Termination Date; (ii) modify the amount of the Aggregate Revolving Loans Commitment; (iii) modify the allocations of the amounts of the Revolving Loans Commitment of each Lender; and (iv) otherwise modify the 2001 Credit Agreement as described in this Eighth Amendment.  The parties agree to undertake such modification in accordance with the terms, subject to the conditions, and in reliance upon the recitals, representations, warranties and covenants set forth herein, in the Agreement, and in the other Loan Documents, irrespective of whether entered into or delivered on or after April 30, 2001.

D.     Capitalized terms used but not otherwise defined in this Eighth Amendment shall have the meanings respectively ascribed to them in the 2001 Credit Agreement.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements hereinafter set forth, and for other good and valuable consideration,

1

the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

<b>A G R E E M E N T :</b>

**A. Amendment to Section 1.1 of the 2001 Credit Agreement**.

(i)    Section 1.1 of the 2001 Credit Agreement is hereby amended by deleting the definition "Eurodollar Rate" in its entirety and replacing it with the following:

"Eurodollar Rate" means, with respect to a Eurodollar Advance for the relevant Eurodollar Interest Period, the sum of:  (a) the quotient of: (i) the Eurodollar Base Rate applicable to such Eurodollar Interest Period; divided by (ii) one minus the Reserve Requirement (expressed as a decimal) applicable to such Eurodollar Interest Period; plus (b) nine-tenths of one percent (0.90%) per annum.  The Eurodollar Rate shall be rounded to the next higher multiple of 1/16 of 1% if the rate is not such a multiple."

(ii)    Section 1.1 of the 2001 Credit Agreement is hereby amended by deleting the definition "Revolving Facility Termination Date" in its entirety and replacing it with the following:

"Revolving Facility Termination Date" means May 29, 2008, or any earlier date on which the Aggregate Revolving Loans Commitment is reduced to zero or otherwise terminated pursuant to the terms hereof."

**B. Amendment to Section 2.1 of the 2001 Credit Agreement**. Section 2.1(c) of the 2001 Credit Agreement is hereby amended by deleting the existing clause (c) thereof, and replacing it with the following:

"(c) Total Revolving Committed Amount. The Aggregate Revolving Loans Commitment is hereby set at an aggregate principal amount of Four Hundred Fifty Million Dollars ($450,000,000)."

**C. Reallocation of the Amounts of the Revolving Loans Commitment**.  The amount of the respective Revolving Loans Commitment of each Lender shall be reallocated to be the amounts set forth opposite each Lender's signature to this Eighth Amendment.

**D. Amendment to Section 6.14(g) of the 2001 Credit Agreement**.

The 2001 Credit Agreement is hereby amended by deleting Section 6.14(g) in its entirety and replacing it with the following:

"Borrower (on a consolidated basis) shall maintain a return on assets of not less than 0.75%. The return on assets shall be an amount (expressed as a percentage) equal to the adjusted net income of Borrower divided by the total assets of Borrower.  The percentage set forth in this Section 6.14 (g) shall be measured quarterly on a rolling four-quarter basis, beginning as of four quarters ending on June 30, 2001 and shall be derived from the

applicable quarterly financial statements filed with the appropriate Governmental Agency.  For purposes of this <u>Section 6.14(g)</u>, "adjusted net income" shall mean the consolidated net income of Borrower (calculated in accordance with GAAP), excluding the effects of the amortization of goodwill and "total assets" shall mean total consolidated average assets for such period.

**E.**     **Conditions**.

(i)     <u>General</u>.  The Borrower hereby acknowledges and agrees that, in addition to the other conditions and requirements of <u>Section 4.2</u> of the 2001 Credit Agreement, the Lenders shall not be required to make any Advance, unless as of the date hereof and on the applicable Borrowing Date, (a) the representations and warranties contained in this Eighth Amendment and the 2001 Credit Agreement (including all exhibits and schedules attached hereto and thereto) shall be true, accurate, and complete as of the date hereof and such Borrowing Date, and (b) the Borrower shall have fully complied with each of its promises and covenants contained in this Eighth Amendment and the 2001 Credit Agreement.  Each Borrowing Notice with respect to each such Advance shall constitute a representation and warranty by the Borrower that the conditions contained in this Eighth Amendment and the 2001 Credit Agreement shall have been satisfied.

(ii)     <u>Eighth Amendment</u>.  In addition to other conditions set forth in this Eighth Amendment and the 2001 Credit Agreement, including, without limitation, those applicable to the making of Advances, the obligations of the Lenders under the Agreement shall be subject to the performance by the Borrower of all of its agreements theretofore to be performed under the Agreement and to the receipt of all of the following, duly executed and dated the date hereof, and in form and substance satisfactory to the Agent and its counsel:

(a)     restated Revolving Notes for the benefit of each Lender that had a commitment under the 2001 Credit Agreement immediately prior to the effectiveness of this Eighth Amendment, in the form set forth on <u>Exhibit A</u> to this Eighth Amendment;

(b)     Revolving Notes for the benefit of each Lender that did not have a commitment under the 2001 Credit Agreement immediately prior to the effectiveness of this Eighth Amendment, in the form set forth on <u>Exhibit B</u> to this Eighth Amendment;

(c)     copies of the articles of incorporation of the Borrower, together with all amendments through the date hereof, and a certificate of good standing, both certified by the appropriate governmental officer in its jurisdiction of incorporation and dated within the five Business Days preceding the date hereof;

(d)     copies, certified by the Secretary or Assistant Secretary of the Borrower, of its by-laws and of its Board of Directors' resolutions authorizing the execution, delivery, and performance, respectively, of this Eighth Amendment, the Revolving Notes to be delivered pursuant to this Eighth Amendment and any other documents to be executed, delivered, or performed in connection with this Eighth Amendment (collectively, "Amendment-Related Documents");

(e)    an incumbency certificate, substantially in the form of <u>Exhibit C</u> attached hereto, executed by the Secretary or Assistant Secretary of the Borrower, which shall identify by name and title and bear the signature of the officers of the Borrower authorized to sign the Amendment-Related Documents and to make borrowings hereunder and under the 2001 Credit Agreement, upon which certificate the Agent and the Lenders shall be entitled to rely until informed of any change in writing by the Borrower; and

(f)    a written opinion of the Borrower's counsel, addressed to the Lenders, in substantially the form set forth on <u>Exhibit D</u> attached hereto.

**F.    <u>Additional Terms</u>.**

(i)    <u>Acknowledgment of Indebtedness under Agreement</u>.    The Borrower acknowledges and confirms that, as of the date hereof, immediately prior to giving effect to any Advance in respect of the increase in the Aggregate Revolving Loans Commitment contemplated by this Eighth Amendment, the Borrower is indebted to the Lenders, without defense, setoff, or counterclaim (a) in the aggregate principal amount of Zero Dollars ($0) in Term Loans, and (b) in the aggregate principal amount of Two Hundred Thirty-Two Million, Five Hundred Thousand and 00/100 Dollars ($232,500,000.00) in Revolving Loans, all made under the 2001 Credit Agreement.

(ii)    <u>Effectiveness</u>.    The provisions of this Eighth Amendment will become effective upon its execution by the Borrower, JPMorgan Chase Bank, N.A. and the other Lenders that are parties to this Eighth Amendment.

(iii)    <u>The Agreement</u>.    All references in the 2001 Credit Agreement to the term "Agreement" shall be deemed to refer to the Agreement referenced in this Eighth Amendment.

(iv)    <u>The Lenders</u>.    All references in the Agreement to the "Lenders" shall be deemed to refer to the lending institutions listed on the signature pages to this Eighth Amendment and their respective permitted successors and assigns.  Each Lender hereby acknowledges that it has received a copy of all of the documents that constitute the 2001 Credit Agreement, that it is a Lender under all of the Loan Documents, and that it will perform in accordance with the terms of such Loan Documents all of the obligations that are required to be performed by it as a Lender.

(v)    <u>Eighth Amendment and 2001 Credit Agreement to be Read Together</u>.    This Eighth Amendment supplements and is hereby made part of the 2001 Credit Agreement, and the 2001 Credit Agreement and this Eighth Amendment shall from and after the date hereof be read together and shall constitute the Agreement.  Except as otherwise set forth herein, the 2001 Credit Agreement shall remain in full force and effect.

(vi)    <u>Transaction Documents</u>.    The terms "Transaction Documents" and "Loan Documents," as used in the Agreement, shall from and after the date hereof include the Amendment-Related Documents.

(vii)   Counterparts.  This Eighth Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same document.

(viii)   Representations and Warranties.   The Borrower hereby represents and warrants to the Lenders and Agent as follows:

(a)   No Default or Unmatured Default has occurred and is continuing (or would result from the amendments contemplated hereby).

(b)   The execution, delivery and performance by the Borrower of this Eighth Amendment have been duly authorized by all necessary corporate and other action and do not and will not require any registration with, consent or approval of, or notice to or action by any person or entity (including any governmental agency) in order to be effective and enforceable.

(c)   This Eighth Amendment and the other Loan Documents (as amended by this Eighth Amendment) constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms.

(d)   All representations and warranties of the Borrower in the 2001 Loan Agreement (as modified by this Eighth Amendment) are true and correct, except for the purposes of this Eighth Amendment only, the reference in Section 5.4 of the 2001 Loan Agreement to the consolidated financial statements as of and for the period ending December 31, 2000 shall be deemed to refer to the consolidated financial statements of the Borrower and its Subsidiaries required to be delivered to the Lenders pursuant to Section 6.1(a) of the 2001 Loan Agreement as of and for the year ended December 31, 2006.

(e)   The Borrower's obligations under the Agreement and under the other Loan Documents are not subject to any defense, counterclaim, set-off, right to recoupment, abatement or other claim.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Eighth Amendment as of the date first written above.

**FBOP CORPORATION**

By: _____

Print Name: _____

Title: _____

FBOP Corporation
11 West Madison Street
Oak Park, Illinois 60302
Attention: Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook LLP
111 South Wacker Drive
Chicago, Illinois 60606
Attention: Edward C. Fitzpatrick, Esq.

Revolving Loans Commitment

$105,000,000

Percentage Commitment

23.3%

**JPMORGAN CHASE BANK, N.A.**, as Agent and as a Lender

By: _____

Print Name: _____

Title: _____

JPMORGAN CHASE BANK, N.A.
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. John L. Spalding

with a copy to:

Barack Ferrazzano Kirschbaum
  & Nagelberg LLP
200 West Madison Street, Suite 3900
Chicago, Illinois 60606
Attention: Edwin S. del Hierro, Esq.

S-1

IN WITNESS WHEREOF, the Borrower, the Lenders, and the Agent have executed this Eighth Amendment as of the date first written above.

**FBOP CORPORATION**

By:_____

Print Name:_____

Title:_____

FBOP Corporation
11 West Madison Street
Oak Park, Illinois 60302
Attention: Mr. Michael E. Kelly

with a copy to

Lord, Bissell & Brook LLP
111 South Wacker Drive
Chicago, Illinois 60606
Attention: Edward C. Fitzpatrick, Esq.

Revolving Loans Commitment

$105,000,000

Percentage Commitment

23.3%

**JPMORGAN CHASE BANK, N.A.**, as
Agent and as a Lender

By: _____ M. Pa_____

Print Name: Kristin M. Pasznger

Title: V P

JPMORGAN CHASE BANK, N.A.
120 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. John L. Spalding

with a copy to:

Barack Ferrazzano Kirschbaum
 & Nagelberg LLP
200 West Madison Street, Suite 3900
Chicago, Illinois 60606
Attention: Edwin S. del Hierro, Esq.

S-1

Revolving Loans Commitment

$30,000,000

Percentage Commitment

6.7%

**ASSOCIATED BANK, NA**, as a Lender

By: _____

Print Name: _____ Nate Selk _____

Title: __ Assistant Vice President ____

Associated Bank, NA
200 North Adams Street
Green Bay, Wisconsin 54307-9006
Attention: ~~Mr. Brent D. Jensen~~

        Mr. Nate Selk

Revolving Loans Commitment

$50,000,000

Percentage Commitment

11.1%

**BMO CAPITAL MARKETS FINANCING, INC.** (Assignee of Harris Trust and Savings Bank), as a Lender

By: _____

Print Name: _____

Title: _____

BMO Capital Markets Financing, Inc.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

Revolving Loans Commitment

$30,000,000

Percentage Commitment

6.7%

**ASSOCIATED BANK, NA**, as a Lender

By:_____

Print Name:_____

Title:_____

Associated Bank, NA
200 North Adams Street
Green Bay, Wisconsin 54307-9006
Attention: Mr. Brent D. Jensen


Revolving Loans Commitment

$50,000,000

Percentage Commitment

11.1%

**BMO CAPITAL MARKETS FINANCING, INC.** (Assignee of Harris Trust and Savings Bank), as a Lender

By:_____

Print Name: Michael S. Cameli

Title: Director

BMO Capital Markets Financing, Inc.
111 West Monroe
Chicago, Illinois 60603
Attention: Mr. Michael S. Cameli

with a copy to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: Steven G. Hastings, Esq.

Revolving Loans Commitment

$75,000,000

Percentage Commitment

16.7%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By: _____

Print Name: Richard T. Zell

Title: First Vice President

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

Revolving Loans Commitment

$25,000,000

Percentage Commitment

5.6%

**M&I MARSHALL & ILSLEY BANK**, as a Lender

By: _____

Print Name: _____

Title: _____

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention: Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: K. Thor Lundgren, Esq.

Revolving Loans Commitment

$75,000,000

Percentage Commitment

16.7%

**LASALLE BANK NATIONAL ASSOCIATION**, as a Lender

By:_____

Print Name:_____

Title:_____

LaSalle Bank National Association
135 South LaSalle Street
Chicago, Illinois 60603
Attention: Mr. Richard T. Zell

Revolving Loans Commitment

$25,000,000

Percentage Commitment

5.6%

**M&I MARSHALL & ILSLEY BANK,** as a Lender

By: _Gregg R Weyer_

Print Name: _Gregg R Weyer_

Title: _Senior Vice President_

M&I Marshall & Ilsley Bank
770 North Water Street
Milwaukee, Wisconsin 53202-3593
Attention: Mr. Gregg R. Weyer

with a copy to:

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: K. Thor Lundgren, Esq.

S-3

Revolving Loans Commitment

$35,000,000

Percentage Commitment

7.8%

**FIFTH THIRD BANK**, as a Lender

By: _____

Print Name: VANTA ST. CLAIR

Title: SVP

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention: Mr. Peter Caligiuri

Revolving Loans Commitment

$45,000,000

Percentage Commitment

10.0%

**UNION BANK OF CALIFORNIA, N.A.**, as a Lender

By: _____

Print Name: _____

Title: _____

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention: Dennis A. Cattell,
        Vice President

RECEIVED TIME MAY. 31. 9:43AM

Revolving Loans Commitment

$35,000,000

Percentage Commitment

7.8%

**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name:_____

Title:_____

Fifth Third Bank
1701 Golf Road, Tower 1
Suite 700
Rolling Meadows, Illinois 60008
Attention: Mr. Peter Caligiuri

Revolving Loans Commitment

$45,000,000

Percentage Commitment

10.0%

**UNION BANK OF CALIFORNIA, N.A.,** as a Lender

By:_____

Print Name:_____Dennis A. Cattell____

Title:_____VP_____

Union Bank of California, N.A.
445 South Figueroa Street
Los Angles, California 90071
Attention: Dennis A. Cattell,
Vice President

Revolving Loans Commitment

$50,000,000

Percentage Commitment

11.1%

**WACHOVIA BANK, NATIONAL ASSOCIATION,** as a Lender

By: _____
Print Name: Alan J. Bilskie
                   Director
Title: International Credit Products
_____

Wachovia Bank, National Association
One South Broad Street
PA-1223
Philadelphia, Pennsylvania 19107
Attention: Roy O. Young,
                   Director

Revolving Loans Commitment

$35,000,000

Percentage Commitment

7.8%

**WELLS FARGO BANK, N.A.,** as a Lender

By: _____
    Leighton D. Kor
    Vice President

Wells Fargo Bank, N.A.
MAC N8200-098
666 Walnut Street
Des Moines, IA 50309

Revolving Loans Commitment

$50,000,000

Percentage Commitment

11.1%

**WACHOVIA BANK, NATIONAL ASSOCIATION,** as a Lender

By:_____

Print Name:_____

Title:_____

Wachovia Bank, National Association
One South Broad Street
PA-1223
Philadelphia, Pennsylvania 19107
Attention: Roy O. Young,
            Director

Revolving Loans Commitment

$35,000,000

Percentage Commitment

7.8%

**WELLS FARGO BANK, N.A.,** as a Lender

By:_____
    Leighton D. Kor
    Vice President

Wells Fargo Bank, N.A.
MAC N8200-098
666 Walnut Street
Des Moines, IA 50309

# EXHIBIT J

**EXECUTION COPY**

## WAIVER AND NINTH AMENDMENT TO
## AMENDED AND RESTATED CREDIT AGREEMENT

THIS WAIVER AND NINTH AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT (the "Agreement") dated as of March 31, 2008, is entered into among FBOP CORPORATION, a bank holding company incorporated under the laws of the State of Illinois (the "Borrower") and having its principal place of business at 11 West Madison Street, Oak Park, Illinois 60302, the institutions that are parties hereto as lenders (the "Lenders"), and JPMORGAN CHASE BANK, N.A. (successor by merger to Bank One, N.A. (Illinois)), a national banking association having a place of business at 120 South LaSalle Street, Chicago, Illinois 60603-3400, in its capacity as the agent for the Lenders (in such capacity, the "Agent") and as a Lender.

## W I T N E S S E T H :

WHEREAS, the Borrower, the Lenders and the Agent have entered into that certain Amended and Restated Credit Agreement, dated as of April 30, 2001 (as heretofore amended, modified or otherwise supplemented, the "Credit Agreement");

WHEREAS, a certain Default exists under the Credit Agreement which is listed on Exhibit A attached hereto (the "Existing Default");

WHEREAS, the Borrower has requested that the Agent and the Lenders waive the Existing Default, and the Agent and the Lenders are willing to do so on the terms and subject to the conditions set forth herein; and

WHEREAS, the Borrower desires to amend the Credit Agreement as set forth herein, and the Agent and the Lenders are willing to do so on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Definitions.**  Terms defined in the Credit Agreement which are used herein shall have the same meanings as are set forth in the Credit Agreement for such terms unless otherwise defined herein.

2.    **Amendment.**  Subject to the complete satisfaction of all of the conditions set forth in Section 4 of this Agreement:

2.1    Section 6.14(g) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"(g)    Borrower (on a consolidated basis) shall maintain a return on assets of not less than 0.75%.  The return on assets shall be an amount

(expressed as a percentage) equal to (i) (a) the adjusted net income of Borrower for its fiscal quarter ending on March 31, 2008, <u>multiplied</u> by (b) four (4) <u>divided</u> by (ii) the total assets of Borrower. The percentage set forth in this <u>Section 6.14(g)</u> shall be measured as of Borrower's fiscal quarter ending on March 31, 2008 and shall be derived from the applicable quarterly financial statement filed with the appropriate Governmental Agency. For purposes of this <u>Section 6.14(g)</u>, "adjusted net income" shall mean the consolidated net income of Borrower (calculated in accordance with GAAP), excluding the effects of the amortization of goodwill and "total assets" shall mean total consolidated average assets for such period."

    **3.**    **Waiver.** Subject to the complete satisfaction of all of the conditions set forth in Section 4 of this Agreement, the Agent and the Lenders hereby waive the Existing Default.

    **4.**    **Conditions.** The terms of Section 2 and Section 3 of this Agreement shall become effective only when each of the following conditions have been completely satisfied as determined by the Agent in its sole and absolute discretion (the date of such satisfaction being hereinafter referred to as the "Effective Date"):

    4.1    Documents. The Agent shall have received this Agreement duly executed and delivered by the Borrower, the Required Lenders and the Agent, which shall be in form and substance acceptable to the Agent in its sole and absolute discretion.

    4.2    Representations and Warranties. As of the date hereof (and, if different, also as of the Effective Date), the representations and warranties contained herein and in the Credit Agreement shall be true and complete (both immediately before and after giving effect to consummation of the transactions contemplated hereby).

    4.3    Proceedings. All resolutions, consents and other corporate proceedings taken or to be taken in connection with the transactions contemplated hereby, and all agreements, instruments, certificates and other documents relating thereto, shall be in form and substance reasonably satisfactory to the Agent, as determined in its sole and absolute discretion, and shall be in full force and effect.

    4.4    Fees. Borrower shall have paid: (a) to the Agent, for the account of each Lender who executes this Agreement prior to or on March 31, 2008, a non-refundable amendment fee in an amount equal to .02% of each Lender's Commitment and (b) all other reasonable fees and out-of-pocket expenses required to be paid to the Agent, the Lenders and the Agent's special counsel on or prior to the Effective Date.

    **5.**    **Representations and Warranties of Borrower.** Borrower represents and warrants that: (a) the execution and delivery by Borrower of this Agreement and the performance of Borrower of its obligations hereunder: (i) are within Borrower's corporate, (ii) are duly authorized by the board of directors of Borrower, and, if necessary, the shareholders of Borrower, (iii) are not in contravention of the terms of Borrower's articles of incorporation or

by-laws, (iv) are not in contravention of the terms of the provisions of any indenture, instrument or agreement to which Borrower is a party or is subject, or by which it, or its Property, is bound, or conflict with or constitute a default thereunder, or result in, or require, the creation or imposition of any Lien in, of or on the Property of Borrower pursuant to the terms of any such indenture, instrument or agreement, (v) do not contravene any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Borrower; and (vi) do not require any order, consent, adjudication, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, or other action in respect of any governmental or public body or authority, or any subdivision thereof; (b) this Agreement has been duly executed and delivered by Borrower and constitutes the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as limited by applicable bankruptcy, reorganization, insolvency or similar laws affecting the enforcement of creditors' rights generally and except as limited by general principles of equity; (c) the Credit Agreement and each other Loan Document, after giving effect hereto, constitutes the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally or by general equitable principles; (d) as of the date hereof, and (after giving effect hereto and consummation of the transactions contemplated hereby) as of the Effective Date, there exists no Default or Unmatured Default; and (e) all conditions set forth in Section 4 of this Agreement have been satisfied in full (provided that no representation or warranty is made as to the Agent's or any Lender's acceptance or satisfaction with any matter).

**6.**     **Reference to the Effect on the Credit Agreement.**

6.1     On and after the Effective Date (a) each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein," or words of like import shall mean and be a reference to the Credit Agreement as amended hereby, and (b) each reference to the Credit Agreement in all other Loan Documents shall mean and be a reference to the Credit Agreement as amended hereby.

6.2     Except as otherwise provided herein, the Credit Agreement, each other Loan Document, all covenants, representations and warranties made therein, and all other documents, instruments and agreements executed and/or delivered in connection therewith, shall remain in full force and effect, and are hereby reaffirmed, ratified and confirmed.

6.3     The execution, delivery and effectiveness of this Agreement shall not (a) except as specifically stated herein, amend the Credit Agreement or any other Loan Document, (b) operate as a waiver of any right, power or remedy of the Agent or any Lender, (c) constitute a waiver of, or consent to any departure from, any provision of the Credit Agreement or any other Loan Document, or (d) constitute a waiver of any Default or Unmatured Default.

6.4     This Agreement shall be deemed a Loan Document for the purposes of the Credit Agreement.

**7.**     **Choice of Law.** This Agreement shall be governed by and construed in accordance with the internal laws (including, without limitation, 735 ILCS Section 105/5-1 et

seq, but otherwise without regard to the conflict of laws provisions) of the State of Illinois, but giving effect to federal laws applicable to national banks.

        **8.**     **Headings.**  Section headings in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the provisions of this Agreement.

        **9.**     **Counterparts.**  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart. The delivery of an executed counterpart of a signature page to this Agreement by telecopier or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

[Signature page follows]

**IN WITNESS WHEREOF,** this Waiver and Ninth Amendment to Amended and Restated Credit Agreement has been duly executed as of the day and year first above written.

**FBOP CORPORATION**

By: _____

Print Name: _____

Title: _____

**JPMORGAN CHASE BANK, N.A.,** as Agent and as a Lender

By:_____

Print Name: _____

Title:_____

**ASSOCIATED BANK, NA,** as a Lender

By:_____

Print Name: _____

Title:_____

**BMO CAPITAL MARKETS FINANCING, INC.** (Assignee of Harris Trust and Savings Bank), as a Lender

By:_____

Print Name: _____

Title:_____

**IN WITNESS WHEREOF**, this Waiver and Ninth Amendment to Amended and Restated Credit Agreement has been duly executed as of the day and year first above written.

### FBOP CORPORATION

By:_____

Print Name:_____

Title:_____

### JPMORGAN CHASE BANK, N.A., as
Agent and as a Lender

By: *Milena Kostadinova*

Print Name: *Milena Kostadinova*

Title: *VP*

### ASSOCIATED BANK, NA, as a Lender

By:_____

Print Name:_____

Title:_____

### BMO CAPITAL MARKETS FINANCING,
**INC.** (Assignee of Harris Trust and Savings Bank),
as a Lender

By:_____

Print Name:_____

Title:_____

**IN WITNESS WHEREOF,** this Waiver and Ninth Amendment to Amended and Restated Credit Agreement has been duly executed as of the day and year first above written.

**FBOP CORPORATION**

By: _____

Print Name: _____

Title: _____

**JPMORGAN CHASE BANK, N.A.,** as
Agent and as a Lender

By: _____

Print Name: _____

Title: _____

**ASSOCIATED BANK, NA,** as a Lender

By: _~~/////~~_____

Print Name: _Nate Selk_____

Title: _Assistant Vice President_____

**BMO CAPITAL MARKETS FINANCING,
INC.** (Assignee of Harris Trust and Savings Bank),
as a Lender

By: _____

Print Name: _____

Title: _____

**LASALLE BANK NATIONAL ASSOCIATION,**
as a Lender

By:_____

Print Name: _____

Title:_____

**M&I MARSHALL & ILSLEY BANK,** as a
Lender

By: *Gregg R Weyer*  _____

Print Name: __Gregg R. Weyer_____

Title:__Senior VIce President_____

**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name: _____

Title:_____

**UNION BANK OF CALIFORNIA, N.A.,** as a
Lender

By:_____

Print Name: _____

Title:_____

**LASALLE BANK NATIONAL ASSOCIATION,**
as a Lender

By: _____

Print Name: Richard T. Zell_____

Title: First Vice President_____


**M&I MARSHALL & ILSLEY BANK,** as a
Lender

By:_____

Print Name: _____

Title:_____


**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name: _____

Title:_____


**UNION BANK OF CALIFORNIA, N.A.,** as a
Lender

By:_____

Print Name: _____

Title:_____

**LASALLE BANK NATIONAL ASSOCIATION,**
as a Lender

By:_____

Print Name: _____

Title:_____


**M&I MARSHALL & ILSLEY BANK,** as a
Lender

By:_____

Print Name: _____

Title:_____


**FIFTH THIRD BANK,** as a Lender

By:_____

Print Name: _____

Title:_____


**UNION BANK OF CALIFORNIA, N.A.,** as a
Lender

By: _____

Print Name: ____Dennis A. Cattell_____

Title: ____V. P._____

**WACHOVIA BANK, NATIONAL ASSOCIATION,** as a Lender

By:

Print Name:   Roy O. Young
Title:        Director

**WELLS FARGO BANK, N.A.,** as a Lender

By:

Print Name:

Title:

**WACHOVIA BANK, NATIONAL ASSOCIATION,** as a Lender

By:_____

Print Name: _____

Title:_____


**WELLS FARGO BANK, N.A.,** as a Lender

By:_____

Print Name: _____

Title:_____

## EXHIBIT A

**Existing Default**

A Default under clause (b) of <u>Article VII</u> of the Credit Agreement resulting from a breach of <u>Section 6.14(g)</u> of the Credit Agreement occurring as of December 31, 2007 as a result of Borrower's return on assets for the four quarters ending on such date being less than permitted by such section for such four quarters.

CH2\2413577.4